No. 15-1073

# In the United States Court of Appeals for the Federal Circuit

SCHOTT GEMTRON CORPORATION,

*Appellant,*

v.

SSW HOLDING COMPANY INC.,

*Appellee.*

Appeal from the United States Patent and Trademark Office
in Case No. IPR2013-00358, Patent Trial and Appeal Board

————————————

**APPELLANT'S OPENING BRIEF**

————————————

Marshall J. Schmitt
Gilberto E. Espinoza
Andrew T. Dufresne
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Avenue, Suite 2000
Chicago, Illinois  60601-6710
Telephone: 312-222-0800
Facsimile: 312-222-0818
*Attorneys for SCHOTT Gemtron Corporation*

**Form 9**

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SCHOTT Gemtron Corporation    v.  SSW Holding Company, Inc.

No. 15-1073

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) SCHOTT Gemtron Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

SCHOTT Gemtron Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

SCHOTT Gemtron Corporation

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

SCHOTT Corporation, AFG Industries, Inc., SCHOTT AG, AGC America, Inc., Carl-Zeiss-Stiftung, Asahi Glass Co., Ltd.

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Marshall J. Schmitt and Gilberto E. Espinoza of Michael Best & Friedrich LLP
Oliver ZItzmann, Head of Intellectual Property SCHOTT AG and Deputy General Counsel of SCHOTT North America, Inc.

November 5, 2014
_____
Date

/s/ Marshall J. Schmitt
_____
Signature of counsel

Marshall J. Schmitt
_____
Printed name of counsel

Please Note: All questions must be answered

cc: Office of the Solicitor, USPTO; Michael Furmanek (counsel for Appellee)

124                                    i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 2

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................ 4

   I.  The '561 Patent Discloses Technology To Be Used
       With Shelf Panels ........................................................................ 5

   II.  SCHOTT Files Its Petition ............................................................ 8

      A. The Petition Challenges Claims 1, 13, and 25 ........................... 8

      B. The Petition Asserts Four Primary Prior Art
         References ............................................................................ 10

      C. The Petition Raises Nine Grounds Of
         Unpatentability ................................................................... 15

   III. The Board Limits The Meaning Of Spill To The
        "Accidental Or Unintentional" Release Of Liquid ........................ 17

   IV. Endorsing SCHOTT's Contention That Angros Is
        Analogous Art, The Board Institutes Trial On
        Two Grounds ............................................................................ 20

   V.  In Its Final Written Decision, The Board Rejects
        Angros As Non-Analogous Art Based On The
        Conclusion That It Deals Only With The
        Intentional Release Of Liquid ..................................................... 22

      A. The Board Concludes That All Of The
         Limitations In The Challenged Claims Are
         Supported By Both Provisional Applications To
         Which The '561 Patent Claims Priority ................................... 23

      B. The Board Determines That One Of Ordinary
         Skill In The Art Was Someone With A

# TABLE OF CONTENTS

**Page**

Bachelor's Degree In Mechanical Engineering And, As Of June 27, 2008, Had At Least Three Years Of Experience Designing Refrigerator Shelves ....................................................................... 25

C. The Board Finds That Neither Ground 3 Nor The Combination Of Grounds 6 And 7 Applies Because Angros Is Not Analogous Art ....................................... 27

D. The Board Deems Moot SSW's Assertion Of Secondary Considerations And SCHOTT's Motion To Exclude ........................................................ 31

SUMMARY OF THE ARGUMENT ....................................................... 32

ARGUMENT ................................................................................ 33

I. Standards Of Review ................................................................ 33

II. The Board Misconstrued The Term "Spill" ................................... 35

A. No Evidence In The Record Supports The Board's Construction Of "Spill" As The Broadest Reasonable Construction ............................................. 35

B. The Board's Claim Construction Violates The Rule That Claims Cannot Be Limited By Subjective Intent ..................................................... 42

III. The Board Erred By Finding That Angros Is Not Analogous Art ..................................................................... 45

A. Based On Its Claim Construction, The Board Misconstrued The Problem Addressed By The '561 Patent ....................................................... 45

B. The Identity Between The Structure And Function Of The Hydrophobic Material Described In The '561 Patent And In Angros Establish That Angros Is Analogous Art .................................. 47

C. The Board Misunderstood The Nature Of Analogous Art ..................................................... 50

## TABLE OF CONTENTS

**Page**

D. The Board Unduly Narrowed The Problem
Addressed By The '561 Patent ...................................................52

E. The Record Established That The Claimed
Technology Is At Most A Scaled Up Version Of
The Technology Disclosed In Angros .........................................55

F. The Board's Claim Construction And Its
Finding That Angros Is Non-Analogous Art
Are Irreconcilable With The Challenged
Claims .....................................................................................58

IV. The Board's Analysis Of Obviousness Is Flawed
Because The Board Misapprehended Christopher
Schechter's Qualifications As One Of Skill In The
Art ...........................................................................................59

V. The Board Erred By Refusing To Institute Trial
Based Upon Grounds 1 And 8........................................................61

A. Under 35 U.S.C. § 319, The Court Has The
Power To Review The Dismissal Of Grounds
As Redundant ............................................................................62

B. The Board Abused Its Discretion By Denying
Review On Grounds 1 And 8 .....................................................67

CONCLUSION AND RELIEF SOUGHT ...............................................72

ADDENDUM ..........................................................................................73

# TABLE OF AUTHORITIES

**Page**

## Cases

*Canon Inc. v. Intellectual Ventures I LLC*,
  IPR2014-00535, Paper No. 9, at 16 (PTAB Sept. 24, 2014) ............... 61

*Cohensive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ............................................................ 68

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ...................................................... 42, 43

*Disney Enters., Inc. v. Kappos*,
  923 F. Supp. 2d 788 (E.D. Va. 2013) ................................................... 60

*Eurand, Inc. v. Mylan Pharm., Inc.*,
  676 F.3d 1063 (Fed. Cir. 2012) ............................................................ 68

*Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*,
  530 U.S. 1 (2000) ................................................................................. 64

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ............................................................ 34

*In re Bigio*,
  387 F.3d 1320 (Fed. Cir. 2004) ....................................... 38, 47, 48, 54

*In re Ellis*,
  476 F.2d 1370 (C.C.P.A. 1973) ............................................................ 51

*In re Enhanced Sec. Research*,
  LLC, 739 F.3d 1347 (Fed. Cir. 2014) ................................................... 33

*In re Fulton*,
  391 F.3d 1195, (Fed. Cir. 2004) .......................................................... 22

*In re Icon Health & Fitness, Inc.*,
  496 F.3d 1374 (Fed. Cir. 2007) ...................................................... 51, 55

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ............................................................ 34

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994) ............................................................. 51

*In re Procter & Gamble Co.*,
  749 F.3d 1376 (Fed. Cir. 2014) ............................................................ 65

# TABLE OF AUTHORITIES

**Page**

*In re Teles AG Informationstechnologien,*
  747 F.3d 1357 (Fed. Cir. 2014) ............................................................ 33

*In re Wolfe,*
  251 F.2d 854 (1958) ............................................................................ 48

*Invitrogen Corp. v. Clontech Labs., Inc.,*
  429 F.3d 1052 (Fed. Cir. 2005) .......................................................... 36

*Jones v. Hardy,*
  727 F.2d 1524 (Fed. Cir. 1984) .......................................................... 67

*KSR Int'l Co. v. Teleflex, Inc.,*
  550 U.S. 398 (2007) ................................................................ 47, 53, 54

*Lamie v. U.S. Tr.,*
  540 U.S. 526 (2004) ............................................................................ 64

*Liberty Mut. Ins. Co. v. Progressive Casualty Ins. Co.,*
  CMB2012-00003, Paper No. 7, at 3 (PTAB Oct. 25, 2012)................. 61

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) ............................................................ 43

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................... 38

*Rambus v. Rea,*
  731 F.3d 1248 (Fed. Cir. 2013) .......................................................... 34

*Sci. Plastic Prods. v. Biotage AB,*
  766 F.3d 1355 (Fed. Cir. 2014) ..................................................... 51, 52

*SeaChange Int'l Inc. v. C-COR Inc.,*
  413 F.3d 1361 (Fed. Cir. 2005) .......................................................... 68

*St. Jude Med., Inc. v. Volcano Corp.,*
  749 F.3d 1373 (Fed. Cir. 2014) .......................................................... 65

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.,*
  346 F.3d 1057 (Fed. Cir. 2003) .......................................................... 69

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  ___ U.S. ___, slip op. (S. Ct. Jan. 20, 2015) ....................................... 34

**Statutes**

28 U.S.C. § 1295(a)(4)(A)....................................................................... 2

28 U.S.C. § 1441(e)(4) ......................................................................... 66

# TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 1447(d) ................................................................. 66

28 U.S.C. § 352(c) ................................................................... 66

35 U.S.C. § 102(a) ............................................................ 16, 67

35 U.S.C. § 102(e) ................................................................... 16

35 U.S.C. § 103 ............................................................ 16, 17, 67

35 U.S.C. § 112 ¶ 2 ........................................................... 43, 44

35 U.S.C. § 141(c) ................................................................. 2, 5

35 U.S.C. § 142 ......................................................................... 2

35 U.S.C. § 314 ............................................................... passim

35 U.S.C. § 315(e) ................................................................... 63

35 U.S.C. § 316(a)(11) ............................................................... 1

35 U.S.C. § 319 ................................................... 2, 5, 62, 65

35 U.S.C. § 326(b) ................................................................... 70

35 U.S.C. § 6 ........................................................................... 2

## Other Authorities

MPEP § 608.01(p) ................................................................. 40

## Rules

Federal Circuit Rule 47.5 ......................................................... 1

## Regulations

37 C.F.R. § 42.1(b) ................................................................. 71

37 C.F.R. § 42.108 ................................................................. 64

37 C.F.R. § 42.2 ..................................................................... 65

37 C.F.R. § 90.3 ....................................................................... 2

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant SCHOTT Gemtron Corporation ("SCHOTT") identifies the following cases that will directly affect or be directly affected by this Court's decision in the present appeal:

- *SSW Holding Co., Inc. v. SCHOTT Gemtron Corp.*, Case No. 3:12-cv-00661, currently pending in the United States District Court for the Western District of Kentucky, Louisville Division. This litigation is presently stayed.

- *SCHOTT Gemtron Corp. v. SSW Holding Co., Inc.*, IPR2014-00367 ("IPR2014–00367"), currently pending at the Patent Trial and Appeal Board ("the Board"). Although the challenged claims in IPR2014-00367 are different than the claims at issue in this appeal, the grounds of unpatentability upon which the Board instituted *inter partes* review are the same. Under 35 U.S.C. § 316(a)(11), the one-year deadline for the Board to issue its final written decision in IPR2014-00367 is June 11, 2015.

# JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. § 6 over the Amended Petition For *Inter Partes* Review of U.S. Patent No. 8,286,561 Under 35 U.S.C. §§ 311-319 And 37 C.F.R. § 42.100 *et seq.* ("the Petition").   On August 20, 2014, the Board issued its Final Written Decision.  A1. SCHOTT timely appealed from that Final Written Decision on September 17, 2014.  ECF 1-2, 1-3; *see also* 37 C.F.R. § A259.3; 35 U.S.C. § 142.  This Court has jurisdiction over the appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

# STATEMENT OF THE ISSUES

United States Patent No. 8,286,561 ("the '561 Patent") claims shelf panels that retain liquid on their top surface by using a hydrophobic material placed in a spill containment pattern.  In the Final Written Decision, the Board held that SCHOTT had failed to establish by a preponderance of the evidence that claims 1, 13, and 25 ("the challenged claims") were unpatentable in light of, among other references, U. S. Patent No. 5,944,685 ("Angros").  The issues on appeal are:

1. Did the Board err by limiting the term "spill" to the "accidental or unintentional" release of liquid where:

   a. No evidence in the record supports such a limitation, and

   b. The governing law prohibits imposing a claim limitation based upon subjective intent?

2. Did the Board err by finding that Angros was non-analogous art where:

   a. Angros addressed the same problem addressed by the challenged claims, that is, how to retain liquid on the shelf surface, and

   b. Angros uses the same structure to perform the same function as in the challenged claims?

3. Did the Board err by refusing to institute trial on two grounds on the basis that the grounds were redundant where:

   a. Neither ground depends upon whether Angros is analogous art, and

b. Each ground provides a basis for unpatentability

wholly independent of the grounds upon which trial

was instituted?

## STATEMENT OF THE CASE

This appeal arises from the *inter partes* review of the '561 Patent

by the Board, IPR2013-00358.  ECF 1-1.

On June 14, 2013, SCHOTT petitioned the Board to review the

patentability of the challenged claims.  A34.   On November 4, 2013, the

Board issued its Decision to Institute Trial ("the Decision to Institute")

on two grounds.  A247, A260, A263, A265.  In particular, the Board held

that SCHOTT had shown a reasonable likelihood that it would be able

to establish by a preponderance of the evidence that (1) claims 1 and 25

are obvious over Angros and WO2006/044641 ("Picken") and (2) claim

13 is obvious over Angros, Picken, and U.S. Patent No. 6,872,441

("Baumann").  A265. The Board declined to institute trial on any of the

other grounds asserted in the Petition on the premise that all of the

other grounds were "redundant."  A263–A264.

On August 20, 2014, the Board issued its Final Written Decision

holding that SCHOTT had not established either ground of

4

unpatentability by a preponderance of the evidence. A1, A23, A26, A30–A31. Central to this holding was the Board's construction of the term "spill" to mean an "accidental or unintentional release of liquid." A18, A20.

SCHOTT appeals from the Final Written Decision under 35 U.S.C. §§ 141(c), 319.

## I. The '561 Patent Discloses Technology To Be Used With Shelf Panels

The technology described and claimed in the '561 Patent is directed to a hydrophobic surface used to contain liquids on the top surface of articles such as stovetops, countertops, table tops, and shelving. A852 (1:15–20), A853 (3:33–38), A863 (23:65–24:3). The specification of the '561 Patent defines broadly the terms "shelving and/or the like," "shelving," "shelf," and "shelf or the like" to encompass "shelves and articles whose [sic: with] top surfaces such as pantry shelves, countertops, stovetops, cook-tops, and table tops." A853 (3:33–37). Refrigerator shelving is a preferred embodiment. A853 (3:37–43).

The essential elements of the technology claimed by the '561 Patent are a shelf panel and a hydrophobic surface applied in a spill containment pattern on the top surface of the shelf panel. A852 (1:66–

5

2:10). The shelf panel is a substrate formed of glass, metal, plastic, or any other suitable material. A853 (3:59–61). The hydrophobic surface consists of hydrophobic compounds known in the prior art. A853 (4:8–17). In particular, the specification discloses using any surface coating that is known to be hydrophobic or super-hydrophobic or known to make a surface hydrophobic or super-hydrophobic. *Id*.

Methods of applying the hydrophobic surface are also known in the prior art. A853 (4:16–17). The specification discloses that "any method of making a portion of the surface of the shelf substrate hydrophobic may be employed." *Id*. The hydrophobic surface is generally in the plane of the top surface of the shelf, which means that the hydrophobic surface, including any surface treatment, extends a small distance above the level of the top surface of the shelf and is not readily noticeable to the naked eye. A856 (9:54–59). The thickness of the hydrophobic surface, including any surface treatment, is typically from about 0.001 microns to 250 microns. A856 (9:59–63).

The hydrophobic surface is applied in a spill containment pattern. A852 (1:66–2:5). The specification discloses various patterns, including a frame-like border, a grid, and other patterns that define a spill

6

containment area.  A853 (3:43–52), A836, A838, A839.  In particular,

the pattern completely bounds or encloses a non-hydrophobic region on

the top surface of the shelf panel to define one or more spill

containment areas.  A853 (3:39–52); A857 (11:9–17, 12:15–26); A857

(12:67) – A858 (13:7).

The hydrophobic surface performs according to its intended

purpose, namely, to repel liquids.  A856 (9:30–37).  In particular, the

specification states that (*id.*):

> The hydrophobic spill containment pattern repels
> liquids, causing them to collect in the non-
> hydrophobic region or regions of the shelf.  The
> hydrophobicity of the hydrophobic surface is
> sufficient to repel a spilled liquid and prevent it
> from crossing onto or over the hydrophobic
> surface and therefore forces the spilled liquid to
> bead up or puddle up on the non-hydrophobic
> regions of the shelf due to the surface tension of
> the liquid.

The '561 Patent also discloses and claims the use of a ceramic frit

in conjunction with the hydrophobic material.  A854 (5:31–37, 6:7–15).

A frit is created by applying a material to a glass surface and then

heating or otherwise treating the glass surface to integrate the

treatment into the surface.  A855 (7:5–24).  The use of ceramic frits in

shelf assemblies is well known in the prior art.  A1131 (¶ 42); A1132

(¶¶ 44, 46); A1136 (¶ 57). The specification discloses explicitly prior art methods that teach applying ceramic frits to glass substrates. A855 (7:36–41). For example, the specification references Baumann, one of the prior art references asserted in the Petition and discussed in more detail below. *Id.*; *infra* at 13–14. The ceramic frit disclosed in the '561 Patent is applied in a spill containment pattern. A854 (6:7–15), A855 (7:18–20). The hydrophobic compound is then applied onto the ceramic frit. *Id.*

## II.    SCHOTT Files Its Petition

On June 14, 2013, SCHOTT filed its Petition For *Inter Partes* Review of U.S. Patent No. 8,286,561 Under 35 U.S.C. §§ 311-319 And 37 C.F.R. § 42.100 *et seq.* A34. On June 21, 2013, SCHOTT filed the Petition, which upon direction of the Board conformed claim charts to the governing rules, but did not change the June 14, 2013 filing date of the proceeding. *Id.*

### A.    The Petition Challenges Claims 1, 13, and 25

Claims 1 and 13 are apparatus claims, and Claim 25 is a method claim. A863 (24:20–30), A864 (25:7–12, 25:49–59).

Claim 1 is the broadest independent claim. It recites (A863 (24:20–30)):

1.  A shelf assembly comprising:

a shelf panel having a generally flat top surface which is
capable of supporting articles which may be placed on said
shelf panel;

a hydrophobic surface applied in a spill containment pattern on
said top surface;

wherein the majority of the surface area of said top surface of
the shelf panel is not hydrophobic, thereby providing one or
more non-hydrophobic central portions bounded by said spill
containment pattern of said hydrophobic surface.

Claim 13 depends directly from claim 1.  It recites (A864 (25:7–
12)):

13.  The shelf assembly of claim 1, wherein the hydrophobic
surface comprises:

a ceramic frit layer adjacent to and bonded to the top surface of
said shelf panel; and

a hydrophobic compound coated over the ceramic frit layer.

Claim 25 is the only independent method claim.  It recites (A864
(25:49–59)):

25.  A method of manufacturing a shelf capable of containing
liquid spills thereon comprising:

providing a panel having a generally flat top surface which is
capable of supporting articles which may be placed on said
panel;

applying a hydrophobic surface arranged in a spill containment
pattern generally in the plane of said top surface;

leaving the majority of the surface area of said top surface of
the panel non-hydrophobic, thereby providing one or more
non-hydrophobic central portions bounded by the spill
containment pattern of the hydrophobic surface.

## B.    The Petition Asserts Four Primary Prior Art References

The Petition asserted five references as prior art that, either alone
or in various combinations, render one or all of the challenged claims
unpatentable. A118. The five references consisted of Angros, Picken,
and Baumann, as well as U.S. Patent Publication No. 2012/0009396
("Sikka") and U.S. Patent No. 6,352,758 ("Huang"). *Id.* Huang is not
relevant here. *See* A5.

### 1.    Angros

Angros relates generally to the field of analytic plates, such as
microscope slides or diagnostic plates, which have a hydrophobic liquid
containment border. A1057 (1:14–17, 2:25–32). Typically, analytic
plates are made of clear glass or plastic. A1057 (2:37–38).

Representative embodiments in Angros are illustrated in Figures 1A
and 1B (A1055).



Figures 1A and 1B depict a glass slide having a conventional
length, width, and thickness. A1057 (2:39–42). The slide has an upper
and a lower surface. A1057 (2:42–43). A liquid containment border is
disposed on the upper surface of the glass slide. A1057 (2:43–46). The
liquid containment border surrounds a liquid containment area. A1057
(2:49–51). The liquid containment border forms a barrier that prevents
a liquid or liquid sample placed on the containment area from
spreading, leaking, or migrating off the containment area. A1057
(2:51–62).

The liquid containment border "is a composition comprising a
liquid repellant compound dissolved in a volatile solvent." A1058 (3:9–
12). The containment border "forms a molecular layer when dry and
therefore is substantially flush (level) with the upper surface . . . of the

slide . . . .   The border . . . is therefore not raised above the upper surface . . . to a degree that is visible to the naked eye."  A1058 (3:3–7). The containment border is typically less than 2.54 microns.  A1058 (3:7–9).  The containment border is also "highly resistant to chemical removal and physical removal by washing, scrubbing, soaking in acids, alkalis, organic solvents, and aqueous solvents."  A1058 (3:46–51).  As a result, the slide can "be used repeatedly without losing its functionality."  A1058 (3:52–53).  The liquid containment border can be applied in various patterns, such as, ovals, stars, ellipses, pentagons, hexagons, trapezoids, or even non-geometric or fanciful shapes.  A1058 (4:13–48).

## 2.    Picken

Picken discloses shelf assemblies having "an upper frame portion or form or guard 346 bonded to the upper surface 336 of shelf panel 312 and along one or more edge regions 314, 320, 322 of the shelf panel" (A1136 (¶ 57), A1153 (Fig. 17)):



FIG. 17

The form or guard may be made of polymeric or plastic material or metallic material.  A1136( ¶ 57).  The form or guard "provides a spill containment function to the otherwise generally flat surface of the shelf panel along the edge region or regions."  *Id.*  Picken further teaches binding the forms to a frit layer on the upper surface of the shelf panel. *Id.*

## 3.    Baumann

Baumann is directed "to glass, ceramic and metal substrates with at least one structured hydrophobic surface which provides a good self-cleaning effect."  A1081 (1:9–11).  The structured hydrophobic surface is a frit or combination of frits, described in Baumann as a "micro-rough structure, i.e., a structure with elevations and depressions in a geometrical or random, preferably random arrangement."  A1081 (2:32–

13

41), A1082 (3:5–7), A1083 (5:11–18).  "The layer with the micro-rough surface structure located on the substrate contains glass flux and structure-forming particles."  A1082 (3:51–55).  The thickness of the micro-rough layer is generally between 5 and 100 microns.  A1082 (4:36–38).  The micro-rough layer is at least partly hydrophobic, especially at the elevation tip.  A1082 (4:40–41).

Bauman teaches, however, that it is preferable to make the whole surface of the micro-rough layer hydrophobic by applying a very thin coating of a hydrophobic compound over the frit.  A1082 (4:52–55).  Baumann explains (A1083 (6:11–19)):

> The agents for making the surface hydrophobic are products normally used in the art.  They are either polymers with that action or preferably monomeric or oligomeric compounds containing a fairly long-chain alkyl or preferably fluoroalkyl radical with that action and also a functional group whereby the compounds with a hydrophobising action can be cross-linked and thus form a film and/or whereby a reaction with functional groups at the surface of the micro-rough layer is enabled.

### 4.    Sikka

Sikka was filed on April 7, 2011, as a continuation of Application Serial No. PCT/US2009/059A2599 filed on October 7, 2009; Sikka published on January 12, 2012.  A1086.  Sikka claims the benefit of

Provisional Application Serial Nos. 61/103,295 filed on October 7, 2008, and 61/159,914 filed on March 13, 2009.  A1086.

Sikka is directed to a hydrophobic spill-resistant border that is applied to a planar or substantially planar surface such as the glass panel of a shelf.  A1096 (¶¶ 03–04); A1098 (¶¶ 31–32); A1099 (¶¶ 41–44).  The hydrophobic "spill-resistant border surrounds a region of the surface that has a lower hydrophobicity or lower oleophobicity than the spill-resistant border."  A1096 (¶ 04).  The hydrophobic spill-resistant border may be "placed at the edges of (e.g., at or near the edges of the treated surface) or form one or more barriers separating regions of a surface that have lower hydrophobicity than the borders or barriers."  *Id.*  The width of the hydrophobic spill-resistant border located at or near the edges of the surface is in the range of 0.2 to 2.0 inches in glass shelving for refrigerators.  A1098 (¶ 32).  The thickness of the hydrophobic spill-resistant border is in the range from 30 microns to 250 microns.  A1099 (¶¶ 37–39).

## C.    The Petition Raises Nine Grounds Of Unpatentability

The Petition challenged the patentability of claim 1, 13, and 25 on the following grounds:

1.    Claims 1 and 25 are unpatentable under 35 U.S.C. § 102(a) as anticipated by Angros (A148, A160–A161);

2.    Claims 1 and 25 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Sikka (A149, A161–A162);

3.    Claims 1 and 25 are unpatentable under 35 U.S.C. § 103 as obvious over Picken in view of Angros (A150–A151, A162–A163);

4.    Claims 1 and 25 are unpatentable under 35 U.S.C. § 103 as obvious over Picken in view of Sikka (A151–A152, A164–A165);

5.    Claims 1 and 25 are unpatentable under 35 U.S.C. § 103 as obvious over Picken in view of Huang (A153–A154, A165–A167);

6.    Claims 1, 13, and 25 are unpatentable under 35 U.S.C. § 103 as obvious over Picken in view of Baumann (A154–A155, A159–A160, A167–A168);

7.    Claim 13 is unpatentable under 35 U.S.C. § 103 as obvious over Angros in view of Baumann (A155–A156);

8.    Claim 13 is unpatentable under 35 U.S.C. § 103 as obvious

over Sikka in view of Baumann (A156–A157);  and

9.    Claim 13 is unpatentable under 35 U.S.C. § 103 as obvious

over Huang in view of Baumann (A158–A159).

Grounds 1, 3, 6, 7, and 8 are relevant to this appeal.

### III.   The Board Limits The Meaning Of Spill To The "Accidental Or Unintentional" Release Of Liquid

In the Petition, SCHOTT asserted that all claim limitations in the

'561 Patent should' be given their plain and ordinary meaning as

understood by one of ordinary skill in the art except for the terms "shelf

panel" and "generally in the plane."  A131–A132.  SCHOTT proposed

that "shelf panel" means "a piece of material with a top surface

intended to be positioned horizontally."  A131.

In Patent Owner's Preliminary Response ("the Preliminary

Response"), Appellee SSW Holding Company, Inc. ("SSW") proposed

constructions for many terms, only two of which are relevant here —

"shelf panel" and "spill containment pattern."  A199–A210.

In particular, SSW proposed that "shelf panel" should be

construed to mean "a piece of material with a top surface intended to be

positioned horizontally and of sufficient size and integrity to support

articles conventionally stored in pantries, on counters, on stovetops, on cook-tops, on table tops, in refrigerators and freezers, and the like." A201.

In the context of construing "spill containment pattern," SSW proposed "that the plain and ordinary meaning of 'spill' is an accidental or unintentional release of liquid." A203. In support, SSW argued that this construction was consistent with the dictionary definition of "spill" offered by SSW – "to cause or allow esp[ecially] accidentally or unintentionally to fall, flow, or run so as to be lost or wasted." *Id.* (internal quotations omitted) (citing A1480). SSW also argued that its proposed construction was consistent with Figure 3 of the '561 Patent because "[a] person of ordinary skill in the art would understand that this orientation of the opened soda can would be unintentional because it is not generally desirable to spill soda in a refrigerator." A203. SSW did not cite anything to support this proposition. *Id.*

In the Decision to Institute, the Board construed three terms: (1) "shelf panel," (2) "generally in the plane of said top surface," and (3) "majority of the surface area of said to surface of the shelf panel is not hydrophobic," stating that "[a]ll other remaining terms in the

18

challenged claims are given their ordinary and customary meaning and need not be further construed at this time." A252–A256. The Board construed "shelf panel" to mean "a piece of material positioned horizontally at a distance above some other surface to hold objects." A5, A254. SSW did not challenge any of these constructions in the Patent Owner's Response ("the Response") or at oral argument. A6.

In the Final Written Decision, the Board noted that neither party had challenged the Board's construction of any of the three terms previously construed in the Decision to Institute and adopted those constructions. A6.

In addition, the Board construed the term "spill" even though "the Petition and the Patent Owner's Response [did] not set forth a formal construction for the term 'spill'" because the Board "determined that a construction was necessary." A6. The Board construed the term "spill" to mean "an accidental or unintentional release of liquid." A8. In the Final Written Decision, the Board adopted for the most part the dictionary definition offered by SSW. *See* A8. In support, the Board relied on Figure 3 to conclude that the technology disclosed in the '561

Patent was limited to "accidental" and "unintentional" releases of liquid.  A8.

## IV.   Endorsing SCHOTT's Contention That Angros Is Analogous Art, The Board Institutes Trial On Two Grounds

On November 4, 2013, the Board instituted trial on Ground 3 and a combination of Grounds 6 and 7.  A265.  Citing 35 U.S.C. § 314(a), the Board combined Grounds 6 and 7 based on the conclusion that SCHOTT had made "a sufficient showing that there is a reasonable likelihood that claim 13 would have been obvious based on the combination of Angros, Picken, and Baumann."  A261.  The Board concluded further that, in light of its determination to institute trial on Grounds 3 and the combination of 6 and 7, the remaining grounds asserted by SCHOTT, including Grounds 1 and 8, were redundant.  A263–A264.

In the Decision to Institute, the Board agreed with SCHOTT that Angros was analogous prior art.  A259–A260.  In particular, the Board was persuaded that "[t]he problem faced by the Angros inventors was the same as the problem faced by Applicants, namely, how to contain a liquid in a predetermined area using a structure that is thin and does not extend significantly above the top surface of the panel."  A259–A260

(internal quotations omitted) (citing A139).  The Board also accepted

SCHOTT's reasoning regarding the rationale to combine Angros with

Picken (A259–A260 (internal quotations omitted) (citing A139–A140)):

"the application of the spill-containment border of Angros to the shelf

assembly of Picken is nothing more than the predictable use of prior art

elements according to their established functions."  Accordingly, the

Board found that SCHOTT had demonstrated that there was a

reasonable likelihood that it would prevail with respect to claims 1 and

25 as being unpatentable as obvious over Angros and Picken.[1]  A260.

The Board also concluded that SCHOTT had made a sufficient

showing that there was a reasonable likelihood that it would prevail

with respect to claim 13 as being unpatentable as obvious over the

combination of Angros, Picken, and Baumann.  A261.  In reaching this

conclusion, the Board rejected SSW's argument that the combination of

[1] In IPR2014-00367, on June 11, 2014, the Board instituted trial on the
same grounds adopting similar reasoning after oral argument in this
matter and less than two months before the Board issued the Final
Written Decision at issue here.  *SCHOTT Gemtron Corp. v. SSW
Holding Co., Inc.*, IPR2014-00367, Paper 6 (PTAB).

Angros and Baumann "is improper, because *adding* an intervening frit layer, as recited in claim 13, would be contrary to Angros' direct teaching of *avoiding* an intervening layer." A262 (emphasis in the original) (citing A237). The Board found that Angros did not teach away from using a frit "because it does not criticize, discredit, or otherwise discourage the arrangement suggested by the combination of Angros and Baumann." A262–A263 (citing *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004)).

## V.    In Its Final Written Decision, The Board Rejects Angros As Non-Analogous Art Based On The Conclusion That It Deals Only With The Intentional Release Of Liquid

In the Final Written Decision, the Board held that SCHOTT had failed to prove by a preponderance of the evidence that claims 1, 13, and 25 were unpatentable. A26, A27, A31. As explained above (*supra* at 17–19), after adopting its claim constructions from the Decision to Institute, the Board went on to construe the term "spill." A6–A8. The Board then recounted the disclosures of Angros and Picken. A8–A11.

## A.    The Board Concludes That All Of The Limitations In The Challenged Claims Are Supported By Both Provisional Applications To Which The '561 Patent Claims Priority

To determine whether Angros and Picken rendered the challenged claims obvious, the Board next determined the level of skill in the art. A11–A18.  The first step in that determination was to establish the priority date of the challenged claims.  A11–A16.

On October 16, 2012, the '561 Patent issued from U.S. Patent Application No. 12/562,920 ("the '920 Application") which was filed on September 18, 2009.  A828.  The '920 Application was a continuation-in-part of International Application No. PCT/US2009/048775, which published as WO2009/158567.  A1028.  The '920 Application claimed priority to two provisional applications.  A828.

The first provisional application, U.S. Provisional Application No. 61/133,273 ("the First Provisional"), was filed on June 27, 2008. A828, A867.  The second provisional application, U.S. Provisional Application No. 61/216,540 ("the Second Provisional"), was filed on May 18, 2009.  A828, A945.  The first 32 pages of both provisional applications were identical (except for the attorney docket number) (*compare* A871–A902 *with* A950–A981), and the figures in both

23

applications were also identical (*compare* A903–A929 *with* A988–A1014).

The Second Provisional incorporated, however, new material directed to the use of a ceramic frit to treat the surface of the shelf panel before applying the hydrophobic compound. A982–A987. In particular, the Second Provisional disclosed "preparing the surface with a ceramic frit material." A985. It also described how to use the ceramic frit by applying heat at 1150°F to fuse it to the glass surface. A984.

Although the Second Provisional added new matter that for the first time introduced the use of a frit, the Board concluded that the First Provisional alone provided written description for ***all*** of the challenged claims without explaining how the First Provisional provided any disclosure of the frit limitations in claim 13. A15. Accordingly, the Board concluded that the priority date of the challenged claims, including claim 13, was June 27, 2008, rather than May 18, 2009, the date on which the Second Provisional first disclosed a frit. *Id.*

**B.    The Board Determines That One Of Ordinary Skill In The Art Was Someone With A Bachelor's Degree In Mechanical Engineering And, As Of June 27, 2008, Had At Least Three Years Of Experience Designing Refrigerator Shelves**

The Board determined "that a person of ordinary skill in the art at the time of the claimed invention (i.e., as of June 27, 2008, . . .) would have had a degree in mechanical engineering or similar discipline, and at least three years of work experience with refrigerator shelf assemblies."[2]  A17 (citations omitted).

Based on its analysis, the Board concluded that SCHOTT's expert witness, Christopher Schechter, did not qualify as a person of ordinary

---

[2] The Board stated that "the parties do not dispute that Angros' disclosure regarding microscope slides is not in the same 'field of endeavor' as the '561 Patent, which relates to refrigerator shelves." A19–A20 (citations omitted).  Although SCHOTT agreed at oral argument that it was not contending that Angros was analogous art as being within the same field of endeavor, SCHOTT never agreed that the field of the '561 Patent was limited to refrigerator shelves, which the '561 Patent conclusively refutes.  A852 (1:15–20); A853 (3:33–38); A863 (23:65–24:3).

skill in the art.  A17–A18.  The Board stated that, although he had a

Master's of Science degree in Mechanical Engineering, Mr. Schechter

"has only worked as an engineer designing and manufacturing shelf

assemblies since December 2011" and "had less than two years of

experience when he signed his declaration on June 23, 2013."  A17-A18

(citing A1161 (¶ 1) – A1162 (¶ 2); A1174 (¶ 36)).

In fact, Mr. Schechter had an additional year of experience for

which the Board did not account.  A1181 (17:6–14); A1184 (26:4–23).

Although paragraph 1 of Mr. Schechter's declaration referenced

December 2011, the record evidence reflected the correct date of

December 2010.  A1473; *see also* A224 (SSW stating that Mr. Schechter

began working a SCHOTT Gemtron in 2010); A1181 (17:6–14); A1184

(26:4–23).  First, SSW filed an online version of Mr. Schechter's résumé

that listed his employment at SCHOTT Gemtron starting in 2010, not

2011.  A1473; *see also* A224.  Second, during Mr. Schechter's cross-

examination, SSW noted the typographical error in his declaration.

A1181 (17:6–14).  Mr. Schechter also testified that, at the time of his

declaration, he had approximately 2.5 years of experience when he

signed his declaration and just over three years of experience when he was cross-examined.  A1184 (26:4–23).

The Board also accorded Mr. Schechter's testimony "regarding the alleged obviousness of the claims less weight because he was not a person of ordinary skill in the art at the time of the invention disclosed in the '561 patent."  A18.

## C.    The Board Finds That Neither Ground 3 Nor The Combination Of Grounds 6 And 7 Applies Because Angros Is Not Analogous Art

The Board observed that the "primary dispositive fact Petitioner must establish is that Angros is analogous art to the claimed invention."  A18.  Although in the Decision to Institute the Board had treated Angros as analogous art, the Board reversed itself in the Final Written Decision.  *Compare* A260 *with* A23.

The Board rejected SCHOTT's statement of the problem pertinent to the inventors of the '561 Patent and instead accepted SSW's statement.  A22.  According to SSW, "the problem pertinent to the inventors of the '561 patent is 'not simply how to contain liquids in a predetermined area — it was how to maximize the available storage

space . . . *while containing accidental and unpredictable spills*.'" A21 (emphasis in the original) (citations omitted).

The Board acknowledged that "the claims do not recite a limitation for maximizing shelf space." A21. Nonetheless, the Board "determine[d] that the hydrophobic spill-containment perimeter on refrigerator shelves of the '561 patent is designed to contain accidentally spilled liquid and thereby maximize available storage space, whereas the microscope slides of Angros are designed to contain miniscule amounts of intentionally placed liquid." A22. The Board rejected SCHOTT's argument that the '561 Patent was not limited to unintentional spills cross-referencing its rationale for the claim construction of spill. A20. The Board further supported its argument that Angros was not analogous art with the testimony of Mr. Schechter that microscope slides are not something that he encounters in his work and that he did not find Angros in a prior art search but rather obtained the reference from counsel. A22.

Next, the Board concluded that Angros would not give rise to obviousness even if Angros was analogous to the '561 Patent. A23. The Board was "not persuaded by Petitioner's argument that the application

28

of Angros' spill-containment border is merely the predictable use of prior art elements, because we do not find Angros to be analogous prior art to ***Picken***." A24 (emphasis added). The Board reasoned that, although all of the elements were present in the prior art, and Mr. Schechter provided multiple reasons for combining the prior art, Mr. Schechter had failed to explain that one skilled in the art of refrigerator shelves would look to microscope slides to replace the spill containment border in Picken with a less obtrusive border. A22, A25.

In addition the Board rejected SCHOTT's argument that the following testimony from SSW's own expert, Mr. Mills, established that the challenged claims recited nothing more than a scaled up version of Angros (A1377 (248:6–249:22) (objections omitted)):

> Q But we agree, do we not, that the claimed embodiment in both Angros and the '561 patent will contain liquids in a hydrophobic border on a glass panel, correct?
>
> A That would be correct, yes.
>
> Q Now, we talked this morning about how the hydrophobic surface doesn't care whether it's a spill or a leak or whether it's carefully placed on there like the Coke can in the SSW video. The hydrophobic surface in Angros doesn't care either, does it?
>
> A It shouldn't.

Q  The hydrophobic surface in Angros works just like the hydrophobic surface in the '561 patent, doesn't it?

A  Yes, it does, but I mean, you're talking about a difference again in size and the amount of liquid that's there. Angros is -- if you were to just scale it up and from what we have learned, it would not retain as much liquid for a given area, because there's no – there's no frit. The frit does seem to improve that capability.

Q  So what you're saying is if you scaled up Angros Embodiment 1A --

A  Just took it and made it bigger.

Q  Let me finish my question.

A  Okay.

Q  You scaled up Exhibit 1A but didn't use a frit, it might not work as well as the SSW shelf that does use a frit; is that correct?

A  Correct.

Q  But I think what you're saying is the frit makes the hydrophobic surface work better?

A  It seems to, yes.

Q  And isn't that what Baumann is about, that if you put a hydrophobic surface over a frit the hydrophobic surface works better?

A  He does say that.

Q  That's the teaching of Baumann, is it not?

A  It would be, yes.

The Board concluded that the questions in the above-cited deposition testimony were "directed to (1) whether a frit layer would make a hydrophobic surface work better, and (2) if, hypothetically, a microscope [sic: slide] were scaled up, whether it would retain liquid." A24 (citations omitted).

As to claim 13, the Board first concluded "that the combination of Picken and Baumann result in a refrigerator shelf, as disclosed in Picken, with its entire top surface treated with Baumann's self-cleaning coating." A29. The Board then concluded that Angros could not be combined with Picken and Baumann because Angros was not analogous art. *Id.* Accordingly, the Board concluded that SCHOTT had failed to carry its burden with respect to the combination of Grounds 6 and 7. A30.

### D. The Board Deems Moot SSW's Assertion Of Secondary Considerations And SCHOTT's Motion To Exclude

The Board did not reach SSW's case of secondary considerations because of its conclusion that Angros was "non-analogous art and not combinable with the other references." A30. The Board dismissed as moot SCHOTT's motion to exclude because the challenged evidence related to SSW's assertions of secondary considerations of non-

obviousness, which the Board did not reach in its Final Written Decision. *Id.*

## SUMMARY OF THE ARGUMENT

This appeal arose because the Board misconstrued the term "spill" by limiting it to the "accidental or unintentional" release of liquid. This claim construction is erroneous at multiple levels. The "accidental or unintentional" limitation is unsupported in the specification of the '561 Patent. The limitation is contrary to the dictionary definition relied upon by SSW and the Board. The limitation creates anomalies that render the claims indefinite, not enabled, or not operative. In short, the Board's claim construction conflicts with the science that underlies the technology described and claimed in the '561 Patent. Accordingly, the Court should vacate the claim construction and implement the broadest reasonable construction of the term spill, that is, "the release of liquid onto a surface."

The misconstruction of "spill" led the Board to the erroneous conclusion that Angros is not analogous art, which was the foundation for the Board's holding that SCHOTT failed to establish by a preponderance of the evidence that the challenged claims are obvious.

Correcting the Board's fundamental error unravels the Board's entire analysis and leads to the conclusion that Angros is indeed analogous art. That conclusion requires that the matter be remanded to enable the Board to consider SCHOTT's motion to exclude and SSW's assertion of secondary considerations.

Finally, the Board's refusal to address the merits of Grounds 1 and 8 effectively extinguished SCHOTT's ability to obtain a hearing on these grounds. The Board's action in dismissing these grounds as redundant was an abuse of discretion that this Court can remedy only by remanding with a directive to the Board to conduct a full *inter partes* review trial on these grounds.

## ARGUMENT

### I.    Standards Of Review

In general, this Court reviews "the Board's decisions *de novo* for errors of law and for substantial evidence as to questions of fact." *In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1361 (Fed. Cir. 2014) (citing *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1351 (Fed. Cir. 2014)).

Accordingly, this Court reviews *de novo*:

(a) the Board's claim construction as to the broadest reasonable construction of "spill," *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, ___ U.S. ___, slip op. at 11–12 (S. Ct. Jan. 20, 2015); *Rambus v. Rea*, 731 F.3d 1248, 1252 (Fed. Cir. 2013);

(b) the Board's underlying factual determinations upon which claim construction is based to the extent the Board relied on evidence intrinsic to the patent, *Teva Pharm. USA,* slip op. at 11–12,: and

(c) the Board's decision regarding obviousness. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012) (citing *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)).

The Court reviews for substantial evidence:

(a) the Board's underlying factual determinations as to claim construction to the extent they are based on extrinsic evidence, *Teva Pharm. USA*, slip op. at 11–12, and

(b) the Board's underlying factual determinations as to obviousness. *In re Baxter Int'l, Inc.*, 678 F.3d at 1361.

The Court reviews for an abuse of discretion the Board's decision to dismiss Grounds 1 and 8 as redundant of the grounds instituted for trial.

## II.   The Board Misconstrued The Term "Spill"

The lynchpin of the Final Written Decision is the Board's construction of "spill" to mean "the accidental or unintentional release of liquid."  That construction is flawed at multiple levels, which means the Final Written Decision cannot stand and should be vacated.

### A.   No Evidence In The Record Supports The Board's Construction Of "Spill" As The Broadest Reasonable Construction

After reciting the parties' arguments, the Board spent a single paragraph in the Final Written Decision explaining its dispositive claim construction.  A7–A8.  Indeed, the primary basis for this construction appears to be SSW's argument from its Preliminary Response that "spill" must be limited to accidental or unintentional acts because "[a] person of ordinary skill in the art would understand that this orientation of the opened soda can would be unintentional because it is not generally desirable to spill soda in a refrigerator."  A7.  Notably, this interpretation lacked any citation in the Preliminary Response and after institution was not renewed in the Response.  A6, A8, *see also*

35

A203.  Such bald speculation, unsupported by any evidence, cannot substantiate or justify the Board's claim construction.  A203.  *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.").

The only extrinsic evidence in the record relevant to the construction of "spill" establishes conclusively that the Board's construction is not the broadest reasonable construction.  Indeed, the Board incorporated into its claim construction only a portion of the dictionary definition offered by SSW (A1480):  "to cause or allow esp[ecially] accidentally or unintentionally to fall, flow, or run so as to be lost or wasted."  The use of "especially" necessitates that there are other forms of spills, such as, intentional spills.  The presence of the term "especially" means that this dictionary definition cannot constitute substantial evidence supporting the Board's claim construction.  It was clear error for the Board to read "especially" out of the definition presented in the record.

The intrinsic evidence in the record also fails as a matter of law to support the Board's "accidental or unintentional" limitation on "spill." In particular, the Board erred to the extent it relied on the "conceptual" representations of a soda can turned on its side in the figures of the '561 Patent to conclude that "spill" is limited to accidental or unintentional releases. Even if SSW's speculation about the intent behind the soda can is correct, which is not a given (*see infra* at 44), nothing in the specification indicates that the figures limit the scope of the claims rather than simply illustrating one application of the claimed technology. The examples in the specification, which all recite the deliberate pouring of liquid, confirm that the technology encompasses more than the accidental release of soda. *See infra* at 39. Moreover, it was undisputed that whether the claimed technology retains liquid ejected from a soda can accidentally tipped depends on where the can was located, how full it was, and the speed and direction of the tipping. *See* A1296 (116:2–11, 117:9–19); A1320 (21:23) – A1321 (22:3); A1358 (173:22) – A1359 (174:20); A2145 (221:9) – A2146 (222:12); A2146 (223:14) – A2147 (229:11).

It is telling that, when SSW demonstrated the technology to its customers for the first time, it carefully poured liquid from a soda can. A1335 (80:15–81:25); *see also* A1266 (video approx. 2 mins.).  The applicants never intended to claim, nor could they have claimed, a shelf that contained only, or even all, unintentional spills.  *See* A861 (20:1–64).  There is no basis to read the claims so narrowly.

The words "unintentional" and "accidental" are never used in the specification.  In addition, neither the specification nor the prosecution history expressly disclaims a broader definition of "spill."  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).  Indeed, neither the Board nor SSW cites to any evidence in the prosecution history to support the narrow construction of "spill."  Accordingly, SSW did not disavow any scope of the term "spill" during prosecution.  Thus, the Board ignored the rules of claim construction, particularly under the applicable "broadest reasonable interpretation" standard, by reading too much into Figure 3 to impose limitations supported nowhere in the specification or the prosecution history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).

The parties and the Board agree that the term "spill" in the limitation "spill containment pattern" should be given its plain and ordinary meaning. *See* A8, A130–A132, A203–A204. The specification describes the type of pattern that contains a spill as a pattern that contains a liquid released on the surface of the shelf panel. *See* A863 (24:24–25), A864 (25:54–55); *see also* A2147 (227:13–229:17). The specification does not limit the scope of the claims to any specific type of release of a liquid.

The only specific disclosure in the specification of a release of liquid is the discussion of Examples 1–29. Each describes exclusively the retention of only liquids released ("spilled") intentionally. A861 (20:1–41). Indeed, the specification is explicit that the examples demonstrate the claimed technology. *Id.* These examples universally involve the deliberate pouring of liquid under carefully controlled conditions (*e.g.*, level shelf panel with pouring occurring a short distance above the shelf to avoid waves). *Id.*

The specification states that the "examples are merely intended to illustrate the shelf assemblies of the present disclosure, and are not meant to limit the scope thereof in any way." A861 (19:65–67). In the

examples, "[w]ater was poured slowly so as not to cause 'waves' or 'splashes' onto the geometric center of the non-hydrophobic region." A861 (20:16–18). Indeed, water was intentionally released onto the top surface of a shelf panel to test the performance of a hydrophobic spill containment pattern. A861 (20:30–41).

Thus, the Board's disregard of these examples on the basis that they "disclose[ ] only a demonstration of water retention by a shelf with a hydrophobic border" is a non-sequitur. A7. The purpose of examples in a patent is to demonstrate the claimed technology. MPEP § 608.01(p) ("Examples and description should be of sufficient scope as to justify the scope of the claims."). The examples in the '561 Patent did exactly that – demonstrate the claimed technology, in the Board's own words, "water retention by a shelf with a hydrophobic border."

In short, the hydrophobic border is indifferent to the intent behind the release, which is why the examples demonstrate the claimed technology. Indeed, nothing in the '561 Patent implies that the hydrophobic border described in the specification can distinguish between intentional and unintentional releases. That is because the border cannot do so. SSW's expert admitted repeatedly that the

hydrophobic borders in the '561 Patent, like the borders in Angros, are incapable of distinguishing between intentional and unintentional releases of liquid. *See* A1296 (116:2–11, 117:9–19); A1320 (21:23) – A1321 (22:3); A1358 (173:22) – A1359 (174:20). For purposes of the claimed technology, it makes no difference how the liquid finds its way onto the shelf. A1358 (173:2–11); A1359 (176:16–19); A1360 (178:3–8, 179:11–19, 180:17–181:13); A1377 (248:13–18). The relevant phenomenon and the problem to be solved is "liquid" retention, which includes retaining both intentional and unintentional spills. A1296 (116:2–11, 117:9–19); A1320 (21:23) – A1321 (22:3); A1358 (173:22) – A1359 (174:20); A2145 (221:9) – A2146 (222:12); A2146 (223:14) – A2147 (229:11).

Further, SSW's technical witnesses all agreed that the hydrophobic barriers recited in the claims do not retain all unintentional spills. *See id.* As a result, interpreting the challenged claims based upon whether a spill is intentional or not provides no clear guidance as to the scope of the claim because it is impossible to know whether the hydrophobic barrier will contain any particular unintentional spill. Instead, the specification, the examples, and the

41

claims focus on structures that retain liquids whether spilled

intentionally or not.

Consequently, the Board's claim construction would mean either

that the specification does not enable the claimed technology because no

shelf can contain only accidental or unintentional spills, or that none of

SSW's hydrophobic shelves fall within the scope of the claims because

no shelf can contain all accidental or unintentional spills.  Either result

would be absurd.

## B.    The Board's Claim Construction Violates The Rule That Claims Cannot Be Limited By Subjective Intent

The anomalies created by the Board's claim construction illustrate

why construction of a claim limitation cannot be dependent on the

intent or subjective viewpoint of a party practicing the claim.

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–51 (Fed.

Cir. 2005).

In *Datamize*, the Court reviewed the indefiniteness of the claim

term "aesthetically pleasing" as it is used in the context of claim 1 of the

patent in suit.  417 F.3d at 1345.  The Court noted that the patentee

had not offered a workable objective standard to determine when an

interface screen was "aesthetically pleasing."  *Id.* at 1349.  The Court

further stated that "[t]he scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." *Id.* Accordingly, the Court affirmed the district court's holding that the term "aesthetically pleasing" rendered the claims invalid under 35 U.S.C. § 112 ¶ 2 as indefinite. *Id.* at 1356.

Here, the Board's construction of "spill" makes the scope of the challenged claim wholly dependent on the intent of the individual practicing the claims and would therefore render the claims indefinite. Claims should be construed, where possible, to preserve their validity. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004). Under the Board's construction, the '561 Patent fails to provide any objective definition identifying a standard for determining when an individual releases liquid on the shelf panel "accidentally" or "unintentionally." Without a workable standard, the public is unable to determine the scope of the claimed invention. *Datamize*, 417 F.3d at 1350 ("Some objective standard must be provided in order to allow the public to determine the scope the claimed invention."). Under the Board's construction, it would be impossible to determine whether a

particular shelf meets the spill containment limitation because that determination depends upon the intent of the person using the shelf at the time the spill occurs. Not only is there no objective standard to determine intent, but that intent will change from use to use. Accordingly, the Board has construed "spill" in a manner that renders the claimed invention indefinite under 35 U.S.C. § 112 ¶ 2 (pre-AIA).

Moreover, not even the named applicants practiced the claimed invention because the release of liquid to demonstrate the spill retention, that is, liquid retention, capability of the shelves in Examples 1–29 was intentional. A861 (20:1–64). This result is contrary to reality because the specification describes Examples 1 to 29 as illustrations of the claimed invention. A861 (19:65–67). Even the preferred embodiment shown in Figure 3 may or may not be within the scope of the claims as construed by the Board. Nothing in the specification describes whether the can was turned on its side intentionally or unintentionally. Indeed, as explained above, (*supra* at 38), when demonstrating the technology, SSW poured liquid from a soda can intentionally. A1266, A1335 (80:15–81:25).

The only way to impose reasonable, definite limits on the claims here is to construe the terms "spill" and "spill containment" to refer to retaining liquid however released.  Accordingly, the broadest reasonable construction of the term "spill" is "the release of liquid onto a surface."

## III.  The Board Erred By Finding That Angros Is Not Analogous Art

The Board's unduly narrow construction led the Board to the erroneous conclusion that Angros is non-analogous art that cannot render the '561 Patent obvious.  The Board's primary reasoning was that, because the '561 Patent addresses the problem of containing "accidental or unintentional" releases of liquid while maximizing shelf space, Angros addresses a different problem because liquids are placed intentionally on microscope slides where available space is not an issue.  Given that the Board's claim construction is flawed, however, the Board's conclusion regarding Angros cannot stand.

## A.  Based On Its Claim Construction, The Board Misconstrued The Problem Addressed By The '561 Patent

The central flaw in the Board's analysis, and SSW's position on Angros, is that the '561 Patent addresses spill retention, not spill prevention.  The intent behind a spill might be relevant to the second

45

problem, but not the first, which is the problem addressed in both the '561 Patent and Angros.  Accordingly, Angros is analogous art.

The problem confronted by one of ordinary skill in the art trying to design a shelf that contains spills is not dependent on whether a spill is intentional or not.  Rather, the problem faced by the designer is to contain liquids.  That process is indifferent to whether the release of liquid was intentional.  Indeed, nowhere did the Board or SSW ever explain why it makes a difference for the purpose of the technology or the problem faced by the designer whether the release was intentional.  Such an explanation is absent from the record because it does not exist.  The science is such that all one cares about in containing spills is preventing liquid from running off the edges of the shelf.

Indeed, SSW's technical witnesses acknowledged that one of skill in the art would know as a matter of engineering principle that the technology in Angros worked in exactly the same way as the technology in the '561 Patent.  *Supra* at 29.  The liquid being retained in Angros is incapable of distinguishing how it came to be on the shelf panel; the same is true of liquid that is spilled on a refrigerator shelf, a table top, or a countertop.  One of skill in the art is not an automaton that blindly

applies technology without recognizing that the technology has applications beyond its original use in light of the way the technology works. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 420–21 (2007). That is precisely the reason why analogous art can be found outside of the relevant field of endeavor.

## B. The Identity Between The Structure And Function Of The Hydrophobic Material Described In The '561 Patent And In Angros Establish That Angros Is Analogous Art

Here, as a consequence of how hydrophobic materials work, the structure and function of the elements disclosed in Angros are identical to the structure and function of the claim elements in the '561 Patent. Such identity is compelling evidence that Angros is analogous art. *In re Bigio*, 381 F.3d at 1325–26; *In re Ellis*, 476 F.2d 1370, 1372 (C.C.P.A. 1973).

In *Bigio*, the claimed technology was directed to a hair brush featuring an allegedly unique shape. *In re Bigio*, 381 F.3d at 1322. During prosecution, the examiner rejected the claims as obvious over a prior art references directed to toothbrushes. *Id.* at 1323. On appeal to the Board, the applicant argued that the term "hair brush" should be limited to "brushes only for scalp hair." *Id.* The Board rejected that

construction and construed broadly hair brush to encompass brushes for scalp hair and for "hairs [o]n other parts of animal bodies (e.g. human facial hair, human eyebrow hair, or pet hair)." *Id.* at 1323–24 (internal quotations omitted).   Under the Board's claim construction, references directed to toothbrushes were analogous art because they were within the same field of endeavor.  *Id.*

The Court affirmed the Board's claim construction and the finding that the references were analogous art.  *In re Bigio*, 381 F3d at 1327. In particular, the Court concluded that the "Board correctly set the field of invention by consulting the structure and function of the claimed invention as perceived by one of ordinary skill in the art." *Id.* at 1326. "In other words, the Board applied the test for analogous art in keeping with the counsel of this court's predecessor:  'The differences are mere change of size and substitution of material of the most obvious kind, *on a par with the differences between a hairbrush and a toothbrush.*'" *Id.* at 1327 (quoting *In re Wolfe*, 45 C.C.P.A. 7A259, 251 F.2d 854, 856 (1958)) (emphasis in the original)).

Although *Bigio* involved field of endeavor prior art, the correspondence between the structure and function of the claimed

technology and the prior art is also directly relevant to whether the prior art addresses the same problem as the claimed technology. Indeed the structure and function of a technology are inextricably intertwined with the purpose of the technology, which is why technologies using the same structure and function frequently address the same problem, even if in a different field.  In *Ellis*, the court concluded that the structure and function of a non-clogging shoe scraper was similar enough to the structure and function of flooring grating to render the scraper pertinent to whether the grating was obvious. 476 F.2d at 1372.  The Court found that the scraper art was analogous even though the classification of the floor grating technology was "Roads and Pavements" and the classification of the scraper was "Brushing, Scrubbing and General Cleaning."  *Id*.  As in *Bigio*, however, the identity of the structure and function between the claimed technology and the prior art made the prior art analogous.  *Id*.

Here, the structure and function of the hydrophobic barrier in Angros and the structure and function of the technology claimed in the '561 Patent are not only similar as in *Bigio* and *Ellis*, but are identical, and therefore, Angros is analogous art.

## C.    The Board Misunderstood The Nature Of Analogous Art

The Board erred by collapsing the inquiry into whether Angros addressed a problem in the field of refrigerator shelves.  Not only did the Board ignore that a microscope slide is a "shelf panel" under its construction of that term, but the Board concluded that Angros does not address the same problem as the '561 Patent because Angros does not address how to contain an unintentional release of liquid on refrigerator shelves.  The Board erred by refusing to recognize that one of skill in the art would understand that the technology that retains liquids in Angros would also retain liquids, and therefore "spills," on a larger panel like a refrigerator shelf.

In particular, the Board conflated the two alternative types of analogous art by focusing improperly on whether Mr. Schechter would have encountered Angros in the normal course of his work.  A22–A23. Similarly, the Board required without citation that, under *KSR*, the substitution of one known element for another must involve elements known in the prior art within the field of endeavor.  A24.  But given that "pertinent to the problem" prior art is frequently outside of the field of endeavor, those in the field would not typically encounter such

prior art. That does not disqualify it as analogous. *Sci. Plastic Prods. v. Biotage AB*, 766 F.3d 1355, 1359 (Fed. Cir. 2014) ("[I]f a reference disclosure has the same purpose as the claimed invention, the reference relates to same problem, and that fact supports use of that reference in an obviousness rejection.").

For example, in *Biotage*, the claimed technology involved a re-sealable cartridge for low pressure liquid chromatography. Nevertheless, the Court held that pressure seals used in soda containers constituted analogous prior art because they solved the same problem at issue. *Biotage*, 766 F.3d at 1360. Many examples exist in the case law of analogous prior art that is drawn from fields of endeavor outside the field of the claimed technology. *See In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1379–80 (Fed. Cir. 2007); *In re Paulsen,* 30 F.3d 1475, 1481–82 (Fed. Cir. 1994); *In re Ellis*, 476 F.2d 1370, 1372 (C.C.P.A. 1973). In each case, this Court considered whether the person of ordinary skill would understand how the analogous art addressed the same problem, not whether actual practitioners in the field would have encountered the art in the course of their ordinary activities.

Similarly, the question is not whether Mr. Schechter would encounter Angros, but whether a person of skill in the art would understand how Angros could be used to retain liquid on a shelf surface.

## D.   The Board Unduly Narrowed The Problem Addressed By The '561 Patent

The Board also erred by adopting SSW's argument that SCHOTT's description of the relevant problem here is incomplete because applicants' problem "was not simply how to contain liquids in a predetermined area — it was how to maximize the available storage space . . . while containing accidental and unpredictable spills." A20–22. To be analogous prior art, however, a reference does not have to address every problem addressed by the claimed technology or provide every benefit ultimately provided by the technology. *Biotage*, 766 F.3d at 1358–59.

Indeed, the Board's recitation of the problem is telling. The Board initially acknowledges that the heart of the problem is how to retain liquids. A20–A21. Only when the Board introduces the concept of maximizing shelf space is the notion of an "accidental" and "unpredictable" spill introduced. Also telling is the use of the adjectives

"accidental" and "unpredictable," which would be wholly unnecessary if the term spill itself meant only accidental or unpredictable releases.

Moreover, it cannot be disputed that maximizing shelf space is a natural result of using a hydrophobic barrier such as the one in Angros. As a result, rather than providing a reason why Angros was non-analogous, the space-saving aspect of the hydrophobic barrier provides a reason to combine Angros and Picken, as SSW's expert acknowledged. A1361 (185:21) – A1362 (186:7), A1364 (194:24–195:9).

The Board also erred in its alternative holding that, even if Angros is analogous art to the '561 Patent, the challenged claims are not obvious because Angros is not analogous to Picken.

As an initial matter, it is telling the Board cites no authority for the proposition that the asserted references must be analogous art to each other. Indeed, there is no legal authority that requires prior art references to be analogous to each other. On the contrary, in *KSR*, the Supreme Court stated that "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, *either in the same field or a different field*." *KSR*, 550 U.S. at 417 (emphasis added). Here, there is no dispute that Picken is

prior art to the '561 Patent.  Accordingly, if Angros is analogous art to the '561 Patent, then Angros and Picken are prior art that one of ordinary skill would combine because the application of a hydrophobic border on the refrigerator shelf of Picken is a predictable variation of the hydrophobic border on the microscope slides of Angros.  *See id.* ("If a person of ordinary skill in the art can implement a predictable variation of it, §103 likely bars its patentability.").

Here, as in *KSR,* it would be a straightforward matter to apply the technology from one reference, Angros, to the technology in the other reference, Picken.  The only difference between the shelf panel in Picken and the shelf panel in Angros is size.  Varying the size of the shelf panel is a routine task within the skill of an ordinary artisan. *KSR*, 550 U.S. at 417 ("For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); *see also In re Bigio*, 381 F.3d at 1327 (mere change in size is of the most obvious kind), *In re Icon Health*, 496 F.3d at 1382 ("One skilled in the art would size the components from Teague

appropriately for Icon's application, therefore producing an embodiment meeting Icon's claims.").

### E.    The Record Established That The Claimed Technology Is At Most A Scaled Up Version Of The Technology Disclosed In Angros

The Final Written Decision is flawed even more fundamentally because it disregards that the claimed technology is not limited to shelves that are the size of refrigerator panels and that, even if such a limitation existed, the record establishes that one of ordinary skill would expect to be able to scale up the technology of Angros.

Nowhere does the patent limit the dimensions of any embodiment of the claimed technology.  Both the specification and the claims apply to a shelf of any size.  Indeed, the specification conspicuously avoids any limitation on the dimensions of the shelf panel.  When describing the detailed embodiment, the patent notes that the height of the retained liquid at any given volume is inversely proportional to the area of the non-hydrophobic surface $\left( height = \frac{\text{volume}}{\text{area}} \right)$.  A856 (9:40–53).  The examples cross-reference this mathematical relationship as well.  A861 (20:27–30).  The point is that the specification was written to cover the complete range of dimensions of a shelf panel.

Similarly, the claims describe a shelf panel without imposing any limitation on the size of the panel.  Given that no limitation exists anywhere in the patent as to the dimensions of the shelf, it is improper to rely on the relative size between a microscope slide and a refrigerator shelf to render Angros non-analogous.

This conclusion is reinforced by the breath of the term "shelf panel."  In its Preliminary Response, SSW attempted to limit this term to a panel that held objects of a certain size, but did not renew its attempt in the Response.  Accordingly, the Board concluded that it had become undisputed that the term "shelf panel" in the challenged claims meant "a piece of material positioned horizontally at a distance above some other surface to hold objects."  A5.  This definition includes no limitation on the dimensions of the shelf panel and describes a microscope slide to the same extent it describes a refrigerator shelf or some other piece of material positioned horizontally to hold objects. Indeed, the challenged claims all encompass a piece of glass the size of a microscope slide with the claimed hydrophobic barrier that might be

used in a refrigerator for a doll house on which a child might place miniature milk cartons.[3]

Accordingly, the Board improperly relied on the relative size of a microscope slide and a refrigerator shelf to conclude that the problem addressed by the claimed technology was different than the problem addressed by Angros.

Indeed, SSW's own technical witness, Mr. Mills, described the claimed technology as a scaled up version of Angros.  The Board erred when it discounted Mr. Mills' testimony as merely responsive to questions about the frit.  *Compare* A24 *with* A1377 (248:6–249:22).  Although Mr. Mills gratuitously directed his answers to a discussion of the frit, the thrust of his testimony was that the claimed technology in the '561 Patent is nothing more than a scaling up of the technology disclosed in Angros.  A1377 (248:6–249:4).  The Board acknowledged as

[3] It is exactly such an example that illustrates why Angros anticipates the challenged claims.  As discussed in Section III (*supra* at 45), whether Angros is analogous art has no place in the anticipation analysis, which is why the Board's refusal to institute trial under Ground 1 was improper.

much by stating that, in addition to testifying about a frit, Mr. Mills

was testifying "if, hypothetically, a microscope [sic: slide] were scaled

up, whether it would retain liquid." A24.  Mr. Mills' testimony clearly

established that the answer to this question was "yes," which is exactly

the point.  Mr. Mills' testimony in this regard corroborated Mr.

Schechter's unequivocal testimony that he was aware of no engineering

challenges that would prevent one of ordinary skill in the art from

scaling up the technology in Angros to use on a refrigerator shelf.

A1821 (222:4–224:9).

### F.   The Board's Claim Construction And Its Finding That Angros Is Non-Analogous Art Are Irreconcilable With The Challenged Claims

At the end of the day, the Board's holdings regarding obviousness

cannot stand because the Board's claim construction in conjunction with

its exclusion of Angros as analogous art leads to the anomalous result

that the claimed spill containment pattern retains ***only*** accidental or

unintentional spills.  That is because, if the challenged claims include

embodiments that retain intentional releases, the Board's rationale as

to why Angros is non-analogous art no longer applies.  But the

testimony is clear that such a spill containment pattern does not exist

58

because the hydrophobic material cannot distinguish between intentional and unintentional releases. This also explains why the '561 Patent nowhere indicates it is limited to only accidental or unintentional spills.

As a result, the Board's analysis would mean that no shelf will ever meet the limitations of the challenged claims. The only way to avoid this absurd result is to construe "spill" to include both intentional and unintentional releases and to find that Angros is analogous art.

## IV.    The Board's Analysis Of Obviousness Is Flawed Because The Board Misapprehended Christopher Schechter's Qualifications As One Of Skill In The Art

In reaching its finding regarding obviousness, the Board relied repeatedly on its conclusion that Mr. Schechter did not qualify as an expert witness qualified to opine about obviousness. A18, A25. But the Board's conclusion was erroneous as a matter of law. Accordingly, to the extent the Board rejected Mr. Schechter's testimony, the Final Written Decision needs to be vacated.

In particular, the Board committed four errors in considering Mr. Schechter's qualifications.

First, it miscalculated Mr. Schechter's years of experience designing shelf assemblies. Mr. Schechter began working as an engineer designing and manufacturing shelf assemblies in December 2010, not 2011 as stated by the Board, which means he had an additional year of experience unaccounted for by the Board. *Compare* A17–18 *with* A1473, A224, A1181 (17:6–14), A1184 (26:4–23).

Second, the Board's finding that "Mr. Schechter was not a person of ordinary skill in the art at the time of the invention of the '561 patent" is legally erroneous. "[A]s the USPTO correctly points out, an 'expert must be qualified to testify about what a person with ordinary skill in the art must have understood at the time of the invention, but the expert's knowledge of that may have come later.'" *Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d 788, 799 (E.D. Va. 2013) (citation omitted).

Third, The Board unduly narrowed the relevant field to refrigerator shelves given that the '561 Patent explicitly and repeatedly disclaims any such limitation. A852 (1:15–20), A853 (3:33–38), A863 (23:65–24:3).

Fourth, Mr. Schechter never testified that he does not qualify as one of ordinary skill in the art.  *Compare* A18 *with* A1182 (18:1–12); A1162 (¶ 4).

These errors by the Board struck to the very heart of its rejection of Mr. Schechter's testimony.  As a result, the Final Written Decision should be vacated.

## V.    The Board Erred By Refusing To Institute Trial Based Upon Grounds 1 And 8

Under 35 U.S.C. § 314, the Board decided to institute an *inter partes* trial on Ground 3 and a combination of Grounds 6 and 7 ("the trial grounds"); found that all the other grounds, including Ground 1 and Ground 8, were redundant ("the redundant grounds"), that is, would not add any new substance to the trial grounds; and dismissed the redundant grounds as a result.  *See Canon Inc. v. Intellectual Ventures I LLC*, IPR2014-00535, Paper No. 9, at 16 (PTAB Sept. 24, 2014) (rejecting as redundant grounds that did not "add substantively to the grounds on which we institute"); *Liberty Mut. Ins. Co. v. Progressive Casualty Ins. Co.*, CMB2012-00003, Paper No. 7, at 3 (PTAB Oct. 25, 2012) ("All of the myriad references relied on provide essentially the same teaching to meet the same claim limitation, and

the associated arguments do not explain why one reference more closely satisfies the claim limitation at issue in some respects than another reference, and vice versa.").

The dismissal of the redundant grounds was error, one that severely prejudiced SCHOTT because Grounds 1 and 8, as a matter of law, were independent of the trial grounds. Critically, this error lies not in the Board's statutory prerogative to decide whether to institute *inter partes* review under Section 314, but rather in an assertion of discretionary power to streamline the proceedings. As such, and in light of the prejudice suffered by SCHOTT, this Court has both the power to review and the duty to correct the deprivation of SCHOTT's right to a resolution of Grounds 1 and 8 on the merits after a full *inter partes* review trial.

### A. Under 35 U.S.C. § 319, The Court Has The Power To Review The Dismissal Of Grounds As Redundant

Congress struck a careful balance among the various provisions governing the institution and conduct of *inter partes* review proceedings and the preclusive effect of decisions by the Board in those proceedings. Where the Board declines to institute *inter partes* review proceedings with respect to a claim, 35 U.S.C. § 314(d) renders that decision

effectively unreviewable by foreclosing any opportunity for appeal. The Petitioner is not estopped, however, from being heard on its challenge in other venues. 35 U.S.C. § 315(e). In contrast, if a trial is instituted as to a claim and leads to a final written decision by the Board, the Petitioner is estopped from raising in another proceeding any ground that was or could have been raised. *Id.*; *but see* 35 U.S.C. § 317(a) (no estoppel applies if the parties settle and the proceeding is terminated as to the petitioner). Such an estoppel is fair as long as the Petitioner receives a fair hearing on the claims subject to review.

Given this balance, it is clear that a decision to dismiss a ground on the basis of redundancy is reviewable. Under § 314, each petition for *inter partes* review presents the Director with a basic, binary decision: whether (or not) to institute trial proceedings. 35 U.S.C. § 314(b) ("The Director shall determine ***whether*** to institute inter partes review under this chapter pursuant to a petition . . . .") (emphasis added). Congress further mandated that "[t]he determination by the Director ***whether*** to institute inter partes review under this section shall be final and nonappealable." 35 U.S.C. § 314(d) (emphasis added). Thus, only the decision whether to institute is final and non-appealable under § 314(d).

"It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6 (2000)).

In contrast, a decision to dismiss a ground as redundant is not a decision "whether" to institute a review, which has already been made because a trial has been instituted as to the claims and grounds set for trial. To be sure, when the Board has resolved that decision in favor of institution, it has often proceeded to select among different grounds of unpatentability presented in a successful petition, but that procedural embellishment stems not from the statute but rather from the PTO's own regulations. *See* 37 C.F.R. § 42.108. Such regulations cannot be used to insulate an agency from review of its decisions. *Kucana v. Holder*, 558 U.S. 233, 251–253 (2010).

Once review has been instituted, § 314(d) merely precludes appeal from the institution decision itself. The substance of the institution decision, however, becomes part of the whole proceeding along with all of the subsidiary rulings in that decision, *see* 37 C.F.R. § 42.2 (defining

"proceeding" as including the institution decision), and therefore is reviewable with other interlocutory orders—such as evidentiary or discovery determinations—upon appeal of the Final Written Decision under § 319.  The most common example of this principle is that claim constructions from the Decision to Institute often become part of the Final Written Decision subject to review as was the case here.

Indeed, this interpretation is consistent with reading § 314(d) to foreclose appeals from the wholesale denial of a petition, *see St. Jude Med., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1376 (Fed. Cir. 2014), and to preclude interlocutory appeals from decisions to institute a trial, *see In re Procter & Gamble Co.*, 749 F.3d 1376, 1378–79 (Fed. Cir. 2014). Unlike decisions whether to institute, however, a finding of redundancy is merely a consolidation of the issues that will be included in the trial, based on the Board's judgment that a subset of grounds in the petition are representative and sufficient to resolve the disputed issues of patentability.  Beyond the basic question of whether to institute *inter partes* review, however, § 314(d) is silent about any additional determinations—such as claim construction or the selection among multiple grounds of unpatentability—that the Board may in its

discretion choose to undertake when rendering an institution decision. Nowhere does the statute dictate that such additional determinations are unreviewable.  In other contexts, where Congress has sought to shield all aspects of a particular decision from review, it has used language to that effect, designating such decisions as "not reviewable" rather than merely non-appealable.  *See, e.g.*, 28 U.S.C. §§ 352(c), 1441(e)(4), 1447(d).

This is the only conceivable way of reconciling the Board's powers to institute trials and issue final written decisions.  Congress gave the Board the power to decide whether to institute *inter partes* review trials and made that power unfettered given that the Board's decisions to do so are final and non-appealable.  Congress limited that power, however, to the binary decision whether to institute or not.  All other decisions that the Board reaches in the process of reaching a Final Written Decision must be reviewable to prevent the severe prejudice that can result from an error in managing and conducting an *inter partes* review trial.

Where, as here, an *inter partes* review comes properly before the Court pursuant to an appeal from a final written decision of the Board,

nothing in § 314(d) precludes judicial review of any supplemental issues addressed in the institution decision apart from the core statutory determination regarding whether to institute a trial.  Given that the statute is unequivocal that appeal of the Final Written Decision lies here, this Court has the power to review the Board's decision to dismiss Grounds 1 and 8.

### B.     The Board Abused Its Discretion By Denying Review On Grounds 1 And 8

In this case, the Board abused its discretion by denying review of SCHOTT's proffered grounds of unpatentability based on anticipation by Angros under 35 U.S.C. § 102 and obviousness over Sikka and Baumann under 35 U.S.C. § 103.  The Board's redundancy determination and dismissal of those grounds overstepped its authority because that decision was contrary to established law.

This Court has made clear that anticipation and obviousness are "separate and distinct concepts."  *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984).  Furthermore, "[w]hile it is commonly understood that prior art references that anticipate a claim will usually render that claim obvious, it is not necessarily true that a verdict of nonobviousness forecloses anticipation."  *Cohensive Techs., Inc. v. Waters Corp.*, 543

F.3d 1351, 1364 (Fed. Cir. 2008). Accordingly, it is error for a court to "refuse to submit the issue of anticipation to the jury simply because the accused infringer has also asserted an obviousness defense." *Id.* at 1364–65.

Here the Board deprived SCHOTT of a hearing by the fact finder on anticipation by Angros by refusing to hear evidence and summarily dismissing Ground 1 as redundant. The Board abused its discretion by concluding that the anticipation asserted in Ground 1 was redundant with the obviousness grounds asserted in Ground 3 and the combination of Grounds 6 and 7. A263–A264. These grounds cannot be legally redundant of each other even if based on the same or overlapping references. Anticipation and obviousness constitute separate and distinct bases for unpatentability with very different substantive requirements. *Cohesive Techs.*, 543 F.3d at 1364.

For example, an obviousness determination requires considering objective indicia of nonobviousness, *Eurand, Inc. v. Mylan Pharm., Inc.*, 676 F.3d 1063, 1075–80 (Fed. Cir. 2012), while objective indicia are irrelevant to anticipation, *see, e.g.*, *SeaChange Int'l Inc. v. C-COR Inc.*, 413 F.3d 1361, 1380 (Fed. Cir. 2005). Similarly, and most important

here, obviousness analyses are limited to considering analogous prior art, while the "question whether a reference is analogous art is irrelevant to whether that reference anticipates." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1068–69 (Fed. Cir. 2003).  Accordingly, like here, a claim can be deemed nonobvious and still be anticipated, for example, by a non-analogous prior art reference.

By conflating obviousness and anticipation under the guise of "redundancy," the Board improperly foreclosed the determination whether Angros, analogous or not, anticipates the '561 Patent.  That error can be corrected only by vacating the Final Written Decision and ordering that a trial be instituted on Ground 1

Although Ground 8 was based on obviousness, the Board's dismissal of that ground based on redundancy was similarly an abuse of discretion.   The Sikka reference describes shelves, including refrigerator shelves, in language eerily similar to the '561 Patent.  The rationale that the Board provided for why Mr. Schechter would not encounter the Angros technology simply does not apply to Sikka.  Moreover, the status of Sikka as prior art is undisputed because Sikka is within the same field of endeavor and is pertinent art to the problem

to be solved.[4]  In other words, for several reasons, Ground 8 is not redundant to the trial grounds, and once trial was instituted on claim 13, the Board should have included Ground 8 in the analysis.

While the Board offered no authority or analysis to support its redundancy decision in this case, it has in the past sought to justify its use of redundancy based on judicial economy concerns.  Specifically, the Board has cited consideration of "the efficient administration of the Office, and the ability of the Office to timely complete proceedings" as mandated by 35 U.S.C. § 326(b) and the desire "to secure the just, speedy, and inexpensive resolution of every proceeding" under 37 C.F.R.

_____

[4] Even accepting the Board's analysis of the priority date of claims 1 and 25 (*see supra* at 23–24), its analysis of the priority date of Claim 13 is facially flawed.  Given that the First Provisional Application never mentions a frit, that application cannot provide written description support for Claim 13, which includes a frit as a limitation.  The earliest possible priority date of Claim 13 is May 18, 2009, which means that Sikka pre-dates claim 13 and is prior art.  *See also* A2106 at 64:6–11, A2107 at 66:16–19, A2111 at 85:1–8 (applicants conceived of using a frit "sometime in early 2009").

§ 42.1(b).  *Liberty Mut. Ins. Co. v. Progressive Cas. Ins. Co.*, CMB2012-00003, Paper No. 7, at 2 (PTAB Oct. 25, 2012).  Such justifications never justify, however, depriving a party of a fair hearing.

Moreover, there is no question here that the Board had plenty of time to resolve this matter within the statutory deadline.  SCHOTT challenged only three claims of the '561 Patent, relied on only five prior art references, and asserted only nine grounds of unpatentability.  A4–A5.  Considering Grounds 1 and 8 in addition to Ground 3 and the combined Grounds 6 and 7 would not have imposed a substantial burden on the Board or endangered the statutory one-year deadline for a final written decision.  In fact, the Board accelerated the default briefing deadlines in its initial scheduling order in view of the relatively limited number of issues in the case.  *See* A278.  The Board ultimately issued its Final Written Decision months before the statutory deadline on November 4, 2014.  A1.

In short, the Board's redundancy determination conflated independent grounds of unpatentability thereby excluding grounds that were materially different from those selected for trial.  The dismissal of Grounds 1 and 8 constitutes an *ultra vires* act that is at odds with

precedent, has caused substantial prejudice to SCHOTT, and lacked a sufficient administrative justification.  Accordingly, SCHOTT requests that the Final Written Decision be vacated and remanded for substantive consideration of Grounds 1 and 8.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, SCHOTT respectfully requests that the Court vacate the Final Written Decision, remand for a trial on Grounds 1 and 8, and remand for further consideration of SCHOTT's Motion to Exclude and SSW's assertion of secondary considerations.

Dated: January 21, 2014

/s/ Marshall J. Schmitt
Marshall J. Schmitt
Gilberto E. Espinoza
Andrew T. Dufresne
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Avenue, Suite 2000
Chicago, Illinois  60601-6710
Telephone: 312-222-0800
Facsimile: 312-222-0818
mjschmitt@michaelbest.com
geespinoza@michaelbest.com
atdufresne@michaelbest.com

*Attorneys for Appellant*
*SCHOTT Gemtron Corporation*

# ADDENDUM

Final Written Decision, 35 U.S.C. § 318(a) and 37
C.F.R. § 42.73 (Paper 106) ..........................................Add.1–Add.33

U.S. Patent No. 8,286,561 issued October 12,
2012 ..........................................................................Add.34–Add.72

Trials@uspto.gov
571-272-7822

Paper No. 106
Entered: August 20, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SCHOTT GEMTRON CORPORATION,
Petitioner,

v.

SSW HOLDING COMPANY, INC.,
Patent Owner.
_____

Case IPR2013-00358
Patent 8,286,561 B2
_____

Before JUSTIN T. ARBES, PHILIP J. HOFFMANN, and
GEORGIANNA W. BRADEN, *Administrative Patent Judges*.

BRADEN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00358
Patent 8,286,561 B2

# I.    INTRODUCTION

## A. Background

SCHOTT Gemtron Corporation ("Petitioner") filed an Amended
Petition (Paper 5, "Pet.") requesting *inter partes* review of claims 1, 13, and
25 of U.S. Patent No. 8,286,561 B2 (Ex. 1001, "the '561 patent") pursuant
to 35 U.S.C. §§ 311–19.  SSW Holding Company, Inc. ("Patent Owner")
filed a Preliminary Response (Paper 12, "Prelim. Resp.").  On November 4,
2013, we instituted this *inter partes* review of claims 1, 13, and 25 on two
grounds of unpatentability alleged in the Petition.  Paper 14 ("Dec. to Inst.").
After institution of review, Patent Owner filed a Response (Paper 46, "PO
Resp.") to the Petition.  Petitioner filed a Reply (Paper 62 (confidential);
Paper 63 (public)) ("Reply") to Patent Owner's Response.

Counsel for both Petitioner and Patent Owner were present and
presented argument at an oral hearing held on June 23, 2014.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  In this final
written decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R.
§ 42.73, we determine Petitioner has not proven by a preponderance of the
evidence that claims 1, 13, and 25 of the '561 patent are unpatentable.

## B. The '561 Patent

The '561 patent describes shelving, such as shelving adapted for use
in refrigerators and having a top surface with a hydrophobic surface

---

[1] A transcript ("Trans.") of the oral hearing is included in the record.  Paper
105.  Each party filed objections to the opposing party's demonstrative
exhibits to be used at the oral hearing.  *See* Papers 98, 101, 103.  As none of
the objected-to demonstrative exhibits impact our analysis in this decision,
we decline to expunge any of these exhibits from the record.  Thus, both
party's objections are dismissed as moot.

IPR2013-00358
Patent 8,286,561 B2

arranged in a spill containment pattern. Ex. 1001, col. 1, ll. 15–18; col. 2, ll. 1–4. The spill containment pattern is intended to act as a barrier to prevent spilled liquid from spilling onto other surfaces. *Id.* at col. 11, ll. 28–37. An example of a spill containment pattern is shown in Figure 3 of the '561 patent, reproduced below:



*FIG. 3*

Figure 3 illustrates a preferred embodiment that includes shelving with a spill containment pattern consisting of a hydrophobic surface in the pattern of a frame-like border. *Id.* at col. 2, ll. 26–30; col. 3, ll. 43–45. The border defines the boundaries of a single non-hydrophobic spill containment area therein. *Id.* at col. 3, ll. 39–46.

## C. Challenged Claims

Challenged claims 1, 13, and 25 are reproduced below.

3

1.  A shelf assembly comprising:
    a shelf panel having a generally flat top surface which is
        capable of supporting articles which may be placed on
        said shelf panel;
    a hydrophobic surface applied in a spill containment pattern
        on said top surface;
    wherein the majority of the surface area of said top surface
        of the shelf panel is not hydrophobic, thereby providing
        one or more non-hydrophobic central portions bounded
        by said spill containment pattern of said hydrophobic
        surface.

13.  The shelf assembly of claim 1, wherein the hydrophobic
        surface comprises:
    a ceramic frit layer adjacent to and bonded to the top
        surface of said shelf panel; and
    a hydrophobic compound coated over the ceramic frit layer.

25.  A method of manufacturing a shelf capable of containing
        liquid spills thereon comprising:
    providing a panel having a generally flat top surface which
        is capable of supporting articles which may be placed on
        said panel;
    applying a hydrophobic surface arranged in a spill
        containment pattern generally in the plane of said top
        surface;
    leaving the majority of the surface area of said top surface
        of the panel non-hydrophobic, thereby providing one or
        more non-hydrophobic central portions bounded by the
        spill containment pattern of the hydrophobic surface.

### D. Prior Art References Alleged to Support Unpatentability

The following table summarizes the prior art references asserted in the

instituted grounds:

IPR2013-00358
Patent 8,286,561 B2

| Name | Description | Date | Exhibit |
|---|---|---|---|
| Angros | US 5,948,685 | Sept. 7, 1999 | Ex. 1005 |
| Baumann | US 6,872,441 B2 | Mar. 29, 2005 | Ex. 1007 |
| Picken | International Publ. No. WO 2006/044641 A2 | Apr. 27, 2006 | Ex. 1009 |

### E. Alleged Grounds of Unpatentability Instituted for Trial

The following table summarizes the challenges to patentability that were instituted for *inter partes* review:

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Angros and Picken | § 103(a) | 1, 25 |
| Angros, Picken, and Baumann | § 103(a) | 13 |

## II.    ANALYSIS

### A. Claim Interpretation

### 1. Prior Construed Claim Terms

In the Decision to Institute, we interpreted various claim terms of the '561 patent as follows:

| Term(s) | Interpretation |
|---|---|
| "shelf panel" | "a piece of material positioned horizontally at a distance above some other surface to hold objects" |

5

| Term(s) | Interpretation |
|---|---|
| "generally in the plane of said top surface" | "all or a portion of the hydrophobic surface extending a small distance above the level of the top surface of the shelf panel that is not readily noticeable to the naked eye" |
| "majority of the surface area of said top surface of the shelf panel is not hydrophobic" | "the surface area of the non-hydrophobic portion is greater than the surface area of the hydrophobic portion" |
| "leaving the majority of the surface area of said top surface of the panel non-hydrophobic" | "the surface area of the non-hydrophobic portion is greater than the surface area of the hydrophobic portion" |

*See* Dec. to Inst. 6–9. During the course of the trial, neither party challenged our construction of the claim terms. Thus, we see no reason to alter the constructions set forth in the Decision to Institute and we incorporate our previous analysis for purposes of this decision.

    2. *Presently Construed Claim Term: "spill"*

    Claim 1 recites a "hydrophobic surface applied in a spill containment pattern." Claim 25 recites a "method of manufacturing a shelf capable of containing liquid spills thereon," comprising "applying a hydrophobic surface arranged in a spill containment pattern." Although the Petition and Patent Owner's Response do not set forth a formal construction for the claim term "spill," given the arguments presented by the parties, we now determine that a construction is necessary. In its Preliminary Response, Patent Owner argued that the plain meaning of "spill" is "an accidental or unintentional release of liquid." Prelim. Resp. 15. According to Patent

6

IPR2013-00358
Patent 8,286,561 B2

Owner, its position is supported by a dictionary definition of "spill," which is "to cause or allow esp[ecially] accidentally or unintentionally to fall, flow, or run so as to be lost or wasted." *Id.* at 15 (citing Merriam-Webster's Collegiate Dictionary 1202 (11th ed. 2006)) (Ex. 2003). Patent Owner contends that its proffered "plain meaning is also consistent with the '561 Patent specification, which describes with reference to Fig. 3, for example, one type of spill occurring when an open soda can is turned over onto its side on the top surface of the shelf panel." *Id.* at 15 (citing Ex. 1001, col. 11, ll. 28–49). As Patent Owner explains, "[a] person of ordinary skill in the art would understand that this orientation of the opened soda can would be unintentional because it is not generally desirable to spill soda in a refrigerator." *Id.*

Petitioner, however, argued at the oral hearing that the term "spill" is not limited by the '561 patent to encompass only unintended, sudden, unexpected, or violent releases of liquid on a surface. Trans. 10:14–24, 18:9–12. Rather, according to Petitioner, "spill" in the context of the '561 patent has a "very specific meaning," which is merely "liquid being placed on the surface." *Id.* at 10:20–21. According to Petitioner, such an interpretation of "spill" is supported by Examples 1–29 in the '561 patent, which describes the intentional and methodical pouring of liquid onto a surface bounded by hydrophobic material. *Id.* at 11:1–11; Reply 1–2.

Petitioner's position is unpersuasive. Contrary to Petitioner's characterization, Example 1 in the '561 patent discloses only a demonstration of water retention by a shelf with a hydrophobic border. *See* Ex. 1001, col. 20, ll. 1–9. The patent recounts, in Example 1, a test to determine the amount of water retainable on a shelf, within a hydrophobic

7

IPR2013-00358
Patent 8,286,561 B2

border, without leakage. *Id.* Thus, Example 1 does not show that the term "spill" merely means liquid placed on a surface. Therefore, we construe "spill," in accordance with its plain meaning and consistent with the specification of the '561 patent, to mean "an accidental or unintentional release of liquid." *See* Ex. 2003; Ex. 1001, col. 11, ll. 28–49 (describing Figure 3 as illustrating "the concept that the hydrophobic surface 1030 will form a spill containment barrier," and using soda can 1026 turned on its side as an example for "spilled liquid").

### B. Claims 1 and 25–Alleged Obviousness over Angros and Picken

Petitioner alleges that claims 1 and 25 of the '561 patent are unpatentable under 35 U.S.C. § 103(a) over Angros and Picken. Pet. 22–23, 33–34. Patent Owner disputes Petitioner's position, arguing that Angros is not analogous art and that a person of ordinary skill in the art would not have had reason to combine the references in the manner proposed by Petitioner. PO Resp. 9–10.

As discussed below, we are persuaded by Patent Owner's arguments. Thus, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1 and 25 are unpatentable as obvious over Angros and Picken.

### 1. Angros's Disclosure

Angros describes an analytic plate, such as a microscope slide or a diagnostic plate, having a containment border for containing a liquid. Ex. 1005, Abstract. Angros discloses that the containment border can be a hydrophobic material applied to the plate surface in a bordered pattern to confine liquid that is applied to the plate within the area surrounded by the border. *Id.* at col. 1, ll. 45–48. According to Angros, the hydrophobic

8

IPR2013-00358
Patent 8,286,561 B2

containment border "is substantially transparent and is substantially flush with the surface of the slide or plate[,] and [ ] covers only a portion of the surface of the slide or plate." *Id.* at col. 1, l. 67–col. 2, l. 3.

Figure 1A of Angros is reproduced below:



Figure 1A illustrates microscope slide 10 with containment border 16. *Id.* at col. 2, ll. 39–45. Containment border 16 surrounds containment area 18 of the upper surface 12 of slide 10, and prevents spreading, leakage, or migration of liquid from containment area 18. *Id.* at col. 2, ll. 49–58. Figure 1B of Angros is reproduced below:



Figure 1B illustrates a side view of an analytic plate with a containment border, top surface 12, and lower surface 14. Angros discloses that "border 16 forms a molecular layer when dry and therefore is substantially flush (level) with the upper surface 12 of the slide 10. The border 16 is, therefore, not raised above the upper surface 12 to a degree that is visible to the naked eye." Ex. 1005, col. 3, ll. 3–7.

2. Picken's Disclosure

Picken describes a shelf assembly for use in a refrigerator. Ex. 1009, Abstract. Figure 1 of Picken is reproduced below:

IPR2013-00358
Patent 8,286,561 B2



Figure 1 illustrates shelf assembly 10 with generally flat shelf panel 12 and a pair of support rails 16. *Id.* The shelf panel may include a curved, turned, or bent edge on the upper surface of the shelf to limit spillage of liquid over the edge of the shelf panel. Ex. 1009 ¶ 4. Figure 13 of Picken is reproduced below:



Figure 13 illustrates a shelf panel with forward edge 120 that curves upward to provide a spill-proof edge. *Id.* ¶ 55. An alternative embodiment disclosed by Picken is shown in Figure 17, reproduced below:



Figure 17 illustrates shelf panel 312 that includes an upper form or guard 346—bonded, via adhesive 326, along edge region 314 on upper surface 336 of shelf panel 312—to prevent liquid movement. *Id.* ¶ 57. The

10

IPR2013-00358
Patent 8,286,561 B2

shelf panel may include a frit layer[2] on the upper or lower surfaces of the panel. *Id.* ¶¶ 6, 57, 71.

### 3. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, 35 U.S.C. § 103 requires us to resolve the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere,* 383 U.S. 1, 17 (1966). "The importance of determining the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.,* 950 F.2d 714, 718 (Fed. Cir. 1991). "Instead of ascertaining what was subjectively obvious to the inventor at the time of invention, [we] must ascertain what would have been objectively obvious to one of ordinary skill in the art at such time." *Id.* Thus, "the level of ordinary skill in the art is a factual question that must be resolved and considered." *Id.*

### a. Effective Filing Date of the '561 Patent

In order for us to resolve the level of ordinary skill in the pertinent art at the time of the invention, we must determine the time of the claimed invention. The '561 patent was filed on September 18, 2009 and is a continuation-in-part of Application No. PCT/US2009/048775, filed on June 2, 2009. The '561 patent claims priority to two provisional applications: U.S. Prov. App. No. 61/133,273 ("the '273 provisional"), filed June 27, 2008; and U.S. Prov. App. No. 61/216,540 ("the '540 provisional"), filed May 18, 2009. Petitioner alleges that none of the claims of the '561 patent

---

[2] A frit layer is a substrate of glass or ceramic material that is placed or printed in a pattern. Ex. 1001, col. 6, ll. 7–13. The material can include finely ground particles. *Id.* at col. 6, ll. 41–59.

IPR2013-00358
Patent 8,286,561 B2

are entitled to the benefit of the filing dates of the provisional applications to which the '561 patent claims priority, because the written descriptions of the provisional applications fail to provide sufficient detail to support the challenged claims. Pet. 8. We are not persuaded by Petitioner's contentions. As discussed in detail below, we conclude that the '273 provisional application, which is the earlier filed of the two provisional applications, supports the claim elements recited in claims 1, 13, and 25. Therefore, the '561 patent is entitled to the June 27, 2008 filing date of the '273 provisional application, and the relevant time period for resolving the level of ordinary skill in the art is June 27, 2008.

i. Written description support for claims 1 and 13

Petitioner first contends that neither the '273 provisional nor the '540 provisional provides any explicit description of the top surface of the shelf panel, and therefore, the limitation of a "shelf panel having a generally flat top surface," as recited in claims 1 and 13, is not supported. Pet. 9–10 (citing Ex. 1002, pg. 33, l. 7–pg. 35, l. 22; Ex. 1003, pg. 35, l. 7– pg. 37, l. 22).[3] We disagree. Figure 44 of the '273 provisional application is reproduced below:



Figure 44 of the '273 provisional application
illustrates a front view of a shelf panel claimed in application

---

[3] When referring to the '273 provisional application (Ex. 1002) and the '540 provisional (Ex. 1003), we refer to the page numbers at the bottom right of each page.

IPR2013-00358
Patent 8,286,561 B2

Figure 44 illustrates a front, section view of shelf assembly 1020 and shelf panel 1024 of the claimed invention.  Ex. 1002, Fig. 44.  Shelf assembly 1020 is characterized as being treated with a hydrophobic or super hydrophobic material around the outer edges of shelf panel 1024.  *Id*. at col. pg. 29, ll. 8–11.  The hydrophobic material acts as a barrier for spilled liquid and prevents the liquid from spilling downward onto other surfaces.  *Id.*

In contrast, a shelf panel used in the prior art is illustrated in Figure 42 of the '273 provisional application, reproduced below:



Figure 42 of the '273 provisional application
illustrates a front view of a shelf panel used in the prior art

Figure 42 is a front, section view of shelf assembly 1000 with shelf panel 1006 and plastic rim 1004.  Plastic rim 1004 is used to encapsulate shelf panel 1006.  *Id*. at pg. 28, ll. 17–21.  The '273 provisional application specifically states "the visible edge of the shelf panel 1006 is located on its upper surface at the intersection of the perimeter of the plastic rim 1004, [and] may include a sealed edge 1014."  *Id*. at pg. 29, ll. 1–6.  Using plastic rim 1004 and potentially sealed edge 1014, an attempt is made to essentially seal spilled liquid from spilling off shelf panel 1006.  *Id*.

When Figure 44 is compared to Figure 42 of the '273 provisional application, the prior art figure has plastic rim 1004 that is used to prevent liquid movement off shelf panel 1006, while the top surface of shelf panel

13

IPR2013-00358
Patent 8,286,561 B2

1024 in Figure 44 does not have plastic rim 1004 and appears generally flat. Furthermore, the '273 provisional application states that "the hydrophobic or super hydrophobic surface treatments in accordance with the invention eliminate the need for any formed lips or ridges on the surface of the shelf panel" (*id*. at pg. 31, ll. 15–17), "in accordance with the invention, it should be noted that components such as a plastic rim (or even a frame) may be completely unnecessary with the use of the hydrophobic surface treatment 1030" (*id*. at pg. 29, l. 22–30, l. 1), and "[w]ith the use of this surface treatment in accordance with the invention, the need for plastic encapsulated material (e.g., the plastic which provides for a spill proof barrier in prior art systems) is eliminated" (*id*. at pg. 10, ll. 7–9). Therefore, we conclude that the '273 provisional application demonstrates support for the limitation, "shelf panel having a generally flat top surface," as recited in claims 1 and 13.

Petitioner next contends that neither the '273 provisional application nor the '540 provisional application discloses a shelf panel where "the majority of the surface area of said top surface of the shelf panel is not hydrophobic," and therefore, the limitation reciting the same in claims 1 and 13 is not supported. Pet. 10–11 (citing Ex. 1002, pg. 33, l. 7–pg. 35, l. 22; Ex. 1003, pg. 35, l. 7–pg. 37, l. 22). We disagree. The '273 provisional application states that in one embodiment, "the hydrophobic or super hydrophobic surface treatment is employed only around the top surface perimeter edge of the shelf panel 1024, for purposes of containing spills and acting as a spill proof barrier." Ex. 1002, pg. 30, ll. 4–7. This disclosure is further supported by the illustration in Figure 43, where the hydrophobic

14

IPR2013-00358
Patent 8,286,561 B2

surface treatment, indicated by diagonal hash marks, is denoted only around the outer edge of shelf panel 1024. *Id.* at Fig. 43.

As construed above, the term "majority of the surface area of said top surface of the shelf panel is not hydrophobic" means that "the surface area of the non-hydrophobic portion is greater than the surface area of the hydrophobic portion." The disclosure that in one embodiment only the outer perimeter edge is hydrophobic indicates that the entire inner portion of shelf panel 1024 is not hydrophobic. As the inner portion of shelf panel 1024 appears to be a greater amount compared to the perimeter edge of shelf panel 1024, we conclude there is disclosure in the '273 provisional application that the majority of the surface area of said top surface of the shelf panel is not hydrophobic. Therefore, the '273 provisional application supports said limitation in claims 1 and 13.

We have reviewed the '273 provisional application and conclude that it provides written description support for all other limitations of claims 1 and 13.

ii. Written description support for claim 25

Petitioner contends that neither the '273 provisional application nor the '540 provisional application discloses any of the steps for manufacturing a shelf as recited in claim 25. Pet. 11. We disagree. The '273 provisional application discloses: (1) multiple examples of applying a hydrophobic surface treatment (Ex. 1002, pg. 10, ll. 1–4); (2) examples of spill containment patterns (*id.* at pg. 9, ll. 16–23); (3) panels with generally flat top surfaces (*id.* at pg. 29, ll. 8–11, Fig. 44); (4) the construction of shelving assemblies (*id.* at pg. 11, l. 10–pg. 12, l. 9); and (5) leaving the majority of the surface on a top surface of a panel non-hydrophobic so that one or more

IPR2013-00358
Patent 8,286,561 B2

non-hydrophobic portions are bounded by hydrophobic surfaces (*id*. at pg. 9, ll. 16–23; Figs. 43, 44).

Petitioner lastly contends that neither provisional application discloses what is meant by "generally in the plane" of the top surface as recited in claim 25. Pet. 11–12. We disagree. The '273 provisional application discloses that hydrophobic or super hydrophobic surface treatments in accordance with the invention eliminate the need for any formed lips or ridges on the surface of the shelf panel and that the relative amount of usable shelf space is increased by eliminating the space taken up by plastic encapsulation, sealants, adhesives, and formed lips and ridges. (Ex. 1002, pg. 31, ll. 15–19.) This disclosure indicates that the hydrophobic treatment does not create a lip or ridge that would use shelf space. Furthermore, Figure 44 of the '273 provisional application illustrates a front, section view of shelf assembly 1020 and shelf panel 1024 of the claimed invention. *Id*. at Fig. 44. Shelf assembly 1020 has a hydrophobic surface treatment around the outer edges of shelf panel 1024. *Id*. at pg. 29, ll. 8–11. The hydrophobic material is not visible in Figure 44. Therefore, we conclude that the '273 provisional application teaches what is meant by "generally in the plane" of the top surface as recited in claim 25.

We have reviewed the '273 provisional application and conclude that it provides written description support for all other limitations of claim 25.

    b. <u>Determination of the Level of Ordinary Skill in the Art</u>

Having determined the appropriate time of the invention (June 27, 2008), we turn to determining the level of ordinary skill in the art at that time. Petitioner's witness, Mr. Chris B. Schechter, submitted a declaration in support of the Petition. Pet. 15 (citing Ex. 1010). In his declaration,

16

Mr. Schechter testified that a person of ordinary skill in the art relevant to the '561 patent "would have at least a bachelor's degree in mechanical engineering and at least four years of experience designing and manufacturing shelf assemblies or equivalent education and training." Ex. 1010 ¶ 4. Patent Owner's witness, Mr. Richard Bruce Mills, defined a person of ordinary skill in the art relevant to the '561 patent to be a person with at least an associate's or bachelor's degree and three years of experience working with shelf assemblies, and having familiarity with "encapsulated spill containing refrigerator shelves." Ex. 2022 ¶ 8. Based on our review of the '561 patent, the types of problems and solutions described in the '561 patent and cited prior art, and the testimony of the parties' declarants, we conclude that a person of ordinary skill in the art at the time of the claimed invention (i.e., as of June 27, 2008, as discussed above in Section II.B.3.a.) would have had a degree in mechanical engineering or a similar discipline, and at least three years of work experience with refrigerator shelf assemblies. *See, e.g.*, Ex. 1001, col. 1, ll. 16–62 (stating that the '561 patent relates to "shelving which may be adapted for use with refrigerators," and describing conventional refrigerator shelf assemblies that use plastic molded parts to encapsulate shelves and silicone sealants to form physical spill containment barriers around the perimeter of the refrigerator shelving); Ex. 1010 ¶¶ 1–2 (describing the background of Mr. Schechter); Ex. 2022 ¶¶ 3–5 (describing the background of Mr. Mills).

We note that under this standard, Petitioner's witness, Mr. Schechter, does not qualify as a person of ordinary skill in the art. Although Mr. Schechter has a Master's of Science degree in Mechanical Engineering, he has only worked as an engineer designing and manufacturing shelf

IPR2013-00358
Patent 8,286,561 B2

assemblies since December 2011.  Ex. 1010 ¶¶ 1-2.  Thus, Mr. Schechter

had less than two years of experience when he signed his declaration on June

14, 2013.  *Id.* ¶ 36.  Furthermore, Mr. Schechter was not a person of

ordinary skill in the art at the time of the invention of the '561 patent (i.e.,

June 27, 2008).  Indeed, at his deposition, Mr. Schechter testified that he

does not qualify as one of ordinary skill in the art under the definition in his

declaration.  Ex. 1011, 26:2–13.  In this case, we accord the testimony of

Mr. Schechter regarding the alleged obviousness of the claims less weight

because he was not a person of ordinary skill in the art at the time of the

invention disclosed in the '561 patent.

### 4. Obviousness Analysis

To prevail in its challenges to the patentability of the claims,

Petitioner must establish facts supporting its challenges by a preponderance

of the evidence.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  The primary

dispositive fact Petitioner must establish is that Angros is analogous art to

the claimed invention.  A claim is unpatentable under 35 U.S.C. § 103(a) if

the differences between the subject matter sought to be patented and the

prior art are such that the subject matter as a whole would have been obvious

at the time the invention was made to a person having ordinary skill in the

art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 406 (2007).  A reference qualifies as prior art for an obviousness

determination under § 103 only when it is analogous to the claimed

invention.  *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011); *Innovention

Toys, LLC v. MGA Entm't, Inc.,* 637 F.3d 1314, 1321 (Fed. Cir. 2011); *In re

Bigio,* 381 F.3d 1320, 1325 (Fed. Cir. 2004); *In re Clay,* 966 F.2d 656, 658

(Fed. Cir. 1992).

IPR2013-00358
Patent 8,286,561 B2

A reference is considered analogous prior art: (1) if the reference is from the same field of endeavor as the claimed subjected matter, regardless of the problem addressed, or (2) if "the reference still is reasonably pertinent to the particular problem with which the inventor is involved," even though the reference is not within the field of the inventor's endeavor. *Bigio*, 381 F.3d at 1325. The "field of endeavor" test asks if the structure and function of the prior art is such that it would be considered by a person of ordinary skill in the art, because of the similarity to the structure and function of the claimed invention as disclosed in the application. *Id.* at 1325-27. It is necessary to apply "common sense" in "deciding in which fields a person of ordinary skill would reasonably be expected to look for a solution to the problem facing the inventor." *Id*. at 1326 (citations and quotation marks omitted). As to the "reasonably pertinent" test:

> A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem. Thus, the purposes of both the invention and the prior art are important in determining whether the reference is reasonably pertinent to the problem the invention attempts to solve. If a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection. An inventor may well have been motivated to consider the reference when making his invention. If it is directed to a different purpose, the inventor would accordingly have had less motivation or occasion to consider it.

*In re Clay,* 966 F.2d at 659.

The parties do not dispute that Angros' disclosure regarding microscope slides is not in the same "field of endeavor" as the '561 patent, which relates to refrigerator shelves. Pet. 21–22; PO Resp. 16; Reply 1;

19

IPR2013-00358
Patent 8,286,561 B2

Trans. 23:8–15, 32:10–14.

Rather, Petitioner contends Angros is analogous art to the claimed invention, because "Angros is reasonably pertinent to the problem faced by the Applicants of the '561 patent." Pet. 22. Specifically, Petitioner states that "[t]he problem faced by the Angros inventors was the same as the problem faced by [Patent Owner], namely, how to contain a liquid in a predetermined area using a structure that is thin and does not extend significantly above the top surface of the panel." *Id.*

Patent Owner disputes that Angros is reasonably pertinent to the problem addressed by the claimed invention, because Angros does not teach containing "spills." PO Resp. 16. According to Patent Owner, the problem faced by the inventors of the '561 patent was not simply how to contain liquids in a predetermined area–it was how to maximize the available storage space on shelves *while containing accidental and unpredictable spills*. *Id.* (citing Ex. 2022 ¶ 30(b)) (emphasis added). Mr. Mills, a former employee of Whirlpool Corporation and witness for Patent Owner, testified that "the hydrophobic border in Angros is ***not*** being used to contain spills or to otherwise provide a spill resistant barrier, which is the problem being addressed by the [']561 patent." Ex. 2022 ¶ 30(b).

Petitioner, however, argues that the term "spill" is not limited by the '561 patent to encompass only unintended, sudden, unexpected, or violent releases of liquid on a surface. Trans. 10:14–24, 18:9–12. Petitioner's argument is unpersuasive in light of our claim construction of the term "spill." As discussed above in Section II.A.2, we construed "spill" to mean "an accidental or unintentional release of liquid."

20

IPR2013-00358
Patent 8,286,561 B2

Petitioner further argues "Patent Owner is trying to read too much into the concept of spill," because the '561 patent does not claim "spill containment." Reply 1–2; Trans. 18:9–23. Although the claims do not recite a limitation for maximizing shelf space, the claims do require a "spill containment" pattern. Such a requirement indicates the claims are directed not merely to liquid containment, but to "spill containment." Angros, however, is directed to the containment of miniscule amounts of liquids that are *intentionally* placed on a microscope slide. Petitioner's argument regarding a "spill" encompassing a "slowly and carefully" poured liquid (Reply 1–2) fails to address sufficiently Patent Owner's argument that the problem pertinent to the inventors of the '561 patent is "not simply how to contain liquids in a predetermined area – it was how to maximize the available storage space . . . *while containing accidental and unpredictable spills*." PO Resp. 16–17 (emphasis added).

Patent Owner's position is supported by the testimony of Mr. Mills as well as the disclosure of the '561 patent itself. *See, e.g.*, Ex. 2022 ¶¶ 26–33; Ex. 1001, Abstract ("a method for containing spills on shelving and the like"); col. 1, l. 24–col. 2, l. 14 (describing prior art shelves and the objects of the disclosed "method for containing spills on shelving and the like"); col. 11, ll. 44–49 ("[C]omponents such as a plastic rim (or even a frame) may be completely unnecessary with the use of the hydrophobic surface 1030 to provide the spill containment feature. As such, the shelf assembly 1020 depicted in FIGS. 3 and 4 maximizes the available useful shelf space since it does not include a plastic rim, a frame, or any other physical barrier or dam extending above the top surface 1023 of the shelf panel 1024 for preventing liquids from spilling off of the shelf panel 1024."); col. 13, ll. 51–56.

IPR2013-00358
Patent 8,286,561 B2

Therefore, we agree with Patent Owner's representation of the problem being addressed by the '561 patent. Specifically, we determine that the hydrophobic spill-containment perimeter on refrigerator shelves of the '561 patent is designed to contain accidentally spilled liquid and thereby maximize available storage space, whereas the microscope slides of Angros are designed to contain miniscule amounts of intentionally placed liquid.

Patent Owner also disputes that Angros is analogous art to the claimed invention, arguing that a person having ordinary skill in the art of the '561 patent would not have considered Angros' microscope slides when developing a spill-containing shelf for refrigerators, freezers, pantries, etc. PO Resp. at 14–16; Ex. 2022 ¶¶ 30–33. According to Patent Owner's declarant, Mr. Mills, a person of ordinary skill in the art of the '561 patent would not have been familiar with microscope slides and would not have considered them a design resource. Ex. 2022 ¶ 26.

Mr. Schechter, an employee of, and witness for, Petitioner, corroborates the testimony of Mr. Mills. Ex. 1011, 79:4–113:2. Mr. Schechter testified that during the course of his work for Petitioner, he familiarized himself with the state of the art by reviewing "patents focused primarily on the consumer appliance industry" (*id*. at 78:19–79:15) and occasionally reviewed technical publications, technical data sheets, and manuals for production equipment (*id*. at 79:16–81:1). Mr. Schechter, however, testified that microscope slides are not something with which he works in his work for Petitioner, and could not recall any instance where he reviewed patents or publications (other than Angros) related to microscopes. PO Resp. 15 (citing Ex. 1011, 112:12–113:2). In fact, Mr. Schechter testified he did not find Angros during a prior art search; rather, it was given

22

IPR2013-00358
Patent 8,286,561 B2

to him by legal counsel.  Ex. 1011, 92:1–4.  We credit the testimony of both Mr. Schechter and Mr. Mills.  We also note that unlike Patent Owner's citation to Mr. Mills' testimony, Petitioner does not cite any testimony (from Mr. Schechter or otherwise) stating that Angros is analogous art to the '561 patent or explaining why that would be the case.  Thus, based on the evidence of record, we are persuaded that one of ordinary skill in the art of the '561 patent would not have considered the subject matter of Angros, which deals with microscope slides, to be reasonably pertinent to the problem being addressed by the applicants of the '561 patent in designing refrigerator shelves.  Therefore, Petitioner has not shown Angros to be prior art under 35 U.S.C. § 103.

In addition, even if Angros did qualify as prior art, Petitioner has not shown that the combination of Angros with Picken would have rendered claims 1 and 25 obvious.  Petitioner argues it would have been obvious to one of skill in the art to modify the shelf panel, as taught by Picken, with the hydrophobic liquid containment barrier, as taught by Angros, because "the application of the spill-containment border of Angros to the shelf assembly of Picken is nothing more than the predictable use of prior art elements according to their established functions."  Pet. 22–23 (citing *KSR Int'l Co.*, 550 U.S. at 417).  According to Petitioner, merely substituting one element (e.g., guard 346 of Picken) for another element known in the field (hydrophobic containment border of Angros) would have been obvious to one of skill in the art and it would have been expected to yield predictable results.  *Id.*

Petitioner relies on testimony from Patent Owner's declarant, Mr. Mills, to allegedly establish that "scaling up" and substituting elements

23

IPR2013-00358
Patent 8,286,561 B2

from a microscope slide to a refrigerator shelf would have been obvious and easily performed by those in the field.  Reply 2; Trans. 14:1–11, 24:16–25:23; Ex. 1017, 248–249.  We are not persuaded Mr. Mills made the admission that Petitioner argues.  The questions Petitioner cites appear to be directed to (1) whether a frit layer would make a hydrophobic surface work better, and (2) if, hypothetically, a microscope were scaled up, whether it would retain liquid.  Trans. 14:1–11; Ex. 1017, 248–249.

We are not persuaded by Petitioner's argument that the application of Angros' spill-containment border is merely the predictable use of prior art elements, because we do not find Angros to be analogous art to Picken.  Although it may be obvious for one of skill in the art to "[make a] simple substitution of one known element for another" (*KSR Int'l Co.*, 550 U.S. at 417), the element must be familiar or known to the person of ordinary skill in the art to be used in the substitution.  Based on the testimony of record, we do not find that a person of ordinary skill in the art of the '561 patent would be familiar with items related to microscope slides.

Furthermore, a patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR Int'l Co.*, 550 U.S. at 419.  "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing *KSR Int'l Co.*, 550 U.S. at 421).  For an obviousness analysis, "it can be important to identify a reason that would have prompted one of skill in the art to combine prior art elements in the way the claimed invention does."

24

IPR2013-00358
Patent 8,286,561 B2

*KSR Int'l Co.*, 550 U.S. at 419. In that regard, Mr. Schechter, witness for Petitioner, testified that Angros and Picken were known in the art and that one of ordinary skill in the art would have been motivated to combine the teachings of the prior art so as to make a design that (i) was more simple or clean or aesthetically pleasing and (ii) had a less obtrusive hydrophobic barrier. Ex. 2048, 226:15–227:8; Ex. 1010 ¶ 28. He then concluded that one of ordinary skill would know how to substitute the spill-contain border in Angros for the plastic guard in Picken. Ex. 1010 ¶¶ 28–29.

Mr. Schechter, however, does not explain sufficiently why a person of ordinary skill in the art would look to the field of microscope slides to find a hydrophobic coating to act as a less obtrusive spill containment border in place of the plastic rim in Picken. Mr. Schechter's testimony is impermissible hindsight; he opined that all of the elements of the claims disparately existed in the prior art, but fails to provide sufficient reason for why one of ordinary skill in the art at the time of filing would have combined these references. *See, e.g.*, *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1348–49 (Fed. Cir. 2014) (holding expert testimony to be impermissible hindsight for failing to explaining what reason or motivation one of ordinary skill in the art at the time of the invention would have had to place the prior art together).

In an obviousness determination, we must avoid analyzing the prior art through the prism of hindsight. Instead, we must "cast our minds back to the time the invention was made (often, as here, many years), to occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then–accepted wisdom in the art." *W.L. Gore & Assoc., Inc. v. Garlock, Inc*., 721 F.2d 1540, 1553 (Fed. Cir. 1983).

25

IPR2013-00358
Patent 8,286,561 B2

Petitioner attempts to imbue one of ordinary skill in the art with knowledge of the claimed invention, when no prior art reference or references of record convey or suggest that knowledge. Rather, Petitioner's argument that Angros is analogous art and that Angros is combinable with Pickens appears to be premised on Petitioner's knowledge of the '561 patent disclosure.

Petitioner bears the burden of showing by a preponderance of evidence that the asserted prior art references are analogous art and otherwise combinable. On the record before us, we find that Petitioner has not shown that Angros qualifies as prior art under 35 U.S.C. § 103 or that, even if it did, it renders the claims unpatentable in combination with Picken. Therefore, we conclude Petitioner has not demonstrated by a preponderance of evidence that claims 1 and 25 of the '561 patent would have been obvious in view of Angros and Picken.

*C. Claim 13 – Alleged Obviousness over Angros, Picken, and Baumann*

Petitioner alleges that claim 13 of the '561 patent is unpatentable under 35 U.S.C. § 103(a) over (i) Angros and Baumann and (ii) Picken and Baumann. Pet. 51. Although Petitioner in its Petition did not allege, expressly, unpatentability of claim 13 based on the combination of all three references (Angros, Picken, and Baumann), we determined, in our Decision to Institute, under 35 U.S.C. § 314(a) that the information presented in the Petition showed a reasonable likelihood that claim 13 would have been obvious based on the combination of Angros, Picken, and Baumann, and instituted a trial on that ground. Dec. to Inst. 15–17.

Patent Owner disputes this ground, arguing that Baumann is non-analogous art to the claimed invention and cannot be used to establish obviousness. PO Resp. 21.

IPR2013-00358
Patent 8,286,561 B2

As discussed above, we are persuaded by Patent Owner's reasoning regarding Angros being non-analogous art; thus, Angros cannot be used in combination with other references (including Baumann) to support a showing of obviousness. Therefore, we determine that Petitioner has not shown by a preponderance of the evidence that claim 13 is unpatentable as obvious over Angros, Picken, and Baumann.

1. Baumann's Disclosure

Baumann describes substrates with at least one structured hydrophobic substrate that "provides a good self-cleaning effect." Ex. 1007, col. 1, ll. 9–11. In one embodiment disclosed by Baumann, the substrate is a ceramic material that is coated with "a composition containing a material producing a glass flux such as a glass frit and structure-forming particles" and that, when the "substrate" is fired at a certain temperature, the glass flux is made hydrophobic. *Id.* at col. 2, ll. 32–39. Baumann further discloses a

> micro-rough layer [that] is printed by means of a printing paste containing a glass frit which forms a glass flux, and the structure-forming particles are applied to the still moist printing surface for example by powdering or dripping on, possibly followed by partial pressing of the particles into the printed surface.

*Id.* at col. 6, ll. 1–8. "The substrate thus treated is then burnt and made hydrophobic in a known manner." *Id.* at col. 6, ll. 6–8.

2. Angros's and Picken's Disclosures

The disclosure of Angros and Pickens are discussed in detail above in Sections II.B.1. and II.B.2.

3. Analysis

Claim 13 depends from claim 1, and in addition to the elements recited in claim 1, claim 13 requires (a) a ceramic frit layer adjacent to and

27

IPR2013-00358
Patent 8,286,561 B2

bonded to the top surface of a shelf panel and (b) a hydrophobic compound coated over the ceramic frit layer.

Petitioner contends that ceramic frits coated with hydrophobic surfaces were well known in the art at the time the '561 patent was filed. Pet. 27. Indeed, the '561 patent cites to Baumann as disclosing a ceramic frit. *Id.*; *see* Ex. 1001, col. 7, ll. 36–41. According to Petitioner, the application of a hydrophobic surface comprising a ceramic frit and a hydrophobic compound, as described in Baumann, to form a spill-containment border, as described in Angros, would be the predictable use of prior art elements according to their established functions. Pet. at 28 (citing *KSR Int'l. Co.*, 550 U.S. at 417). Petitioner then contends that, if the border described in Picken was substituted with the hydrophobic surfaces described in Baumann, a person of ordinary skill in the art would expect that the shelf assembly of claim 13 would result. Pet. 28–29 (citing Ex. 1010 ¶ 35).

Patent Owner disputes Petitioner's position, asserting that Baumann is non-analogous art that is neither from the same field of endeavor as the '561 patent, nor is it "reasonably pertinent" to the problem faced by the inventors of the '561 patent. PO Resp. 22. According to Patent Owner, Baumann is directed to self-cleaning substrates suitable "for glazing vehicles and trains and for glass bricks," as well as "building material such as roof tiles, clinker and floor tiles." Ex. 1007, col. 6, l. 62–col. 7, l. 3. Thus, Patent Owner concludes Baumann is in a different field of endeavor from the '561 patent, which is directed to refrigerator shelves. PO Resp. 22.

Patent Owner also contends that Baumann is non-analogous art, because it is directed to a much different problem than that faced by the inventors of the '561 patent. Specifically, Patent Owner characterizes

28

IPR2013-00358
Patent 8,286,561 B2

Baumann as providing a substrate that eliminates water and dirt that may otherwise collect thereon.  PO Resp. 23 (citing Ex. 2022 ¶¶ 37–38; Ex. 1007, col. 2, l. 64–col. 3, l. 1).  According to Patent Owner, Baumann's intended objective is directly opposite that of the '561 patent, which is to contain spills, not to eliminate them from the shelf.  PO Resp. 23.

In the Decision to Institute, we instituted on the combination of Angros, Picken, and Baumann (Dec. to Inst. 15–17), because the combination of Picken and Baumann lacks a suggestion to create a hydrophobic barrier wherein the majority of the top surface of shelving assembly is not hydrophobic.  We further found a reasonable likelihood that the feature is taught by the combination of Angros's rectangular hydrophobic surface and Picken's shelf structure.  *Id*. at 12–14.  The hydrophobic coating disclosed in Baumann is designed to coat an entire top surface of an article to create a self-cleaning surface that facilitates liquid run-off.  Ex. 1007, col. 2, l. 64–col. 3, l. 1.  Based on the disclosure in Baumann, we conclude that the combination of Picken and Baumann would result in a refrigerator shelf, as disclosed in Picken, with its entire top surface treated with Baumann's self-cleaning coating.  The raised form would remain, because there is no suggestion that the coating of Baumann could perform spill containment.  Therefore, Petitioner can rely only on the disclosure in Angros for a hydrophobic barrier that would not coat the entire top surface of a shelving assembly.

As discussed in detail above, however, we already have concluded that Petitioner has not shown Angros to be reasonably pertinent to the problem addressed by the challenged claims.  Such a deficiency defeats Petitioner's obviousness challenge as to claim 13 and is not remedied by the

IPR2013-00358
Patent 8,286,561 B2

combination of Angros, Picken, and Baumann. Therefore, we determine
Petitioner has not demonstrated by a preponderance of the evidence that
claim 13 of the '561 patent would have been obvious over Angros, Picken,
and Baumann.

### D. Secondary Considerations of Non-Obviousness

Patent Owner contends Petitioner has failed to meet its burden of
showing unpatentability, because objective indicia of nonobviousness
indicate that the claimed subject matter would not have been obvious. PO
Resp. 31–43; Trans. 29. As discussed above, we have found Angros to be
non-analogous and not combinable with the other references. Thus, we need
not address Patent Owner's evidence regarding secondary considerations of
non-obviousness.

### E. Motion to Exclude

Petitioner moves to exclude the following evidence submitted by
Patent Owner in this proceeding: Exhibits 2006–16, 2025, 2034–39, 2042–
46, 2049–51, 2053, 2020 (¶¶ 12–17, 19–22, and 25–39), and 2022 (¶¶ 17–
21). Papers 86 (confidential), 87 (public). Patent Owner filed an opposition
(Paper 90 (confidential); Paper 91 (public)), and Petitioner filed a reply
(Paper 94 (confidential); Paper 95 (public)). All of the evidence sought to
be excluded by Petitioner pertains to Patent Owner's assertions of secondary
considerations of non-obviousness. Because we need not reach that issue,
for the reasons explained above, Petitioner's motion is dismissed as moot.

30

IPR2013-00358
Patent 8,286,561 B2

### III.    CONCLUSION

We have considered the record before us in this *inter partes* review proceeding.  We conclude Petitioner has not proven by a preponderance of the evidence that:

(1)    The subject matter of claims 1 and 25 of the '561 patent is unpatentable under 35 U.S.C. § 103 over the teachings of Angros and Picken; and

(2)    The subject matter of claim 13 of the '561 patent is unpatentable under 35 U.S.C. § 103 over the teachings of Angros, Picken, and Baumann.

### IV.    ORDER

For the reasons given, it is hereby:

ORDERED that Petitioner has not shown by a preponderance of the evidence that claims 1, 13, and 25 of the '561 patent are unpatentable;

FURTHER ORDERED that Petitioner's motion to exclude (Paper 86 (confidential); Paper 87 (public)) is *dismissed*;

FURTHER ORDERED that Petitioner's objections (Paper 98, 103) and Patent Owner's objections (Paper 101) to the opposing party's demonstrative exhibits to be used at the oral hearing are *dismissed*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Certain materials have been sealed in this proceeding, but have not been relied upon in this final written decision.  *See* Papers 76, 97.  The record will be maintained undisturbed pending the outcome of any appeal taken from this decision.  At the conclusion of any appeal proceeding, or if

IPR2013-00358
Patent 8,286,561 B2

no appeal is taken, the materials will be made public. *See* Office Patent

Trial Practice Guide, 77 Fed. Reg. 48,756, 48,760-61 (Aug. 14, 2012).

Further, either party may file a motion to expunge the sealed materials from

the record pursuant to 37 C.F.R. § 42.56. Any such motion will be decided

after the conclusion of any appeal proceeding or the expiration of the time

period for appealing.

IPR2013-00358
Patent 8,286,561 B2

For PETITIONER:

Marshall J. Schmitt
Gilberto E. Espinoza
MICHAEL BEST & FRIEDRICH LLP
mjschmitt@michaelbest.com
geespinoza@michaelbest.com

Oliver A. Zitzmann
SCHOTT CORPORATION
oliver.zitzmann@us.schott.com


PATENT OWNER:

Michael P. Furmanek
Jennifer Burnette
Michael R. Weiner
MARSHALL, GERSTEIN & BORUN LLP
mfurmanek@marshallip.com
jburnette@marshallip.com
mweiner@marshallip.com

Nathaniel L. Dilger
ONE LLP
ndilger@onellp.com

33

US008286561B2

(12) **United States Patent**
Driver et al.

(10) **Patent No.:** **US 8,286,561 B2**
(45) **Date of Patent:** **Oct. 16, 2012**

(54) **SPILL CONTAINING REFRIGERATOR SHELF ASSEMBLY**

(75) Inventors: **John P. Driver**, Henryville, IN (US);
**Matthew McMillin**, Palmyra, IN (US);
**Bradley M. Nall**, Elizabethtown, KY (US)

(73) Assignee: **SSW Holding Company, Inc.**, Fort Smith, AR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 310 days.

(21) Appl. No.: **12/562,920**

(22) Filed: **Sep. 18, 2009**

(65) **Prior Publication Data**

US 2010/0102693 A1        Apr. 29, 2010

**Related U.S. Application Data**

(63) Continuation-in-part of application No. PCT/US2009/048775, filed on Jun. 26, 2009.

(60) Provisional application No. 61/133,273, filed on Jun. 27, 2008, provisional application No. 61/216,540, filed on May 18, 2009.

(51) **Int. Cl.**
*A47B 17/00*        (2006.01)

(52) **U.S. Cl.** .......................... 108/27; 108/108; 312/408

(58) **Field of Classification Search** ................. 108/108, 108/161, 106, 27; 312/408, 404, 351; 211/191, 211/41.18, 41.184; 428/212

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 392,061 | A | 10/1888 | Peckham |
| 870,439 | A | 11/1907 | Kade |

| | | | |
|---|---|---|---|
| 2,191,701 | A | 2/1940 | Wood |
| 3,185,426 | A | 5/1965 | Bjerke |
| 3,354,022 | A | 11/1967 | Dettre et al. |
| 3,579,540 | A | 5/1971 | Ohlhausen |
| 3,716,502 | A | 2/1973 | Loew |
| 3,931,428 | A | 1/1976 | Reick |
| 3,963,349 | A | 6/1976 | Albright et al. |
| 3,967,030 | A | 6/1976 | Johnson et al. |
| 3,976,572 | A | 8/1976 | Reick |
| 3,980,153 | A | 9/1976 | Andrews |
| 4,142,724 | A | 3/1979 | Reick |

(Continued)

FOREIGN PATENT DOCUMENTS

CA        2175848        12/1996

(Continued)

OTHER PUBLICATIONS

EPO Communication dated Dec. 5, 2011, regarding third-party observations filed in corresponding European application No. 09771098.2.

(Continued)

*Primary Examiner* — Jose V Chen
(74) *Attorney, Agent, or Firm* — Marshall, Gerstein & Borun LLP

(57) **ABSTRACT**

The specification discloses a method for containing spills on shelving and the like, and the resulting support members made in accordance with the method, by providing the generally flat top surface of a support with a hydrophobic surface which is arranged in a spill containment pattern and which is generally in the plane of the top surface of the support. The majority of the top surface of the support consists of one or more spill containment areas which are of a non-hydrophobic nature and which are bounded by the hydrophobic surfaces, such that spills on the shelving collect in the non-hydrophobic spill containment area or areas and are prevented from spreading by the hydrophobic surfaces.

**64 Claims, 18 Drawing Sheets**



**SCHOTT Gemtron
EXHIBIT 1001**

**US 8,286,561 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,199,142 | A | 4/1980 | Reick |
| 4,301,197 | A | 11/1981 | Franz et al. |
| 4,301,213 | A | 11/1981 | Davies |
| 4,311,755 | A | 1/1982 | Rummel |
| 4,415,405 | A | 11/1983 | Ruddle et al. |
| 4,451,619 | A | 5/1984 | Heilmann et al. |
| 4,453,533 | A | 6/1984 | Scheidler et al. |
| 4,492,217 | A | 1/1985 | Scheidler |
| 4,581,149 | A | 4/1986 | Horodysky et al. |
| 4,591,530 | A | 5/1986 | Lui |
| 4,614,464 | A | 9/1986 | Christensen |
| 4,624,900 | A | 11/1986 | Fau |
| 4,646,948 | A | 3/1987 | Jennings |
| 4,680,173 | A | 7/1987 | Burger |
| 4,687,707 | A | 8/1987 | Matsuo et al. |
| 4,733,843 | A | 3/1988 | Bessinger |
| 4,738,426 | A | 4/1988 | Bessinger |
| D295,950 | S | 5/1988 | Johnston |
| 4,749,110 | A | 6/1988 | Maeno et al. |
| 4,753,977 | A | 6/1988 | Merrill |
| 4,782,112 | A | 11/1988 | Kondo et al. |
| 4,835,014 | A | 5/1989 | Roth et al. |
| 4,855,176 | A | 8/1989 | Ohwaki et al. |
| 4,870,907 | A | 10/1989 | McKee |
| 4,923,260 | A | 5/1990 | Poulsen |
| 4,971,912 | A | 11/1990 | Buhl et al. |
| 4,983,459 | A | 1/1991 | Franz et al. |
| 5,011,727 | A | 4/1991 | Kido et al. |
| 5,011,963 | A | 4/1991 | Ogawa et al. |
| 5,032,641 | A | 7/1991 | Nanishi et al. |
| 5,041,304 | A | 8/1991 | Kusano et al. |
| 5,057,050 | A | 10/1991 | Hill |
| 5,084,191 | A | 1/1992 | Nagase et al. |
| 5,121,134 | A | 6/1992 | Albinson et al. |
| 5,156,611 | A | 10/1992 | Haynes et al. |
| 5,202,361 | A | 4/1993 | Zimmerman et al. |
| 5,225,274 | A | 7/1993 | Ogawa et al. |
| 5,228,764 | A | 7/1993 | Cherry et al. |
| 5,228,905 | A | 7/1993 | Grunewalder et al. |
| 5,238,746 | A | 8/1993 | Soga et al. |
| 5,240,774 | A | 8/1993 | Ogawa et al. |
| 5,274,159 | A | 12/1993 | Pellerite et al. |
| 5,284,707 | A | 2/1994 | Ogawa et al. |
| 5,294,252 | A | 3/1994 | Gun |
| 5,300,239 | A | 4/1994 | Ozaki et al. |
| 5,308,705 | A | 5/1994 | Franz et al. |
| 5,316,799 | A | 5/1994 | Brunken et al. |
| 5,317,129 | A | 5/1994 | Taplan et al. |
| 5,324,566 | A | 6/1994 | Ogawa et al. |
| 5,328,768 | A | 7/1994 | Goodwin |
| 5,338,345 | A | 8/1994 | Scarborough et al. |
| 5,348,547 | A | 9/1994 | Payne et al. |
| 5,362,145 | A | 11/1994 | Bird et al. |
| 5,364,299 | A | 11/1994 | Hill et al. |
| 5,366,810 | A | 11/1994 | Merrifield et al. |
| 5,368,892 | A | 11/1994 | Berguier |
| 5,372,888 | A | 12/1994 | Ogawa et al. |
| 5,380,585 | A | 1/1995 | Ogawa et al. |
| 5,385,966 | A | 1/1995 | Hermansen et al. |
| 5,395,657 | A | 3/1995 | Strepparola et al. |
| 5,424,130 | A | 6/1995 | Nakanishi et al. |
| 5,429,433 | A | 7/1995 | Bird et al. |
| 5,435,839 | A | 7/1995 | Ogawa |
| 5,437,894 | A | 8/1995 | Ogawa et al. |
| 5,437,900 | A | 8/1995 | Kuzowski |
| 5,441,338 | A | 8/1995 | Kane et al. |
| 5,458,976 | A | 10/1995 | Horino et al. |
| 5,466,770 | A | 11/1995 | Audenaert et al. |
| 5,489,328 | A | 2/1996 | Ono et al. |
| 5,500,216 | A | 3/1996 | Julian et al. |
| 5,540,493 | A | 7/1996 | Kane et al. |
| 5,556,667 | A | 9/1996 | Teranishi et al. |
| 5,558,940 | A | 9/1996 | Michels et al. |
| 5,564,809 | A | 10/1996 | Kane et al. |
| 5,576,096 | A | 11/1996 | Ono et al. |
| 5,578,361 | A | 11/1996 | Tsujioka et al. |
| 5,584,957 | A | 12/1996 | Schultheis et al. |
| 5,585,896 | A | 12/1996 | Yamazaki et al. |
| 5,599,893 | A | 2/1997 | Asai et al. |
| 5,612,433 | A | 3/1997 | Ono et al. |
| 5,618,627 | A | 4/1997 | Merrifield et al. |
| 5,651,921 | A | 7/1997 | Kaijou |
| 5,674,967 | A | 10/1997 | Goodwin |
| 5,679,460 | A | 10/1997 | Schakenraad et al. |
| 5,688,864 | A | 11/1997 | Goodwin |
| 5,697,991 | A | 12/1997 | Frazer |
| 5,707,740 | A | 1/1998 | Goodwin |
| 5,725,789 | A | 3/1998 | Huber et al. |
| 5,735,589 | A | 4/1998 | Herrmann et al. |
| 5,747,561 | A | 5/1998 | Smirnov et al. |
| 5,753,734 | A | 5/1998 | Maruyama |
| 5,798,144 | A | 8/1998 | Varanasi et al. |
| 5,800,918 | A | 9/1998 | Chartier et al. |
| 5,813,741 | A | 9/1998 | Fish et al. |
| 5,814,411 | A | 9/1998 | Merrifield et al. |
| 5,824,421 | A | 10/1998 | Kobayashi et al. |
| 5,830,529 | A | 11/1998 | Ross |
| 5,840,201 | A | 11/1998 | Elledge |
| 5,843,338 | A | 12/1998 | Inoue et al. |
| 5,853,690 | A | 12/1998 | Hibino et al. |
| 5,853,800 | A | 12/1998 | Dombrowski et al. |
| 5,858,551 | A | 1/1999 | Salsman |
| 5,876,806 | A | 3/1999 | Ogawa |
| 5,890,907 | A | 4/1999 | Minasian |
| 5,910,557 | A | 6/1999 | Audenaert et al. |
| 5,921,411 | A | 7/1999 | Merl |
| 5,924,359 | A | 7/1999 | Watanabe |
| 5,945,482 | A | 8/1999 | Fukuchi et al. |
| 5,947,574 | A | 9/1999 | Avendano |
| 5,952,053 | A | 9/1999 | Colby |
| 5,958,601 | A | 9/1999 | Salsman |
| 5,980,990 | A | 11/1999 | Goodwin |
| 6,013,724 | A | 1/2000 | Mizutani et al. |
| 6,017,609 | A | 1/2000 | Akamatsu et al. |
| 6,024,948 | A | 2/2000 | Samain et al. |
| 6,025,025 | A | 2/2000 | Bartrug et al. |
| 6,033,738 | A | 3/2000 | Teranishi et al. |
| 6,045,650 | A | 4/2000 | Mitchnick et al. |
| 6,068,911 | A | 5/2000 | Shouji et al. |
| 6,090,447 | A | 7/2000 | Suzuki et al. |
| 6,093,559 | A | 7/2000 | Bookbinder et al. |
| 6,096,380 | A | 8/2000 | Takebe et al. |
| 6,105,233 | A | 8/2000 | Neal |
| 6,114,446 | A | 9/2000 | Narisawa et al. |
| 6,117,555 | A | 9/2000 | Fujimori et al. |
| 6,119,626 | A | 9/2000 | Miyazawa et al. |
| 6,120,720 | A | 9/2000 | Meier et al. |
| 6,136,210 | A | 10/2000 | Biegelsen et al. |
| 6,153,304 | A | 11/2000 | Smith et al. |
| 6,187,143 | B1 | 2/2001 | Juppo et al. |
| 6,191,122 | B1 | 2/2001 | Lux et al. |
| 6,201,058 | B1 | 3/2001 | Mahr et al. |
| 6,207,236 | B1 | 3/2001 | Araki et al. |
| 6,221,434 | B1 | 4/2001 | Visca et al. |
| 6,224,974 | B1 | 5/2001 | Wuu |
| 6,228,435 | B1 | 5/2001 | Yoshikawa et al. |
| 6,228,972 | B1 | 5/2001 | Hikita et al. |
| 6,235,383 | B1 | 5/2001 | Hong et al. |
| 6,235,833 | B1 | 5/2001 | Akamatsu et al. |
| 6,245,387 | B1 | 6/2001 | Hayden |
| 6,264,751 | B1 | 7/2001 | Kamura et al. |
| 6,280,834 | B1 | 8/2001 | Veerasamy et al. |
| 6,333,074 | B1 | 12/2001 | Ogawa et al. |
| 6,333,558 | B1 | 12/2001 | Hasegawa |
| 6,337,133 | B1 | 1/2002 | Akamatsu et al. |
| 6,340,502 | B1 | 1/2002 | Azzopardi et al. |
| 6,342,268 | B1 | 1/2002 | Samain |
| 6,352,758 | B1 | 3/2002 | Huang et al. |
| 6,358,569 | B1 | 3/2002 | Badyal et al. |
| 6,361,868 | B1 | 3/2002 | Bier et al. |
| 6,376,592 | B1 | 4/2002 | Shimada et al. |
| 6,379,751 | B1 | 4/2002 | Schafer et al. |
| 6,383,642 | B1 | 5/2002 | Le Bellac et al. |
| 6,403,397 | B1 | 6/2002 | Katz |
| 6,419,985 | B1 | 7/2002 | Ishizuka |
| 6,423,372 | B1 | 7/2002 | Genzer et al. |
| 6,451,432 | B1 | 9/2002 | Azzopardi et al. |

**US 8,286,561 B2**

Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6,458,420 | B1 | 10/2002 | Akamatsu et al. | 7,166,235 | B2 | 1/2007 | Majeti et al. |
| 6,461,537 | B1 | 10/2002 | Turcotte et al. | 7,175,723 | B2 | 2/2007 | Jones et al. |
| 6,461,670 | B2 | 10/2002 | Akamatsu et al. | 7,179,758 | B2 | 2/2007 | Chakrapani et al. |
| 6,462,115 | B1 | 10/2002 | Takahashi et al. | 7,179,864 | B2 | 2/2007 | Wang |
| 6,471,761 | B2 | 10/2002 | Fan et al. | 7,188,917 | B2 | 3/2007 | Bienick |
| 6,476,095 | B2 | 11/2002 | Simendinger, III | 7,198,855 | B2 | 4/2007 | Liebmann-Vinson et al. |
| 6,479,612 | B1 | 11/2002 | Del Pesco et al. | 7,204,298 | B2 | 4/2007 | Hodes et al. |
| 6,482,524 | B1 | 11/2002 | Yamamoto et al. | 7,211,223 | B2 | 5/2007 | Fouillet et al. |
| 6,488,347 | B1 | 12/2002 | Bienick | 7,211,313 | B2 | 5/2007 | Nun et al. |
| 6,564,935 | B1 | 5/2003 | Yamamoto et al. | 7,211,329 | B2 | 5/2007 | Metz et al. |
| 6,579,620 | B2 | 6/2003 | Mizuno et al. | 7,211,605 | B2 | 5/2007 | Coronado et al. |
| 6,582,825 | B2 | 6/2003 | Amarasekera et al. | 7,213,309 | B2 | 5/2007 | Wang et al. |
| 6,584,744 | B1 | 7/2003 | Schultheis et al. | D547,640 | S | 7/2007 | Remmers |
| 6,589,641 | B1 | 7/2003 | Stirniman et al. | 7,238,751 | B2 | 7/2007 | Wang et al. |
| 6,596,060 | B1 | 7/2003 | Michaud | 7,253,130 | B2 | 8/2007 | Chiang et al. |
| 6,610,363 | B2 | 8/2003 | Arora et al. | 7,258,731 | B2 | 8/2007 | D'Urso et al. |
| 6,613,860 | B1 | 9/2003 | Dams et al. | 7,264,845 | B2 | 9/2007 | Papadaki et al. |
| 6,623,863 | B2 | 9/2003 | Kamitani et al. | 7,265,468 | B1 | 9/2007 | Manel et al. |
| 6,641,654 | B2 | 11/2003 | Akamatsu et al. | 7,273,658 | B2 | 9/2007 | Benayoun et al. |
| 6,649,222 | B1 | 11/2003 | D'Agostino et al. | 7,285,331 | B1 | 10/2007 | Reihs et al. |
| 6,652,640 | B2 | 11/2003 | Asai et al. | 7,288,311 | B2 | 10/2007 | Kawashima et al. |
| 6,660,339 | B1 | 12/2003 | Datta et al. | 7,291,653 | B2 | 11/2007 | Baumann et al. |
| 6,660,363 | B2 | 12/2003 | Barthlott | 7,306,304 | B2 | 12/2007 | Jang |
| 6,660,686 | B2 | 12/2003 | Inagaki et al. | 7,306,895 | B2 | 12/2007 | Kano et al. |
| 6,683,126 | B2 | 1/2004 | Keller et al. | 7,309,278 | B2 | 12/2007 | Shibata |
| 6,685,992 | B1 | 2/2004 | Ogawa et al. | 7,312,057 | B2 | 12/2007 | Bookbinder et al. |
| 6,689,200 | B2 | 2/2004 | Scarborough et al. | 7,323,033 | B2 | 1/2008 | Kroupenkine et al. |
| 6,692,565 | B2 | 2/2004 | Johansen, Jr. et al. | 7,338,835 | B2 | 3/2008 | Bao |
| 6,706,798 | B2 | 3/2004 | Kobayashi et al. | 7,342,551 | B2 | 3/2008 | King |
| 6,720,371 | B2 | 4/2004 | Furuta et al. | 7,344,619 | B2 | 3/2008 | Helmeke |
| 6,729,704 | B2 | 5/2004 | Ames | 7,344,758 | B2 | 3/2008 | Franchina et al. |
| 6,743,467 | B1 | 6/2004 | Jones et al. | 7,344,783 | B2 | 3/2008 | Shea |
| 6,767,984 | B2 | 7/2004 | Toui et al. | 7,354,328 | B2 | 4/2008 | Lee |
| 6,770,323 | B2 | 8/2004 | Genzer et al. | 7,354,624 | B2 | 4/2008 | Millero et al. |
| 6,780,497 | B1 | 8/2004 | Walter | 7,354,650 | B2 | 4/2008 | Nakajima et al. |
| 6,786,562 | B2 | 9/2004 | Obrock et al. | D568,344 | S | 5/2008 | Baacke et al. |
| 6,793,821 | B2 | 9/2004 | Lee et al. | 7,368,510 | B2 | 5/2008 | Lee et al. |
| 6,800,354 | B2 | 10/2004 | Baumann et al. | 7,388,211 | B2 | 6/2008 | Chao et al. |
| 6,806,299 | B2 | 10/2004 | Baumann et al. | 7,393,515 | B2 | 7/2008 | Hoshino et al. |
| 6,808,835 | B2 | 10/2004 | Green et al. | 7,396,395 | B1 | 7/2008 | Chen et al. |
| 6,811,716 | B1 | 11/2004 | Stengard et al. | 7,419,615 | B2 | 9/2008 | Strauss |
| 6,811,844 | B2 | 11/2004 | Trouilhet | 7,449,233 | B2 | 11/2008 | Arora |
| 6,845,788 | B2 | 1/2005 | Extrand | 7,468,333 | B2 | 12/2008 | Kimbrell, Jr. et al. |
| 6,852,390 | B2 | 2/2005 | Extrand | 7,478,785 | B2 | 1/2009 | Herron, III et al. |
| 6,855,375 | B2 | 2/2005 | Nakagawa et al. | 7,524,531 | B2 | 4/2009 | Axtell, III et al. |
| 6,855,759 | B2 | 2/2005 | Kudo et al. | 7,527,832 | B2 | 5/2009 | Sakoske et al. |
| 6,858,284 | B2 | 2/2005 | Nun et al. | D596,931 | S | 7/2009 | Fernandez |
| 6,871,923 | B2 | 3/2005 | Dietz et al. | D596,932 | S | 7/2009 | Kleinsasser |
| 6,872,441 | B2 | 3/2005 | Baumann et al. | 7,563,505 | B2 | 7/2009 | Reihs |
| 6,890,360 | B2 | 5/2005 | Cole et al. | 7,568,583 | B2 | 8/2009 | Wing et al. |
| 6,923,216 | B2 | 8/2005 | Extrand et al. | 7,607,744 | B2 | 10/2009 | Casoli et al. |
| 6,926,946 | B2 | 8/2005 | Ogawa et al. | D607,020 | S | 12/2009 | Baacke et al. |
| 6,931,888 | B2 | 8/2005 | Shekunov et al. | D612,404 | S | 3/2010 | Picken et al. |
| 6,938,774 | B2 | 9/2005 | Extrand | D612,405 | S | 3/2010 | Eicher |
| 6,942,746 | B2 | 9/2005 | Niejelow et al. | D613,316 | S | 4/2010 | Schmidt |
| 6,966,990 | B2 | 11/2005 | Chattopadhyay et al. | 7,726,615 | B2 | 6/2010 | Rutz |
| 6,976,585 | B2 | 12/2005 | Extrand | 7,731,316 | B2 | 6/2010 | Wing |
| 6,976,998 | B2 | 12/2005 | Rizzo et al. | 7,748,806 | B2 | 7/2010 | Egan |
| 6,982,242 | B2 | 1/2006 | Liss et al. | 7,989,619 | B2 | 8/2011 | Guire et al. |
| 6,994,045 | B2 | 2/2006 | Paszkowski | 2001/0018130 | A1 | 8/2001 | Hayden |
| 6,998,051 | B2 | 2/2006 | Chattopadhyay et al. | 2001/0019773 | A1 | 9/2001 | Akamatsu et al. |
| 7,022,416 | B2 | 4/2006 | Teranishi | 2001/0024728 | A1 | 9/2001 | Kamitani et al. |
| 7,026,018 | B2 | 4/2006 | Kranovich | 2001/0030808 | A1 | 10/2001 | Komatsu et al. |
| 7,037,591 | B2 | 5/2006 | Henze et al. | 2001/0055677 | A1 | 12/2001 | Wuu |
| 7,048,889 | B2 | 5/2006 | Arney et al. | 2002/0001676 | A1 | 1/2002 | Hayden |
| 7,052,244 | B2 | 5/2006 | Fouillet et al. | 2002/0034627 | A1 | 3/2002 | Jacquiod et al. |
| 7,056,409 | B2 | 6/2006 | Dubrow | 2002/0045007 | A1 | 4/2002 | Arora et al. |
| 7,057,832 | B2 | 6/2006 | Wu et al. | 2002/0077412 | A1 | 6/2002 | Kobayashi et al. |
| 7,057,881 | B2 | 6/2006 | Chow et al. | 2002/0111402 | A1 | 8/2002 | Mizuno et al. |
| 7,074,273 | B2 | 7/2006 | Shimomura et al. | 2002/0177655 | A1 | 11/2002 | Pratt et al. |
| 7,074,294 | B2 | 7/2006 | Dubrow | 2002/0192472 | A1 | 12/2002 | Metz et al. |
| 7,083,748 | B2 | 8/2006 | Chattopadhyay et al. | 2002/0197490 | A1 | 12/2002 | Amidaiji et al. |
| 7,083,828 | B2 | 8/2006 | Muller et al. | 2003/0021902 | A1 | 1/2003 | Yamamoto et al. |
| 7,109,256 | B2 | 9/2006 | Amano et al. | 2003/0026972 | A1 | 2/2003 | Reihs |
| 7,112,369 | B2 | 9/2006 | Wang et al. | 2003/0040243 | A1 | 2/2003 | Ward |
| 7,148,181 | B2 | 12/2006 | Tanaka et al. | 2003/0040568 | A1 | 2/2003 | Furuta et al. |
| 7,150,904 | B2 | 12/2006 | D'Urso et al. | 2003/0070677 | A1 | 4/2003 | Handique et al. |
| 7,153,357 | B2 | 12/2006 | Baumgart et al. | 2003/0072723 | A1 | 4/2003 | Gers-Barlag et al. |
| 7,157,018 | B2 | 1/2007 | Scheidler | 2003/0073067 | A1 | 4/2003 | Bookfinder et al. |

**US 8,286,561 B2**

Page 4

| | | | |
|---|---|---|---|
| 2003/0077533 A1 | 4/2003 | Murota et al. |
| 2003/0091809 A1 | 5/2003 | Scarborough et al. |
| 2003/0110976 A1 | 6/2003 | Abidh et al. |
| 2003/0117051 A1 | 6/2003 | Kweon |
| 2003/0119684 A1 | 6/2003 | Tsao |
| 2003/0125656 A1 | 7/2003 | Davankov et al. |
| 2003/0143339 A1 | 7/2003 | Kobayashi |
| 2003/0149218 A1 | 8/2003 | Cote'et al. |
| 2003/0166840 A1 | 9/2003 | Urry et al. |
| 2003/0170401 A1 | 9/2003 | Shimomura et al. |
| 2003/0176572 A1 | 9/2003 | Maekawa et al. |
| 2003/0179494 A1 | 9/2003 | Kaneko |
| 2004/0005469 A1 | 1/2004 | Metz et al. |
| 2004/0025747 A1 | 2/2004 | Kamitani et al. |
| 2004/0050297 A1 | 3/2004 | Kobayashi et al. |
| 2004/0053058 A1 | 3/2004 | Kamitani et al. |
| 2004/0056575 A1 | 3/2004 | Dietz et al. |
| 2004/0097616 A1 | 5/2004 | Hoppler et al. |
| 2004/0102124 A1 | 5/2004 | Suzuki |
| 2004/0121168 A1 | 6/2004 | Goodwin et al. |
| 2004/0137814 A1 | 7/2004 | Kimbrell, Jr. et al. |
| 2004/0138083 A1 | 7/2004 | Kimbrell, Jr. et al. |
| 2004/0142557 A1 | 7/2004 | Levy et al. |
| 2004/0154106 A1 | 8/2004 | Oles et al. |
| 2004/0201048 A1 | 10/2004 | Seki et al. |
| 2004/0209203 A1 | 10/2004 | Kano et al. |
| 2004/0213904 A1 | 10/2004 | Muller et al. |
| 2004/0216227 A1 | 11/2004 | Papadaki et al. |
| 2005/0000463 A1 | 1/2005 | Mochizuki |
| 2005/0004264 A1 | 1/2005 | Tanabe |
| 2005/0008859 A1 | 1/2005 | Forgacs |
| 2005/0009953 A1 | 1/2005 | Shea |
| 2005/0022313 A1 | 2/2005 | Scheidler |
| 2005/0053793 A1 | 3/2005 | Benay-Oun et al. |
| 2005/0075020 A1 | 4/2005 | Benayoun et al. |
| 2005/0106762 A1 | 5/2005 | Chakrapani et al. |
| 2005/0121782 A1 | 6/2005 | Nakamura et al. |
| 2005/0143547 A1 | 6/2005 | Stark et al. |
| 2005/0165194 A1 | 7/2005 | Benayoun et al. |
| 2005/0170098 A1 | 8/2005 | Baumann et al. |
| 2005/0221098 A1 | 10/2005 | Azzopardi et al. |
| 2005/0239211 A1 | 10/2005 | Uchihara et al. |
| 2005/0245395 A1 | 11/2005 | Tanaka et al. |
| 2006/0013926 A1 | 1/2006 | Sebastian et al. |
| 2006/0029808 A1 | 2/2006 | Zhai et al. |
| 2006/0040164 A1 | 2/2006 | Vyas et al. |
| 2006/0051261 A1 | 3/2006 | Badyal |
| 2006/0052556 A1 | 3/2006 | Franchina et al. |
| 2006/0057390 A1 | 3/2006 | Kittle et al. |
| 2006/0062695 A1 | 3/2006 | Haab et al. |
| 2006/0062929 A1 | 3/2006 | Kittle et al. |
| 2006/0081394 A1 | 4/2006 | Li et al. |
| 2006/0089466 A1 | 4/2006 | Shimomura et al. |
| 2006/0110541 A1 | 5/2006 | Russell et al. |
| 2006/0110542 A1 | 5/2006 | Dietz et al. |
| 2006/0113443 A1 | 6/2006 | Remmers |
| 2006/0147634 A1 | 7/2006 | Strauss |
| 2006/0151739 A1 | 7/2006 | Sandner et al. |
| 2006/0154048 A1 | 7/2006 | Teranishi et al. |
| 2006/0162373 A1 | 7/2006 | McMillin et al. |
| 2006/0185555 A1 | 8/2006 | Giessler et al. |
| 2006/0207032 A1 | 9/2006 | Reiners et al. |
| 2006/0213849 A1 | 9/2006 | Bienick |
| 2006/0222865 A1 | 10/2006 | Hoshino et al. |
| 2006/0263516 A1 | 11/2006 | Jones et al. |
| 2006/0266258 A1 | 11/2006 | Asakura et al. |
| 2006/0269758 A1 | 11/2006 | Helmeke |
| 2006/0281889 A1 | 12/2006 | Kobayashi et al. |
| 2006/0286305 A1 | 12/2006 | Thies et al. |
| 2006/0292345 A1 | 12/2006 | Dave et al. |
| 2007/0003705 A1 | 1/2007 | Strauss |
| 2007/0005024 A1 | 1/2007 | Weber et al. |
| 2007/0009657 A1 | 1/2007 | Zhang et al. |
| 2007/0014970 A1 | 1/2007 | Nun et al. |
| 2007/0026193 A1 | 2/2007 | Luzinov et al. |
| 2007/0046160 A1 | 3/2007 | Egan |
| 2007/0065668 A1 | 3/2007 | Idei |
| 2007/0075199 A1 | 4/2007 | Stewart et al. |
| 2007/0141306 A1 | 6/2007 | Kasai et al. |
| 2007/0148407 A1 | 6/2007 | Chen et al. |
| 2007/0166513 A1 | 7/2007 | Sheng et al. |
| 2007/0172650 A1 | 7/2007 | O'Rear et al. |
| 2007/0172658 A1 | 7/2007 | Deruelle et al. |
| 2007/0172661 A1 | 7/2007 | Fechner et al. |
| 2007/0176379 A1 | 8/2007 | Sonnendorfer et al. |
| 2007/0196656 A1 | 8/2007 | Rowell |
| 2007/0202342 A1 | 8/2007 | Whiteford et al. |
| 2007/0213230 A1 | 9/2007 | Pfeiffer et al. |
| 2007/0215004 A1 | 9/2007 | Kuroda et al. |
| 2007/0224898 A1 | 9/2007 | Deangelis et al. |
| 2007/0231517 A1 | 10/2007 | Golownia |
| 2007/0238807 A1 | 10/2007 | Safir et al. |
| 2007/0259156 A1 | 11/2007 | Kempers et al. |
| 2007/0274871 A1 | 11/2007 | Jiang |
| 2007/0298216 A1 | 12/2007 | Jing et al. |
| 2008/0012459 A1 | 1/2008 | Picken et al. |
| 2008/0018709 A1 | 1/2008 | Takenaka et al. |
| 2008/0020127 A1 | 1/2008 | Whiteford et al. |
| 2008/0032403 A1 | 2/2008 | Saito et al. |
| 2008/0039558 A1 | 2/2008 | Lazzari et al. |
| 2008/0044635 A1 | 2/2008 | O'Neill et al. |
| 2008/0050567 A1 | 2/2008 | Kawashima et al. |
| 2008/0063870 A1 | 3/2008 | O'Rear et al. |
| 2008/0066648 A1 | 3/2008 | Asakura et al. |
| 2008/0070146 A1 | 3/2008 | Fomitchev et al. |
| 2008/0088192 A1 | 4/2008 | Hsu |
| 2008/0090004 A1 | 4/2008 | Zhang et al. |
| 2008/0101041 A1 | 5/2008 | Chang et al. |
| 2008/0102347 A1 | 5/2008 | Blunk |
| 2008/0107864 A1 | 5/2008 | Zhang et al. |
| 2008/0131653 A1 | 6/2008 | Lyons et al. |
| 2008/0166549 A1 | 7/2008 | Shieh et al. |
| 2008/0171805 A1 | 7/2008 | Mingarelli |
| 2008/0172937 A1 | 7/2008 | Palmer et al. |
| 2008/0176991 A1 | 7/2008 | Osawa et al. |
| 2008/0197760 A1 | 8/2008 | Leconte et al. |
| 2008/0199657 A1 | 8/2008 | Capron et al. |
| 2008/0199659 A1 | 8/2008 | Zhao |
| 2008/0206550 A1 | 8/2008 | Borlner |
| 2008/0207581 A1 | 8/2008 | Whiteford et al. |
| 2008/0213601 A1 | 9/2008 | Yamamoto et al. |
| 2008/0220170 A1 | 9/2008 | Van Der Flaas |
| 2008/0220676 A1 | 9/2008 | Marin et al. |
| 2008/0221009 A1 | 9/2008 | Kanagasabapathy et al. |
| 2008/0221263 A1 | 9/2008 | Kanagasabapathy et al. |
| 2008/0222694 A1 | 9/2008 | Gelbart et al. |
| 2008/0237126 A1 | 10/2008 | Hoek et al. |
| 2008/0241512 A1 | 10/2008 | Boris et al. |
| 2008/0241523 A1 | 10/2008 | Huignard et al. |
| 2008/0245273 A1 | 10/2008 | Vyorkka et al. |
| 2008/0246804 A1 | 10/2008 | Kawase et al. |
| 2008/0248263 A1 | 10/2008 | Kobrin |
| 2008/0250978 A1 | 10/2008 | Baumgart et al. |
| 2008/0261024 A1 | 10/2008 | Xenopoulos et al. |
| 2008/0268233 A1 | 10/2008 | Lawin et al. |
| 2008/0269358 A1 | 10/2008 | Inoue et al. |
| 2008/0280699 A1 | 11/2008 | Jarvholm |
| 2008/0286556 A1 | 11/2008 | D'urso et al. |
| 2008/0295347 A1 | 12/2008 | Braham |
| 2008/0296252 A1 | 12/2008 | D'Urso et al. |
| 2008/0306202 A1 | 12/2008 | Lin et al. |
| 2008/0310660 A1 | 12/2008 | Lin |
| 2009/0010870 A1 | 1/2009 | Greiner et al. |
| 2009/0011222 A1 | 1/2009 | Xiu et al. |
| 2009/0011227 A1 | 1/2009 | Furukawa |
| 2009/0011960 A1 | 1/2009 | Wu |
| 2009/0018249 A1 | 1/2009 | Kanagasabapathy et al. |
| 2009/0025508 A1 | 1/2009 | Liao et al. |
| 2009/0025609 A1 | 1/2009 | Egami et al. |
| 2009/0032088 A1 | 2/2009 | Rabinowitz |
| 2009/0036978 A1 | 2/2009 | Kleiner et al. |
| 2009/0042469 A1 | 2/2009 | Simpson |
| 2009/0058247 A1 | 3/2009 | Collins et al. |
| 2009/0064894 A1 | 3/2009 | Baumgart et al. |
| 2009/0076430 A1 | 3/2009 | Simpson et al. |
| 2009/0084914 A1 | 4/2009 | Picken et al. |
| 2009/0085453 A1 | 4/2009 | Daley et al. |
| 2009/0087670 A1 | 4/2009 | Peng et al. |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2009/0095941 | A1 | 4/2009 | Nakata et al. | EP | 1429919 | A1 | 6/2004 |
| 2009/0099301 | A1 | 4/2009 | Naraghi et al. | EP | 1433821 | A1 | 6/2004 |
| 2009/0105409 | A1 | 4/2009 | Munzmay et al. | EP | 1473355 | A1 | 11/2004 |
| 2009/0105679 | A1 | 4/2009 | Joubert et al. | EP | 1475234 | A1 | 11/2004 |
| 2009/0111344 | A1 | 4/2009 | Murphy et al. | EP | 1479738 | A1 | 11/2004 |
| 2009/0115302 | A1 | 5/2009 | Benz et al. | EP | 1492837 | A1 | 1/2005 |
| 2009/0134758 | A1 | 5/2009 | Vardon | EP | 1503813 | A1 | 2/2005 |
| 2009/0136737 | A1 | 5/2009 | Ring et al. | EP | 1524290 | A1 | 4/2005 |
| 2009/0142604 | A1 | 6/2009 | Imai et al. | EP | 1583615 | A1 | 10/2005 |
| 2009/0155566 | A1 | 6/2009 | Gentleman et al. | EP | 1752284 | A1 | 2/2007 |
| 2009/0162592 | A1 | 6/2009 | Baikerikar et al. | EP | 1857497 | A2 | 11/2007 |
| 2009/0163637 | A1 | 6/2009 | Li et al. | EP | 1873218 | A1 | 1/2008 |
| 2009/0182085 | A1 | 7/2009 | Escobar Barrios et al. | EP | 1875279 | A1 | 1/2008 |
| 2009/0186070 | A1 | 7/2009 | Guire et al. | EP | 1883669 | A1 | 2/2008 |
| 2009/0188877 | A1 | 7/2009 | Stewart | EP | 1902091 | A2 | 3/2008 |
| 2009/0195136 | A1 | 8/2009 | Wing et al. | EP | 1908804 | A1 | 4/2008 |
| 2009/0212505 | A1 | 8/2009 | McMillin et al. | EP | 1988129 | A2 | 11/2008 |
| 2010/0001625 | A1 | 1/2010 | Eckartsberg et al. | EP | 1997619 | A1 | 12/2008 |
| 2010/0026156 | A1 | 2/2010 | LeConte et al. | GB | 1 341 605 | A | 12/1973 |
| 2010/0052491 | A1 | 3/2010 | Vardon | JP | 62-246960 | A | 10/1987 |
| 2010/0102693 | A1 | 4/2010 | Driver et al. | JP | 2004308984 | A | 11/2004 |
| 2010/0109498 | A1 | 5/2010 | Ramm et al. | JP | 2007182491 | A | 7/2007 |
| 2010/0117502 | A1 | 5/2010 | Kang et al. | JP | 2008228958 | A | 10/2008 |
| 2010/0133970 | A1 | 6/2010 | Shin et al. | JP | 2009071672 | | 4/2009 |
| 2010/0176703 | A1 | 7/2010 | Kim | KR | 10-2003-0052853 | | 6/2003 |
| 2010/0181884 | A1 | 7/2010 | De La Garza et al. | MX | 175646 | | 8/1994 |
| 2010/0196702 | A9 | 8/2010 | Furukawa | MX | 183533 | | 12/1996 |
| 2010/0213334 | A1 | 8/2010 | Davenport | MX | 192053 | | 5/1999 |
| 2010/0330347 | A1 | 12/2010 | Badyal et al. | MX | 195031 | | 1/2000 |
| | | | | MX | 199899 | | 11/2000 |
| | | | | MX | 201072 | | 3/2001 |
| | | **FOREIGN PATENT DOCUMENTS** | | MX | 203880 | | 8/2001 |
| | | | | MX | 205074 | | 11/2001 |
| EP | 0207282 | A2 | 1/1987 | MX | PA01011653 | A | 12/2002 |
| EP | 0307915 | A2 | 3/1989 | MX | 215752 | | 8/2003 |
| EP | 0317057 | A2 | 5/1989 | MX | PA02006399 | A | 9/2003 |
| EP | 0332141 | A2 | 9/1989 | MX | PA02012841 | A | 1/2006 |
| EP | 0399568 | A2 | 11/1990 | MX | 234477 | | 2/2006 |
| EP | 0 452 723 | A1 | 10/1991 | MX | PA06003323 | A | 3/2006 |
| EP | 0472215 | A2 | 2/1992 | WO | WO-91/04305 | A1 | 4/1991 |
| EP | 0493270 | A2 | 7/1992 | WO | WO-93/16131 | A1 | 8/1993 |
| EP | 0623656 | A2 | 11/1994 | WO | WO-94/13734 | A1 | 6/1994 |
| EP | 0649887 | A2 | 4/1995 | WO | WO-96/04123 | | 2/1996 |
| EP | 0657393 | A1 | 6/1995 | WO | WO-96/07621 | A1 | 3/1996 |
| EP | 0714870 | A1 | 6/1996 | WO | WO-97/07993 | A1 | 3/1997 |
| EP | 0714921 | A1 | 6/1996 | WO | WO-98/20960 | A1 | 5/1998 |
| EP | 0 719 743 | A1 | 7/1996 | WO | WO-99/23137 | A1 | 5/1999 |
| EP | 0 719 821 | A1 | 7/1996 | WO | WO-99/23437 | A1 | 5/1999 |
| EP | 0739714 | A2 | 10/1996 | WO | WO-99/47578 | A1 | 9/1999 |
| EP | 0 745 568 | A1 | 12/1996 | WO | WO-99/57185 | A1 | 11/1999 |
| EP | 0745567 | A1 | 12/1996 | WO | WO-99/64363 | A1 | 12/1999 |
| EP | 0752459 | A2 | 1/1997 | WO | WO-00/05321 | | 2/2000 |
| EP | 0770706 | A1 | 5/1997 | WO | WO-00/14297 | | 3/2000 |
| EP | 0799791 | A1 | 10/1997 | WO | WO-00/25938 | A1 | 5/2000 |
| EP | 0 811 430 | A1 | 12/1997 | WO | WO-00/34361 | A1 | 6/2000 |
| EP | 0863191 | A2 | 9/1998 | WO | WO-00/39240 | | 7/2000 |
| EP | 0903389 | A1 | 3/1999 | WO | WO-00/46464 | A1 | 8/2000 |
| EP | 0904343 | A1 | 3/1999 | WO | WO-00/66241 | A1 | 11/2000 |
| EP | 0914873 | A2 | 5/1999 | WO | WO-01/19745 | A1 | 3/2001 |
| EP | 0915103 | A1 | 5/1999 | WO | WO-01/62682 | A1 | 8/2001 |
| EP | 0930351 | A1 | 7/1999 | WO | WO-01/74739 | | 10/2001 |
| EP | 0969718 | A1 | 1/2000 | WO | WO-01/79142 | A1 | 10/2001 |
| EP | 1047735 | A2 | 11/2000 | WO | WO-01/79371 | A2 | 10/2001 |
| EP | 1048696 | A2 | 11/2000 | WO | WO-01/98399 | A1 | 12/2001 |
| EP | 1097979 | A1 | 5/2001 | WO | WO-02/14417 | A1 | 2/2002 |
| EP | 1108735 | A1 | 6/2001 | WO | WO-02/28951 | A1 | 4/2002 |
| EP | 1113064 | A1 | 7/2001 | WO | WO-02/062910 | A2 | 8/2002 |
| EP | 1136539 | A1 | 9/2001 | WO | WO-02/074869 | A1 | 9/2002 |
| EP | 1180533 | A1 | 2/2002 | WO | WO-02/098983 | A1 | 12/2002 |
| EP | 1187872 | A1 | 3/2002 | WO | WO-03/010255 | A2 | 2/2003 |
| EP | 1193289 | A1 | 4/2002 | WO | WO-03/012004 | A1 | 2/2003 |
| EP | 1215252 | A2 | 6/2002 | WO | WO-03/030879 | A1 | 4/2003 |
| EP | 1261559 | A1 | 12/2002 | WO | WO-03/037702 | A1 | 5/2003 |
| EP | 1360253 | A2 | 11/2003 | WO | WO-03/045693 | A1 | 6/2003 |
| EP | 1362904 | A1 | 11/2003 | WO | WO-03/080258 | A2 | 10/2003 |
| EP | 1387011 | A1 | 2/2004 | WO | WO-03/082998 | A1 | 10/2003 |
| EP | 1387169 | A1 | 2/2004 | WO | WO-03/093568 | A1 | 11/2003 |
| EP | 1392619 | A1 | 3/2004 | WO | WO-2004/012625 | A2 | 2/2004 |
| EP | 1392772 | A1 | 3/2004 | WO | WO-2004/043319 | A2 | 5/2004 |
| EP | 1401903 | A2 | 3/2004 | | | | |
| EP | 1407792 | A1 | 4/2004 | | | | |

**5**

| WO | WO-2004/058418 | A1 | 7/2004 |
| WO | WO-2004/104116 | A1 | 12/2004 |
| WO | WO-2004/110132 | A2 | 12/2004 |
| WO | WO-2005/021843 | A1 | 3/2005 |
| WO | WO-2005/023935 | A1 | 3/2005 |
| WO | WO-2005/028562 | A1 | 3/2005 |
| WO | WO-2005/068399 | A1 | 7/2005 |
| WO | WO-2005/077429 | A1 | 8/2005 |
| WO | WO-2006/044642 | A2 | 4/2006 |
| WO | WO-2006/081891 | A1 | 8/2006 |
| WO | WO-2006/083600 | A1 | 8/2006 |
| WO | WO-2006/101934 | A1 | 9/2006 |
| WO | WO-2006/135755 | A2 | 12/2006 |
| WO | WO-2007/011731 | A2 | 1/2007 |
| WO | WO-2007/027276 | A1 | 3/2007 |
| WO | WO-2007/052260 | A2 | 5/2007 |
| WO | WO-2007/053266 | A1 | 5/2007 |
| WO | WO-2007/056427 | A2 | 5/2007 |
| WO | WO-2007/070801 | A2 | 6/2007 |
| WO | WO-2007/075407 | A1 | 7/2007 |
| WO | WO-2007/092746 | A2 | 8/2007 |
| WO | WO-2007/102960 | A2 | 9/2007 |
| WO | WO-2007/104494 | A1 | 9/2007 |
| WO | WO-2007/126432 | A1 | 11/2007 |
| WO | WO-2007/126743 | A1 | 11/2007 |
| WO | WO-2007/130294 | A2 | 11/2007 |
| WO | WO-2007/149617 | A1 | 12/2007 |
| WO | WO-2008/004827 | A1 | 1/2008 |
| WO | WO-2008/004828 | A1 | 1/2008 |
| WO | WO-2008/006078 | A2 | 1/2008 |
| WO | WO-2008/021791 | A2 | 2/2008 |
| WO | WO-2008/035347 | A2 | 3/2008 |
| WO | WO-2008/035917 | A1 | 3/2008 |
| WO | WO-2008/050895 | A1 | 5/2008 |
| WO | WO-2008/051221 | A2 | 5/2008 |
| WO | WO-2008/066828 | A2 | 6/2008 |
| WO | WO-2008/078346 | A1 | 7/2008 |
| WO | WO-2008/106494 | A1 | 9/2008 |
| WO | WO-2008/112158 | A1 | 9/2008 |
| WO | WO-2008/123650 | A1 | 10/2008 |
| WO | WO-2008/123955 | A1 | 10/2008 |
| WO | WO-2008/123961 | A1 | 10/2008 |
| WO | WO-2008/134243 | A1 | 11/2008 |
| WO | WO-2008/137973 | A1 | 11/2008 |
| WO | WO-2008/151991 | A1 | 12/2008 |
| WO | WO-2008/153687 | A2 | 12/2008 |
| WO | WO-2009/003847 | A1 | 1/2009 |
| WO | WO-2009/005465 | A1 | 1/2009 |
| WO | WO-2009/012116 | A2 | 1/2009 |
| WO | WO-2009/018327 | A2 | 2/2009 |
| WO | WO-2009/037717 | A2 | 3/2009 |
| WO | WO-2009/041752 | A1 | 4/2009 |
| WO | WO-2009/061199 | A1 | 5/2009 |
| WO | WO-2009/148611 | A1 | 12/2009 |
| WO | WO-2009158567 | A1 | 12/2009 |
| WO | WO-2010/042191 | A1 | 4/2010 |
| WO | WO-2010/042668 | A1 | 4/2010 |

OTHER PUBLICATIONS

Extended European search report from corresponding European application No. 09771098.2, dated Dec. 27, 2011.

International Search Report and Written Opinion for International Application No. PCT/US2010/048711, dated Mar. 17, 2011.

Kobayashi et al., "Surface Tension of Poly[(3,3,4,4,5,5,6,6,6-nonafluorohexyl)-methylsiloxane]", *Marcomolecules*, 23:4929-4933 (1990).

International Preliminary Report on Patentability for corresponding international application No. PCT/US2009/048775, dated Jan. 13, 2011.

International Search Report and Written Opinion for Application No. PCT/US2009/048775, dated Nov. 19, 2009.

International Search Report and Written Opinion from international application No. PCT/US2010/054936, dated Feb. 16, 2011.

U.S. Appl. No. 61/699,200, filed Jul. 14, 2005, Guire et al.

U.S. Appl. No. 61/807,143, filed Jul. 12, 2006, Guire et al.

U.S. Appl. No. 61/891,876, filed Feb. 27, 2007, Lawin et al.

U.S. Appl. No. 61/058,902, filed Jun. 4, 2008, Driver et al.

U.S. Appl. No. 61/090,002, filed Aug. 19, 2008, Driver et al.

U.S. Appl. No. 61/133,273, filed Jun. 27, 2008, Driver et al.

U.S. Appl. No. 61/216,540, filed May 18, 2009, Driver et al.

Prosecution history of European application No. EP06787306.7 (published as EP1902091) as of Sep. 3, 2009.

First Office Action from the State Intellectual Property Office of P.R. China from counterpart application CN200980124417.6 (Mar. 1, 2012) (English and Chinese).

Uneiko Corporation, Rain Clear available at <http://web.archive.org/web/2007070603233 1/http://www.rainclear.com/> (archived Jul. 6, 2007).

U.S. Appl. No. 60/699,200, filed Jul. 14, 2005, Guire et al.

U.S. Appl. No. 60/807,143, filed Jul. 12, 2005, Guire et al.

U.S. Appl. No. 60/891,876, filed Feb. 27, 2007, Lawin et al.

U.S. Appl. No. 61/103,295, filed Oct. 7, 2008, Sikka et al.

U.S. Appl. No. 61/159,914, filed Mar. 13, 2009, Sikka et al.

**6**



*FIG. 1*
*PRIOR ART*



FIG. 2
PRIOR ART

**8**



**FIG. 3**

9



*FIG. 4*



*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8*

**13**



**FIG. 9**



**FIG. 10**



**FIG. 11**



**FIG. 12**



*FIG. 13*



*FIG. 14*



**FIG. 15**



**FIG. 16**



**FIG. 17**

17



*FIG. 18*



*FIG. 19*

*FIG. 20*



*FIG. 21*



*FIG. 22*

**20**



**FIG. 23**

U.S. Patent

Oct. 16, 2012

Sheet 16 of 18

US 8,286,561 B2





*FIG. 24*



*FIG. 25*

Stains allowed to dry for 72 hrs



**FIG. 26A**

After cleaning with wet dish rag



**FIG. 26B**

US 8,286,561 B2

1

# SPILL CONTAINING REFRIGERATOR SHELF ASSEMBLY

## CROSS-REFERENCE TO RELATED APPLICATIONS

Priority is claimed as a continuation-in-part of International Patent Application No. PCT/US09/48775, filed Jun. 26, 2009, which claims priority to U.S. Provisional Patent Application No. 61/216,540, filed May 18, 2009, and U.S. Provisional Patent Application No. 61/133,273, filed Jun. 27, 2008, the entire contents of each of which are hereby incorporated herein by reference.

## FIELD OF THE INVENTION

The invention relates to shelving and the like, e.g., countertops and table tops, including shelving which may be adapted for use with refrigerators. More particularly, the invention relates to the support surfaces of such articles which have spill containing features.

## BACKGROUND ART

Previous types of shelving have been developed for use as refrigerator and other shelves. Shelving designs exist in the prior art which include means for containing liquid spills and leaks from a container stored on a shelf, and preventing the spill from dripping from the shelf onto the floor or into other parts of a refrigerator, commonly referred to as "spill proof" shelving. For example, Kane, et al., U.S. Pat. No. 5,564,809, issued Oct. 14, 1996, discloses a shelf assembly with a shelf panel, a shelf support supporting the panel, and a molded one-piece member encapsulating the edge of the shelf panel and a substantial majority of the shelf support.

Herrmann, et al., U.S. Pat. No. 5,735,589, issued Apr. 7, 1998, discloses a shelf panel for a refrigerator compartment, which includes a shelf panel that is slidably supported for extension and retraction on a support, and which includes slide members that are preferably molded so as to form a rim on the top support surface of the shelf panel to contain liquids.

Bird, et al., U.S. Pat. No. 5,429,433, issued Jul. 4, 1995, also describes a refrigerator shelf which is adapted for containment of spills on the shelf. The shelf includes a planar shelf with a rim molded around the perimeter edge of the shelf. The rim projects above the top surface of the shelf to form a dam for containing liquid spills on the shelf.

Meier, et al., U.S. Pat. No. 6,120,720, issued Sep. 19, 2000, discloses a method of manufacturing a glass shelf with a plastic edge for retaining spills on the shelf. The glass shelf panel is placed in a cavity of a mold and plastic material is injected into the cavity surrounding the glass shelf panel such that a plastic edging is formed around the perimeter of the glass shelf panel.

Additional techniques for containing spills in refrigerator shelving include the use of injection molded plastic, so as to encapsulate a support plate forming the shelf, using plastic molded parts to essentially "sandwich" a support plate between the parts, or using a silicone sealant or various other types of adhesives to form physical spill containment barriers around the perimeter of the refrigerator shelving. In addition to the foregoing, it is known to utilize formed lips or ridges on the surface of the support plate itself, so as to essentially provide a physical barrier as a liquid retention feature.

## SUMMARY OF THE INVENTION

The present invention is a method for containing spills on shelving and the like having a support top surface, and the

2

resulting items made in accordance with the method, by providing the support top surface with a hydrophobic surface which is arranged in a spill containment pattern and which is generally in the plane of the top surface of the support. The majority of the top surface of the support consists of one or more spill containment areas which are of a non-hydrophobic nature and which are bounded by the hydrophobic surfaces, such that spills on the surface collect in the non-hydrophobic spill containment area or areas and are prevented from spreading by the hydrophobic surfaces.

These and other objects, advantages and features of the invention will be more fully understood and appreciated by reference to the Description of the Preferred Embodiments, and the appended drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the invention will now be described with reference to the drawings, in which:

FIG. 1 is a perspective view of a prior art shelf assembly mounted on a pair of support brackets, and utilizing the concept of encapsulation of a shelf for providing spill containment features;

FIG. 2 is a front, sectional view of the shelf assembly shown in FIG. 1, with the absence of the support brackets;

FIG. 3 is a perspective view of a shelf assembly in accordance with a preferred embodiment of the invention including a shelf mounted on a pair of support brackets, the shelf including a hydrophobic spill containment pattern disposed on the top surface thereof to contain spilled liquids;

FIG. 4 is a front, elevation view of the shelf assembly shown in FIG. 3, with the absence of the support brackets;

FIG. 5 is a perspective view of an alternative embodiment of a shelf assembly constructed in accordance with the present disclosure and having a grid-like hydrophobic spill containment pattern;

FIG. 6 is a perspective view of yet another alternative embodiment shelf assembly constructed in accordance with the present disclosure and having a hydrophobic spill containment pattern that includes first and second borders;

FIG. 7 is a partial perspective view of a shelf assembly including support brackets constructed in accordance with a first embodiment the present disclosure;

FIG. 8 is a cross-sectional view of the shelf assembly of FIG. 7 taken through line VIII-VIII of FIG. 7;

FIG. 9 is a partial perspective view of a shelf assembly including support brackets constructed in accordance with a second embodiment of the present disclosure;

FIG. 10 is a cross-sectional view of the shelf assembly of FIG. 9 taken through line X-X of FIG. 9;

FIG. 11 is a perspective view of a shelf assembly including support brackets constructed in accordance with a third embodiment of the present disclosure;

FIG. 12 is a cross-sectional view of the shelf assembly of FIG. 11 taken through line XI-XI of FIG. 11;

FIG. 13 is a side view of a shelf assembly including support brackets constructed in accordance with a fourth embodiment of the present disclosure;

FIG. 14 is a cross-sectional view of the shelf assembly of FIG. 13 taken through line XIV-XIV of FIG. 13;

FIG. 15 is a perspective view of a shelf assembly including support brackets constructed in accordance with a fifth embodiment of the present disclosure;

FIG. 16 is a perspective view of a support bracket of the shelf assembly of FIG. 15;

FIG. 17 is a cross-sectional view of the shelf assembly of FIG. 15 taken through line XVII-XVII of FIG. 15;

**25**

US 8,286,561 B2

3

4

FIG. **18** is a schematic partial cross-sectional view of a shelf assembly including support brackets constructed in accordance with a sixth embodiment of the present disclosure;

FIG. **19** is a top view of a shelf assembly including front and rear trim components in accordance with a seventh embodiment of the present disclosure;

FIG. **20** is a side view of the shelf assembly of FIG. **19**;

FIG. **21** is a detail view of the front trim component of the shelf assembly of FIGS. **19** and **20** taken from circle XXI of FIG. **20**;

FIG. **22** is a detail view of the rear trim component of the shelf assembly of FIGS. **19** and **20** taken from circle XXII of FIG. **20**;

FIG. **23** is a detail view of front portion of a shelf assembly including a front trim component in accordance with an eighth embodiment of the present disclosure;

FIG. **24** is a graph showing the water height retention test results after abrasion with a glass jar for three shelves formed in accordance with embodiments of the present disclosure;

FIG. **25** is a graph showing the water height retention test results after performing a cleaning process on three shelves formed in accordance with embodiments of the present disclosure; and

FIGS. **26**A and **26**B are photographs demonstrating the stain resistant properties of a shelf having a hydrophobic spill containment pattern formed of a ceramic frit and a hydrophobic compound in accordance with an embodiment of the present disclosure.

## DETAILED DESCRIPTION

In the preferred embodiments, the term "shelving and/or the like," "shelving," "shelf," or "shelf and/or the like" encompasses shelves and articles whose top surfaces such as pantry shelves, countertops, stovetops, cook-tops, and table tops. Certain embodiments are especially advantageous for use in refrigerator and freezer shelving.

In such preferred embodiments of the invention, refrigerator shelving is provided with a spill containment pattern which may consist of a hydrophobic surface in the pattern of a frame-like border, which defines the boundaries of a single non-hydrophobic spill containment area therein. The pattern may be a frame-like border which extends along the perimeter of the shelf's top surface (FIG. **3**), or it may be spaced from the perimeter and encompass a smaller portion of the top surface, and may include an outer border with a final spill catch area between the inner and outer border (FIG. **6**). It may consist of a hydrophobic surface in a grid-like pattern, which pattern defines the boundaries of several spill containment areas therein (FIG. **5**). Other variations are intended to be within the scope of the present disclosure.

A preferred embodiment shelf may be incorporated into a shelving assembly with a shelf-supporting mechanism, such as a bracket, and a shelf, which is capable of supporting articles on its top surface. The disclosure provided herein relates to the shelf portion of the assembly, and various brackets that can be used with the shelf.

The shelf may consist of a substrate formed of metal, glass, plastic, another suitable material, or a combination of any of the foregoing, and which has a hydrophobic surface which is generally in the same plane as the top surface of the shelf substrate and which is arranged in a spill containment pattern to provide a spill containment feature on the top surface of the shelf substrate, as illustrated in FIGS. **3**-**6** and described below. The majority of the surface area of the top surface of the shelf substrate is non-hydrophobic in nature. The non-

hydrophobic region of the top surface is bounded by the hydrophobic spill containment pattern such that spilled liquids are repelled by the hydrophobic spill containment pattern and pool and remain contained on these non-hydrophobic spill containing areas by the hydrophobic surfaces. The shelves described herein can be adapted for use as refrigerator or freezer shelves, for example.

A hydrophobic or super hydrophobic surface treatment may be applied to the shelf substrate's top surface to create the hydrophobic spill containment pattern described herein in a variety of methods, and any surface coatings may be used which are known to be hydrophobic or super-hydrophobic or are known to make a surface hydrophobic or super-hydrophobic. The hydrophobic surface described herein is not limited to any specific hydrophobic or super hydrophobic surface treatment, and any method of making a portion of the surface of the shelf substrate hydrophobic may be employed.

More specifically, according to the preferred embodiments, there are several hydrophobic compounds which may be used. Some of the hydrophobic compounds include: fluorocarbons; fluoroalkyl silanes; fluoroalkoxy silanes; and fluoroalkyl alkyl silanes. Any such hydrophobic compounds or a mixture thereof can be used to create the hydrophobic surfaces described herein, and other applicable hydrophobic compounds could also be used. It is believed that tridecafluoro-1,1,2,2-tetrahydrooctyl trichlorosilane provides a good example of a suitable hydrophobic compound. Other suitable hydrophobic compounds include, for example, nonafluorohexyldimethyl(dimethylamino)silane, heptadecafluorotetrahydrodecyldimethyl(dimethylamino)silane, tetrandryrodecyl-tris(dimethylamino)silane, tridecafluoro-1,1,2,2-tetrahydrooctyl silane, (tridecafluoro-1,1,2,2-tetrahydrooctyl)trimethoxysilane, (tridecafluoro-1,1,2,2-tetrahydrooctyl)triethoxysilane, n-octadecyl trimethoxysilane, n-octyl triethoxysilane, and heptadecafluoro-1,1,2,2-tetrahedyodecyl-tris(dimethylamino)silane. It is believed that the above-identified silanes bond and adhere strongly to glass and glass-like surfaces such as the cured ceramic frit material.

Further in accordance with the preferred embodiments described herein, methods of creating the hydrophobic surface may include, without limitation: application of a hydrophobic compound to the top surface using an application technique such as spraying; brushing; wiping; dipping; solvent casting; flow coating; curtain coating; roller coating; spin coating; printing; screen printing; ink jet printing; vacuum coating; magnetic field-assisted cathodic sputtering; plasma deposition; plasma magnetron deposition; plasma or atmospheric CVD; powder or liquid pyrolysis; atomization or chemical vapor deposition; electrophoretic deposition; cross-linking processes; etc. Another method of creating the hydrophobic surface can include "roughening" the portion of the surface of the substrate to be made hydrophobic using various methods (sanding, abrading, etching, e.g., acid etching, or otherwise removing material from the surface) and then applying a hydrophobic compound to the "roughened" surface. Etching can be performed using, for example, hydrofluoric acid, sodium silicate, bifluorides, including for example, a ammonium bifluoride sodium bifluoride, and mixtures thereof, any other known etching solutions, and any mixtures thereof. Commercially available etching solutions are available, for example from Armour® Products (Hawthorne, N.J.). For examples, the Armour Etch Bath® Glass Dipping Solution (product name) or Armour Etch® Glass Etching Cream (product name), available from Armour® Products can be used, and includes a mixture of ammonium bifluoride and sodium bifluoride. The etching solution can be

US 8,286,561 B2

5

applied to the substrate surface with an applicator in the desired pattern. A mask, which is resistant to the etching solution, can be placed on the region of the substrate to be non-hydrophobic to protect this region from being etched. The etching solution can be allowed to remain on the substrate surface for a time in a range of about 15 seconds to about 20 minutes, about 20 seconds to about 15 minutes, about 30 seconds to about 10 minutes, about 45 seconds to about 8 minutes, about 1 minute to about 10 minutes, about 2 minutes to about 8 minutes, about 4 minutes to about 6 minutes, about 15 seconds to about 1 minute, about 20 seconds to about 50 seconds, about 25 seconds to about 45 seconds, about 30 seconds to about 40 seconds, about 1 minute to about 20 minutes, about to about 15 minutes, or about 7 minutes to about 10 minutes. Other suitable times include, for example, about 15 seconds, 20 seconds, 25 seconds, 30 seconds, 35 seconds, 40 seconds, 45 seconds, 50 seconds, 55 seconds, 1 minute, 2 minutes, 3 minutes, 4 minutes, 5 minutes, 6 minutes, 7 minutes, 8 minutes, 9 minutes, 10 minutes, 11 minutes, 12 minutes, 13 minutes, 14 minutes, 15 minutes, 16 minutes, 17 minutes, 18 minutes, 19 minutes, and 20 minutes.

The hydrophobic surface can also be formed, for example, by providing a coating of hydrophobic particles on the surface, by using sol-gel deposition to apply a hydrophobic compound to the surface, either on top of or within the matrix of the sol-gel, by applying a metal oxide primer with an integrated or separate hydrophobic compound, by applying a hydrophobic compound comprising a variety of molecular chain lengths to create a coating with surface irregularities, or by adhering a thin material, such as a tape of thin glass or plastic which has been made hydrophobic to the surface. The hydrophobic surface can formed, for example, by applying a ceramic frit material, with or without structure forming particles therein, to the surface of the substrate in the desired spill containment pattern, curing the frit, and then applying a hydrophobic compound over the cured frit and curing the hydrophobic compound.

Any combination of the above-described surface treatment methods can be also used. For example, the substrate can be first prepared by applying and curing a ceramic frit material to the substrate. The ceramic frit material can then be etched using an etching solution as described above, and a hydrophobic compound can be applied to the etched ceramic frit. Alternatively, the entire substrate including the ceramic frit material can be etched using an etching solution, and a hydrophobic compound can then be applied to the etched ceramic frit. Without intending to be bound by theory, it is believed that etching the ceramic frit prior to application of the hydrophobic compound can improve the hydrophobic properties of the spill containment pattern by creating additional bonding sites on the ceramic frit to which the hydrophobic compound can bond. Additionally, the etched ceramic frit may include more surface area to which the hydrophobic compound can attached by virtue of the combined macroscale surface roughening provided by the ceramic frit and micro-scale surface roughening provided by etching the ceramic frit.

The hydrophobic surface treatments described herein can be cured according to a number of different methods, if curing is required by the surface preparation or the hydrophobic compound, including without limitation: conduction heating; convection heating; UV radiation; VUV radiation; electron beam irradiation; ionizing radiation; laser; IR; and thermal radiation. The hydrophobic surface treatments can also be cured by remaining at ambient conditions for a sufficient length of time, for example, from about 16 hours to about 48 hours, from about 20 hours to about 40 hours, and from about

6

25 hours to about 35 hours. Curing can be performed in a controlled humidity environment. For example, curing can be performed at less than 70% humidity, less than 60% humidity, less than 50% humidity, less than 40% humidity, less than 30% humidity, less than 20% humidity, less than 10% humidity, or at 0% humidity.

One preferred embodiment of the shelf assembly comprises a glass or tempered glass shelf substrate which is printed, e.g., screen printed, with a ceramic frit material, over which a hydrophobic coating is applied. The ceramic frit can be patterned on the substrate using any known placing, printing, or other patterning methods. The ceramic frit material is placed or printed in a pattern, for example, a frame-like border pattern on the glass substrate, which defines at least a portion of the spill containment pattern. For example, the ceramic frit material can be screen printed onto the substrate in the desired pattern using, for example, a silk screen having a mesh count in a range of about 80 to about 360, about 100 to about 300, about 120 to about 280, about 140 to about 240, about 160 to about 220, about 180 to about 200, about 86 to about 360. Other suitable mesh counts include about 80, 82, 84, 86, 88, 90, 92, 94, 96, 98, 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250, 260, 270, 280, 290, 300, 310, 320, 340, 350, and 360. Various other mesh counts may be suitable depending on the composition and particle size of the frit material used. As described in more detail below, the hydrophobic spill containment pattern, and consequently, the frit pattern, can have a variety of shapes and sizes, and can be placed in a variety of locations on the glass substrate. Additionally, portions of the hydrophobic spill containment pattern can be formed, for example, using different hydrophobic compounds and/or different surface treatments. For example, a portion of the spill containment pattern can be formed, for example, by applying and curing a ceramic frit to the substrate and applying a hydrophobic compound to the cured ceramic frit (as described in more detail below) and another portion of the hydrophobic spill containment pattern can be formed, for example, by acid etching a portion of the substrate and applying the hydrophobic compound to the etched portion.

In accordance with various aspects of the invention, the ceramic frit material can include finely ground particles. For example, the ceramic frit material can include lead oxide, silicon dioxide, aluminum oxide, and mixtures thereof. Preferably, the frit material includes silicon dioxide. More preferably, the frit material includes from 5 weight percent (wt. %) to about 100 wt. % silicon dioxide, from about 10 wt. % to about 80 wt. %, from about 20 wt. % to about 60 wt. % from about 30 wt. % to about 40 wt. % from about 15 wt. % to about 75 wt. %, from about 20 wt. % to about 50 wt. %. Other suitable amounts of silicon dioxide in the frit material can include, for example, 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95 and 100 wt. %. For example, the frit material can include about 29 wt. % silicon dioxide. The frit material can also include, for example, additives, such as tantalum oxide, titanium dioxide, calcium oxide, zirconium oxide, sodium oxide, potassium oxides, iron oxide magnesium oxide, barium oxide, bismuth oxide, and mixtures thereof. Suitable commercially available frit materials can be used. For example, a commercially available frit material is available from Ferro Corp. (hereinafter "the Ferro frit") under Product No. A0430 Etch C32 Medium, and contains about 53.71 wt. % lead oxide, about 29 wt. % silicon dioxide, 15.72 wt. % aluminum oxide, 0.39 wt. % tantalum oxide, 0.38 wt. % titanium dioxide, 0.28 wt. % calcium oxide, 0.26 wt. % zirconium oxide, 0.11 wt. % sodium oxide, 0.04 wt. % potassium oxide, 0.04 wt. % iron oxide, 0.03 wt. % magnesium

27

US 8,286,561 B2

7

oxide, 0.02 wt. % barium oxide, and 0.02 wt. % bismuth oxide. The particles of the frit material may be mixed with inorganic or organic pigments or dyes, so as to yield a desired color. The ceramic frit material may be provided as a dry powder or as a paste or other such mixture. Once the ceramic frit material is placed on the substrate, the ceramic frit is then coupled to the substrate. For example, the ceramic frit can be coupled to the substrate by fusing the ceramic frit to the substrate. The ceramic frit can be coupled or fused to substrate by heating the substrate to a temperature in a range of about 1000° F. to about 1400° F., about 1100° F. to about 1300° F., about 1100° F. to about 1200° F., and about 1200° F. to about 1400° F. Other suitable temperatures include about 1000° F., 1050° F., 1100° F., 1150° F., 1200° F., 1250° F., 1300° F., 1350° F., and 1400° F. This heat treatment will cause the particles of the ceramic frit to cure by fusing to each other and to the glass surface to form a continuous structure and thereby couple the ceramic frit to the substrate. The pattern of the fused frit will be substantially identical to the pattern in which the frit material was placed on the substrate. It is believed that this fused frit coating can be characterized as being nearly as hard and tough as the glass itself. Also, the coated glass with the ceramic frit material is durable, and resists chipping, peeling, fading, and scratching. Advantageously, the ceramic frit material is resistant to abrasions from common household containers, such as, for example, glass jars. In addition, the ceramic frit material is substantially resistant to most chemicals. Accordingly, the ceramic frit material is substantially resistant to a variety of cleaners that may be used to clean a glass shelf, including, for example, dish soap, such as Dawn dish soap, Windex, Sparkle, Clorox wipes, and Formula 409 All Purpose Cleaner. A shelf having a hydrophobic spill containment pattern formed from a ceramic frit can resist multiple cleanings without experiencing a decrease in the shelf's ability to retain spilled liquids.

In one embodiment, the ceramic frit can include some micro-scale additive particles which will remain unmelted at the temperature at which the frit is sintered, as described for example in U.S. Pat. Nos. 4,591,530 to Lui, 6,872,441 and 6,800,354 to Baumann, and 5,324,566 and 5,437,894 to Ogawa. The frit is printed or placed in the pattern of a frame-like border at or near the outer perimeter of the shelf substrate's top surface or other desired location for the spill containment pattern. The shelf with the printed frit is then heated to a temperature above the melting point of the primary components of the frit material, but below the melting point of the glass shelf, for a time sufficient to cure the frit so that it is fused or bonded to the top surface of the shelf substrate. The specific time and temperature required to sinter the frit will vary based on the materials chosen for the frit.

By way of example only, the application of the hydrophobic compound will be described with reference to a glass substrate having a fused frit surface modification. Other surface modifications and/or preparations, including for example, acid etching and other surface roughening methods, can be used as described above, and the hydrophobic compound can be similarly applied to such surface modified substrates. The hydrophobic compound, such as, for example, a fluorocarbon, a fluoroalkyl silane, a fluoroalkoxy silane, or a fluoroalkyl alkyl silane is then applied to the fused frit material. Suitable hydrophobic compounds can include, for example, tridecafluoro-1,1,2,2-tetrahydrooctyl trichlorosilane, nonafluorohexyldimethyl(dimethylamino)silane, heptadecafluorotetrahydrodecyldimethyl(dimethylamino)silane, tetrandyrodecyl-tris(dimethylamino)silane, tridecafluoro-1,1,2,2,-tetrahydrooctyl silane, (tridecafluoro-1,1,2,2-tetrahydrooctyl)trimethoxysilane, (tridecafluoro-1,1,

8

2,2-tetrahydrooctyl)triethoxysilane, n-octadecyl trimethoxysilane, n-octyl triethoxysilane, and heptadecafluoro-1,1,2,2-tetrahedyodecyl-tris(dimethylamino)silane.

The hydrophobic compound can be applied to the frit material as a hydrophobic solution, which includes a solvent and the hydrophobic compound dissolved or dispersed in the solvent. The solvent can be, for example, dry or wet hexane. Suitable solvents include, for example, hexane, heptanes, methyl chloride, naphtha, toluene, acetone, perfluorocarbons, and mixtures thereof. The hydrophobic solution can include from about 0.1% to about 5% of hydrophobic compound. Other suitable ranges include, for example, about 0.5% to 4%, about 1% to about 3%, about 1% to about 5%, and about 2% to about 4%. Suitable amounts of the hydrophobic compound in the hydrophobic solution, can include, for example, about 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1, 1.5, 2, 2.5, 3, 3.5, 4, 4.5, and 5%. For example, a 1% solution of tridecafluoro-1, 1,2,2-tetrahydrooctyl trichlorosilane, a perfluoroalkyl alkyl silane, in hexane, can be applied to the fused fit, for example by wiping the solution onto the frit or applying the solution using an applicator tip, or by using any other known method. The hydrophobic compound can be applied to the solution using, for example, a one pass method in which a coated applicator is swept across the frit border a single time or a multiple pass method in which the applicator is passed over the frit border two or more times. The hydrophobic solution is then cured by heating it and/or exposing it to controlled humidity for a period of time. For example, conductive heating, convention heating, thermal radiation, UV radiation, VUV radiation, electron beam irradiation, ionizing radiation, laser, IR can be used to cure the hydrophobic solution. The hydrophobic solution can be cured, for example, at a temperature in a range of about 100° F. to about 600° F., about 150° F. to about 550° F., about 200° F. to about 500° F., about 250° F. to about 450° F., about 300° F. to about 350° F., or about 100° F. to about 300° F. Other suitable temperatures include, for example, about 100° F., 150° F., 200° F., 250° F., 300° F., 350° F., 400° F., 450° F., 500° F., 550° F., and 600° F. The hydrophobic solution can be cured, for example, by heating for a time in a range of about 5 minutes to about 1 hour, about 10 minutes to about 45 minutes, about 20 minutes to about 30 minutes, about 10 minutes to about 20 minutes, and about 15 minutes to about 30 minutes. Other suitable times include, for example, about 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, and 60 minutes. Alternatively, the hydrophobic solution can be cured without heating. Heating, however, can accelerate the curing process. For example, the hydrophobic solution can be allowed to cure by leaving the glass substrate having the cured ceramic frit coated with the hydrophobic solution in ambient conditions for a time in a range of about 16 to about 48 hours, about 20 to about 40 hours, about 25 to about 35 hours, about 16 to about 24 hours, or about 20 hours to about 30 hours. The hydrophobic solution can be cured, whether at elevated temperatures or at ambient temperature, in relatively dry environment. For example, the hydrophobic solution can be cured in an environment having less than 70% humidity, less than 60% humidity, less than 50% humidity, less than 40% humidity, less than 30% humidity, less than 20% humidity, less than 10% humidity, or at 0% humidity. Upon curing, the hydrophobic compound preferably forms a continuous hydrophobic layer on the fused frit or other surface treatment.

Without intending to be bound by theory, it is believed that in the case of a fluorosilane, bonding is achieved between surface Si—OH contained on and extending from the surface of the fused frit material or other modified substrate surface, such as, for example, an acid etched surface, and the Si—OH groups of the silane. The surface hydroxyl groups can results

28

US 8,286,561 B2

9

from partial hydrolysis of the silane and the silicon dioxide in the fused frit material during heating. The Si—OH groups are caused to react with corresponding groups to form Si—O—Si linkages between the silane and the fused frit material. Correspondingly, Si—OH groups of adjacent silane molecules are also caused to react and form Si—O—Si cross linkages, thereby forming a continuous hydrophobic layer across the frit material. The method described herein will produce a hydrophobic surface that is a continuous border around the perimeter of the shelf's top surface which will operate as a spill containment feature.

One advantage of using a ceramic frit material to prepare the surface of the shelf for coating with the hydrophobic solution as described herein, in addition to improving the durability of the hydrophobic surface, is that frit material is commercially available in multiple colors and can be printed in a manner which allows for the inclusion of designs, company names or logos in the surface area where the frit material is applied to the shelf substrate.

In accordance with the preferred embodiments, the hydrophobic surface provides a spill containment surface which prevents spilled liquids from leaking off of the shelf substrate's top surface. For example, a frit material can be placed or printed in a continuous border pattern around the perimeter of the glass substrate and fused to the glass substrate as described above. A hydrophobic compound can then be bonded to the fused frit material, and thereby form a hydrophobic spill containment pattern, which bounds a non-hydrophobic spill containment surface formed of the glass substrate. The hydrophobic spill containment pattern repels liquids, causing them to collect in the non-hydrophobic region or regions of the shelf. The hydrophobicity of the hydrophobic surface is sufficient to repel a spilled liquid and prevent it from crossing onto or over the hydrophobic surface and therefore forces the spilled liquid to bead up or puddle up on the non-hydrophobic regions of the shelf due to the surface tension of the liquid. Thus, the hydrophobic surface is capable of containing spills without the use of a barrier lip or barrier edging used in prior art spill containment assemblies which act as a "dam" for the spilled liquid. The hydrophobic spill containment pattern can retain a spill having a height when pooled in the non-hydrophobic region of less than about 5.5 mm. For example, the spill containment pattern can retain a spill having a height of about 0.5 mm, about 1 mm, about 1.5 mm, about 2 mm, about 2.5 mm, about 3 mm, about 3.5 mm, about 4 mm, about 4.5 mm, about 5 mm, or about 5.5 mm. The height of the spill liquid provides a measure of the amount of spilled liquid retained by a shelf regardless of the area of the non-hydrophobic spill containing region of the shelf. The height of the retained spill liquid is determined by dividing the volume of spill liquid retained by the shelf before failure (i.e. leakage) by the area of the non-hydrophobic spill containing region.

The reference to the fact that the hydrophobic surface is generally in the plane of the top surface of the shelf is intended to include surfaces and surface treatments, all or a portion of which may extend a small distance above the level of the top surface of the shelf which is not readily noticeable to the naked eye. For example, as described in greater detail above, the hydrophobic surface may be a hydrophobic coating, or a combination of a layer of ceramic frit and a hydrophobic coating on the ceramic frit. Such layers typically have a thickness of from about 0.001 microns to about 250 microns. Other suitable thickness ranges include from about 0.001 microns to about 2 microns, about 0.01 microns to about 1.5 microns, about 0.1 microns to about 1 microns, about 0.001 microns to about 10 microns, about 0.01 microns to about 8

10

microns, about 0.05 microns to about 7 microns, about 0.1 microns to about 5 microns, about 1 micron to about 4 microns, about 1 micron to about 10 microns, about 2 microns to about 8 microns, about 4 microns to about 6 microns, about 10 microns to about 100 microns, about 20 microns to about 80 microns, about 40 microns to about 60 microns, about 100 microns to about 250 microns, about 150 to about 200 microns, about 1 micron to about 250 microns, about 10 microns to about 200 microns, about 20 microns to about 150 microns, about 30 microns to about 100 microns, about 40 microns to about 80 microns, and about 50 microns to about 70 microns. Other suitable thickness include, for example, about 0.001, 0.005, 0.01, 0.05, 0.1, 0.5, 1, 5, 10, 15, 20, 30, 40, 50, 60, 70, 80, 90, 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, and 250 microns.

A visual perspective of situations involving liquid spillage is illustrated in FIGS. 1 and 2 which illustrate a prior art shelving assembly 1000. With reference to FIG. 1, the assembly 1000 is shown in fairly simplistic format. The assembly 1000 may include a number of other components, including elements such as shelf support brackets, for example. Specifically, the assembly 1000 includes a frame 1002 which is rectangular in configuration and surrounds and is secured to an inner plastic rim 1004. The plastic rim 1004 is also a rectangular configuration. The plastic rim 1004 is utilized to encapsulate a shelf panel 1006. The shelf panel 1006 could be constructed of glass or similar materials. The frame 1002, plastic rim 1004 and shelf panel 1006 are supported on a pair of opposing side plates 1008.

To illustrate the concepts of liquid spillage, a soda can 1010 is illustrated as being left on its side on the upper surface of the shelf panel 1006. The soda can 1010 has spilled liquid which is shown as liquid 1012 on a portion of the shelf panel 1006. The visible edge of the shelf panel 1006 located on its upper surface at the intersection of the perimeter of the plastic rim 1004 may include a sealed edge 1014. As previously described herein, the sealed edge 1014 may merely include some type of a sealing adhesive or, alternatively, a silicone material or the like. In this manner, an attempt is made to essentially provide a raised physical barrier that is sealed to the shelf panel 1006 to seal the spilled liquid 1012 from spillage off of the shelf panel 1006.

A preferred embodiment shelf assembly 1020 of the present disclosure is illustrated in FIGS. 3 and 4. In accordance with the preferred embodiments described herein, the shelf assembly 1020 is characterized as having a shelf panel 1024 with a hydrophobic surface 1030 (shown shaded) arranged and configured in a spill containment pattern 1021 on a top surface 1023 of the shelf panel 1024 to provide the spill containment functions. In FIGS. 3 and 4, the spill containment pattern 1021 of the hydrophobic surface 1030 consists of a frame-like border disposed at or around the outer perimeter of the top surface 1023 of the shelf panel 1024, thereby completely bounding, encircling, and/or enclosing a non-hydrophobic central portion 1025 of the shelf panel 1024. More specifically, the spill containment pattern 1021 of the embodiment depicted in FIGS. 3 and 4 includes a continuous pattern formed of parallel left and right side edge containment strips 1021a, 1021b, and parallel front and rear edge containment strips 1021c, 1021d, i.e., all respectively engaged to adjacent ones. Each of the edge containment strips 1021a-1021d are generally uniform in width and arranged in an elongated linear configuration at a location directly at a respective edge of the shelf panel 1024. That is, in the embodiment depicted in FIGS. 3 and 4, there is no non-hydrophobic area on the top surface 1023 of the shelf panel 1024 between the spill containment pattern 1021 and the

US 8,286,561 B2

11 12

perimeter edge of the shelf panel **1024**. In alternative embodiments, however, at least one of the strips **1021-1021***d* of the spill containment pattern **1021** depicted in FIGS. **3** and **4** can be offset inward from the perimeter edge of the shelf panel **1024** such that the shelf panel **1024** can include a non-hydrophobic area disposed between at least a portion of the spill containment pattern **1021** and the perimeter edge of the shelf panel **1024**.

Still referring to FIGS. **3** and **4**, the side edge containment strips **1021***a*, **1021***b* are disposed at substantially right angles relative to the front and rear edge containment strips **1021***c*, **1021***d*. So configured, the spill containment pattern **1021** of the embodiment depicted in FIGS. **3** and **4** forms a continuous, generally square, rectangular, and/or box-shape completely bounding, encircling, and/or enclosing the non-hydrophobic central portion **1025**, which also has a generally square, rectangular, and/or box-shape.

As with other known refrigerator shelf assemblies, the shelf assembly **1020** of the present disclosure may also include shelf brackets **1022** for supporting the shelf assembly **1020** in a refrigerator or other appliance, for example. In a preferred embodiment, the shelf brackets **1022** are designed and configured such as to not interfere with and/or intrude upon the top surface **1032** of the shelf panel **1024**, thereby maximizing the useable shelf space. Various embodiments of such shelf brackets **1022** will be described below with reference to FIGS. **7-18**.

FIG. **3** also illustrates the concept that the hydrophobic surface **1030** will form a spill containment barrier. For example, a soda can **1026** is illustrated as being turned on its side on the top surface **1023** of the shelf panel **1024**, and spilled liquid from the soda can **1026** is identified as liquid **1028**. In this manner, the spilled liquid **1028** is prevented from spilling downwardly onto other surfaces below the shelf, and the spilled liquid **1028** is contained to the non-hydrophobic central portion **1025** defined on the top surface **1023** of the shelf **1024**. Further, the spilled liquid **1028** is also prevented from seeping into cracks or crevices in a manner where substantial bacteria, mold, and other undesirable materials can form. In particular, and in accordance with the preferred embodiments, it should be noted that components such as a plastic rim (or even a frame) may be completely unnecessary with the use of the hydrophobic surface **1030** to provide the spill containment feature. As such, the shelf assembly **1020** depicted in FIGS. **3** and **4** maximizes the available useful shelf space since it does not include a plastic rim, a frame, or any other physical barrier or dam extending above the top surface **1023** of the shelf panel **1024** for preventing liquids from spilling off of the shelf panel **1024**.

In addition to the embodiment shown in FIGS. **3** and **4**, an alternative embodiment of the shelf assembly **1020** of the present disclosure can include the hydrophobic surface **1030** disposed on the top surface **1023** of the shelf panel **1024** in a grid-like spill containment pattern **1021**, as shown in FIG. **5**. Identical to the spill containment pattern **1021** described above with reference to FIGS. **3** and **4**, the grid-like spill containment pattern **1021** depicted in FIG. **5** includes a continuous frame-like border disposed at or around the outer perimeter of the top surface **1023** of the shelf panel **1024**. More specifically, the frame-like border of the spill containment pattern **1021** depicted in FIG. **5** includes parallel left and right side edge containment strips **1021***a*, **1021***b*, and parallel front and rear edge containment strips **1021***c*, **1021***d*. These spill containment strips **1021***a*-**1021***d* can be generally identical to the corresponding spill containment strips **1021***a*-**1021***d* described above with reference to FIGS. **3** and **4** and, therefore, will not be described in any further detail.

In addition to the aforementioned spill containment strips **1021***a*-**1021***d*, the grid-like spill containment pattern **1021** depicted in FIG. **5** includes two spaced apart longitudinal spill containment strips **1021***e*, **1021***f* and two spaced apart lateral spill containment strips **1021***g*, **1021***h*. The longitudinal spill containment strips **1021***c*, **1021***d* intersect the lateral spill containment strips **1021***e*, **1021***f* at generally right angles. As depicted, the longitudinal spill containment strips **1021***e*, **1021***f* are parallel to each other, as well as parallel to the left and right side spill containment strips **1021***a*, **1021***b*. Moreover, the lateral spill containment strips **1021***g*, **1021***h* are parallel to each other, as well as parallel to the front and rear spill containment strips **1021***c*, **1021***d*. Other configurations are intended to be within the scope of the disclosure.

So configured, the grid-like spill containment pattern **1021** of the embodiment of the shelf assembly **1020** of FIG. **5** defines first through ninth non-hydrophobic central portions **1025***a*-**1025***i* on the top surface **1023** of the shelf panel **1024**. Each of the non-hydrophobic central portions **1025***a*-**1025***i* is completely bounded, encircled, and/or enclosed by four of the spill containment strips **1021***a*-**1021***h* and is therefore square, rectangular, and/or box-shaped. With this configuration, FIG. **6** illustrates that each of the non-hydrophobic central portions **1025***a*-**1025***i* is capable of containing a liquid **1028** separate from the other non-hydrophobic central portions **1025***a*-**1025***i*.

FIG. **6** shows yet another embodiment of a shelf assembly **1020** constructed in accordance with the present disclosure and including a spill containment pattern **1021**. Similar to the shelf assemblies **1020** described above with reference to FIGS. **3-5**, the shelf assembly **1020** of FIG. **6** includes a continuous frame-like border of a hydrophobic surface **1030** disposed at or around the outer perimeter of the top surface **1023** of the shelf panel **1024**, thereby completely bounding, encircling, and/or enclosing a non-hydrophobic central portion **1025** of the shelf panel **1024**. However, unlike the embodiments described above, the embodiment depicted in FIG. **6** includes a double-border configuration consisting of a first continuous hydrophobic surface border **1017** and a second continuous hydrophobic surface border **1019** disposed inside of the first hydrophobic surface border **1017**.

The first hydrophobic surface border **1017** is disposed about the perimeter edge of the shelf panel **1024**, and the second hydrophobic surface border **1019** is offset inwardly from the first hydrophobic surface border **1017**. The first hydrophobic surface border **1017** includes parallel left and right side edge containment strips **1017***a*, **1017***b*, and parallel front and rear edge containment strips **1017***c*, **1017***d*. Each of the edge containment strips **1017***a*-**1017***d* of the first continuous hydrophobic surface border **1017** are generally uniform in width and arranged in an elongated linear configuration directly at the edge of the perimeter of the shelf panel **1024**. The side edge containment strips **1017***a*, **1017***b* are disposed at right angles relative to the front and rear edge containment strips **1017***c*, **1017***d*. So configured, the first hydrophobic surface border **1017** forms a continuous generally square, rectangular, and/or box-shape completely bounding, encircling, and/or enclosing the non-hydrophobic central portion **1025**, which is also generally square, rectangular, and/or box-shaped. Moreover, as depicted, the second continuous hydrophobic surface border **1019** includes parallel left and right side edge containment strips **1019***a*, **1019***b*, and parallel front and rear edge containment strips **1019***c*, **1019***d*. Each of the edge containment strips **1019***a*-**1019***d* of the second hydrophobic surface border **1019** are generally uniform in width and arranged in an elongated linear configuration offset inwardly from the first hydrophobic surface border **1017**. The

30

13

14

side edge containment strips **1019***a*, **1019***b* are disposed at right angles relative to the front and rear edge containment strips **1019***c*, **1019***d* such that the second hydrophobic surface border **1019** forms a generally square, rectangular, and/or box-shape completely bounding, encircling, and/or enclosing the non-hydrophobic central portion **1025** of the shelf panel **1024**. So configured, the first and second hydrophobic surface borders **1017**, **1019** define a non-hydrophobic ring portion **1027** located between the two borders **1017**, **1019**. The non-hydrophobic ring portion **1027** can advantageously capture any spill overflow which might escape from the non-hydrophobic central portion **1025** and travel over the second hydrophobic surface border **1019**. These and other variations in the spill containment pattern **1021** can be made without departing from the spirit and scope of the novel concepts of the preferred embodiments of the present disclosure. For example, while FIG. **6** depicts a double-border pattern, a pattern of any number concentric or non-concentric border patterns could be provided on the substrate surface. Each border pattern can, for example, surround at least a portion of the non-hydrophobic region.

The hydrophobic surface arranged in a spill containment pattern in accordance with the preferred embodiments described herein eliminates the need for plastic encapsulation material to create a spill containment barrier. Accordingly, the shelves produced in accordance with the preferred embodiments described herein utilize relatively less material than prior art spill-containing shelves. Further, the shelves described herein have no need for silicone sealants to create a spill containment barrier. With the exception of the hydrophobic tape embodiment, they have no need for adhesives to create a spill containment barrier. Elimination of the need for these materials also results in relatively less use of material. Further, using the hydrophobic surfaces arranged in a spill containment pattern in accordance with the preferred embodiments eliminates the need for formed lips or ridges on the shelf's top surface, which reduces the amount of material used and the complexity of manufacturing, and, therefore, reduces the manufacturing cost.

Elimination of plastic encapsulation and sealants from the design of the shelf member also eliminates a potential source of failure or leakage since the sealants and plastic encapsulation may have cracks or crevices where they join with the shelf member in which organic or inorganic materials may become entrapped and involve a bond area to the shelf member which may eventually leak. Still further, the use of hydrophobic surfaces arranged in a spill containment pattern retains an amount of liquid comparable to that retained by prior art shelves having spill containing dam features, without the necessity of using the dams.

Still further, by eliminating the space taken up by plastic encapsulation, sealants, adhesives, or formed lips, ridges, physical barriers, and dams, the relative amount of usable shelf space is increased, i.e., maximized, on the top surface **1023** of the shelf panel **1024** in accordance with the preferred embodiments described herein.

A further aspect of the present disclosure that serves to maximize the usable shelf space includes shelf brackets **1022** that are specifically designed, arranged, and configured to adhere to a bottom surface and/or side edge of the shelf panel **1024**, thereby avoiding any necessity to interfere with and/or obstruct at least the perimeter portions of the top surface **1023** of the shelf panel **1024** adjacent to the side edges and, in some embodiments, the entirety of the top surface **1023** of the shelf panel **1024**.

FIGS. **7** and **8** depict a shelf assembly **1020** including a pair of support brackets **100**, only one of which is depicted, con-

structed in accordance with a first embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly **1020** includes a flat shelf panel **1024** with a hydrophobic surface **1030** arranged and configured in a spill containment pattern **1021** on its top surface **1023**. The spill containment pattern **1021** can resemble any of the patterns described above with respect to FIGS. **3-6**, or otherwise.

The brackets **100** are mirror images of each other and are adhered to side perimeter portions **12** of the shelf panel **10**. The brackets **100** of the embodiment depicted in FIGS. **7** and **8** are adapted to be slidably supported on ribs formed in the side panels of an appliance such as a refrigerator. As shown in FIG. **8** above, each bracket **100** includes a horizontal leg **104** and a vertical leg **102** extending downward from an inner edge **105** of the horizontal leg **104**. As such, the brackets **100** have a generally upside-down L-shaped cross-section. The brackets **100** of this embodiment are preferably constructed of metal, but could be constructed of plastic or any other foreseeable material. The vertical and horizontal legs **102**, **104** are disposed at an angle of approximately 90° relative to each other. So configured, the horizontal leg **104** includes a substantially horizontal top surface **104***a* that corresponds to and supports a generally horizontal bottom surface **12***a* of a corresponding side perimeter portion **12** of the shelf panel **10**. Finally, a layer of an adhesive material **106** is disposed between the top surfaces **104***a* of the horizontal legs **104** of the brackets **100** and the bottom surface **12***a* of the side perimeter portions **12** of the shelf panel **10** to adhere the shelf panel **10** to the brackets **100**. The adhesive material **106** can include a clear acrylic UV-cured adhesive, a clear polyurethane hot melt, or any other adhesive material capable of serving the principles of the present disclosure. So configured, and as illustrated in FIGS. **7** and **8**, no aspect of the brackets **100** extends above and/or over the top surface **1023** of the shelf panel **1024**. That is, in this embodiment, the brackets **100** are disposed entirely below the top surface **1023** of the shelf panel **1024**, e.g., entirely opposite the shelf panel **1024** from its top surface **1023**. As such, the usable space on the top surface **1023** is maximized.

FIGS. **9** and **10** depict a shelf assembly **1020** including a pair of support brackets **200**, only one of which is depicted, constructed in accordance with a second embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly **1020** includes a flat shelf panel **1024** with a hydrophobic surface (not shown) arranged and configured in a spill containment pattern (not shown) on its top surface **1023**. The spill containment pattern can resemble any of the patterns described above with respect to FIGS. **3-6**, or otherwise.

The brackets **200** are mirror images of each other and are adhered to opposing side perimeter portions **12** of the shelf panel **1024**. The brackets **200** are adapted to be slidably supported on ribs formed in the side panels of an appliance such as a refrigerator. As shown in FIG. **10**, each bracket **200** includes a horizontal leg **204** and a vertical leg **202** extending upward from an outer edge **205** of the horizontal leg **204**. As such, the brackets **200** have a generally L-shaped cross-section. The vertical leg **202** may or may not extend beyond the top surface **1023** of the shelf panel **1024**. The brackets **200** of this embodiment can be constructed of plastic, metal, or any other suitable material. The vertical and horizontal legs **202**, **204** are disposed at an angle of approximately 90° relative to each other. So configured, the horizontal leg **204** includes a substantially horizontal top surface **204***a* that corresponds to and supports a generally horizontal bottom surface **12***a* of a corresponding side perimeter portion **12** of the shelf panel **1024**. Finally, a layer of an adhesive material **206** is disposed

US 8,286,561 B2

15                                                              16

between the top surfaces 204a of the horizontal legs 204 of the brackets 200 and the bottom surface 12a of the corresponding side perimeter portions 12 of the shelf panel 1024 to adhere the shelf panel 1024 to the brackets 200. The adhesive material 206 can include a clear acrylic UV-cured adhesive, a clear polyurethane hot melt, or any other adhesive material capable of serving the principles of the present disclosure. So configured, and as illustrated in FIGS. 9 and 10, no aspect of the brackets 200 extends above and/or over the top surface 1023 of the shelf panel 1024. That is, in this embodiment, the brackets 200 are disposed entirely below the top surface 1023 of the shelf panel 1024. The horizontal legs 204 are disposed entirely opposite the shelf panel 1024 from its top surface 1023, and the vertical legs 202 are disposed entirely to the side of the shelf panel 1024. As such, the usable space on the top surface 1023 is maximized.

FIGS. 11 and 12 depict a shelf assembly 1020 including a pair of support brackets 300 constructed in accordance with a third embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly 1020 includes a flat shelf panel 1024 with a hydrophobic surface 130 arranged and configured in a spill containment pattern 1021 on its top surface 1023. The spill containment pattern can resemble any of the patterns described above with respect to FIGS. 3-6, or otherwise.

The brackets 300 are adapted to latch into ladder racks, for example, at the rear of an appliance such as a refrigerator in a conventional manner. Each bracket 300 includes an elongated top member 302 with a generally circular cross-section. In one form, depicted in FIG. 12, the top member 302 includes a horizontal supporting surface 304 formed, for example, by forging, stamping, or crushing the round wire in a fixture. So configured, the supporting surface 304 corresponds to and supports a generally horizontal bottom surface 12a of a corresponding side perimeter portion 12 of the shelf panel 1024. In another form, the elongated top member 302 may not include the horizontal supporting surface 304, but rather, can have a perfectly circular cross-section providing a line of contact between the top member 302 and the shelf panel 1024. Finally, a layer of an adhesive material 306 is disposed between the top members 302 of the brackets 300 and the bottom surface 12a of the corresponding side perimeter portions 12 of the shelf panel 1024 to fix the shelf panel 1024 to the brackets 300. The adhesive material 306 can include a clear acrylic UV-cured adhesive, a clear polyurethane hot melt, or any other adhesive material capable of serving the principles of the present disclosure. So configured, and as illustrated in FIGS. 11 and 12, no aspect of the brackets 300 extends above and/or over the top surface 1023 of the shelf panel 1024. That is, in this embodiment, the brackets 300 are disposed entirely below the top surface 1023 of the shelf panel 1024, e.g., entirely opposite the shelf panel 1024 from its top surface 1023. As such, the usable space on the top surface 1023 is maximized.

FIGS. 13 and 14 depict a shelf assembly 1020 including a pair of support brackets 400, only one of which is shown, constructed in accordance with a fourth embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly 1020 includes a flat shelf panel 1024 with a hydrophobic surface (not shown) arranged and configured in a spill containment pattern (not shown) on its top surface 1023. The spill containment pattern can resemble any of the patterns described above with respect to FIGS. 3-6, or otherwise.

The brackets 400 are mirror images of each other. The brackets 400 are adapted to latch into ladder racks, for example, at the rear of an appliance such as a refrigerator in a

conventional manner. As illustrated, each bracket 400 includes a tri-angular shaped plate a vertical plate portion 402 and a horizontal plate portion 404, thereby having a generally L-shaped upper cross-section. The brackets 400 of this embodiment can be constructed of metal, plastic, or any other suitable material. The vertical and horizontal plate portions 402, 404 are disposed at an angle of approximately 90° relative to each other. So configured, the horizontal plate portion 404 includes a substantially horizontal top surface 404a that corresponds to and supports a generally horizontal bottom surface 12a of a corresponding side perimeter portion 12 of the shelf panel 1024. Finally, a layer of an adhesive material 406 is disposed between the top surfaces 404a of the horizontal plate portions 404 of the brackets 400 and the bottom surface 12a of the side perimeter portions 12 of the shelf panel 1024 to fix the shelf panel 1024 to the brackets 400. The adhesive material 406 can include a clear acrylic UV-cured adhesive, a clear polyurethane hot melt, or any other adhesive material capable of serving the principles of the present disclosure. So configured, and as illustrated in FIGS. 13 and 14, no aspect of the brackets 400 extends above and/or over the top surface 1023 of the shelf panel 1024. That is, in this embodiment, the brackets 400 are disposed entirely below the shelf panel 1024, e.g., entirely opposite the shelf panel 1024 from its top surface 1023. As such, the usable space on the top surface 1023 is maximized.

FIGS. 15-17 depict a shelf assembly 1020 including a pair of support brackets 500 constructed in accordance with a fifth embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly 1020 includes a flat shelf panel 1024 with a hydrophobic surface (not shown) arranged and configured in a spill containment pattern (not shown) on its top surface 1023. The spill containment pattern can resemble any of the patterns described above with respect to FIGS. 3-6, or otherwise.

The brackets 500 are mirror images of each other. The brackets 500 are adapted to latch into ladder racks, for example, at the rear of an appliance such as a refrigerator in a conventional manner. As illustrated in FIGS. 16 and 17, each bracket 500 includes a metal tri-angular shaped plate portion 502 and a plastic supporting rail 504. The supporting rail 504 includes an elongated recess 504a receiving an elongated top edge 502a of the plate portion 502. The supporting rail 504 is immovably fixed to the plate portion 502 by snap-fit or adhesion, for example. Additionally, the supporting rail 504 includes a substantially horizontal top surface 504b that corresponds to and supports a corresponding generally horizontal bottom surface 12a of the shelf panel 1024. Finally, the bottom surfaces 12a of the side perimeter portions 12 of the shelf panel 1024 are adhered to the top surfaces 504b of the supporting rails 504 with an adhesive material (not shown) to fix the shelf panel 10 to the brackets 500. The adhesive material can include a clear acrylic UV-cured adhesive, a clear polyurethane hot melt, or any other adhesive material capable of serving the principles of the present disclosure. So configured, and as illustrated in FIGS. 15-17, no aspect of the brackets 500 extends above and/or over the top surface 1023 of the shelf panel 1024. That is, in this embodiment, the brackets 500 are disposed entirely below the top surface 1023 of the shelf panel 1024, e.g., entirely opposite the shelf panel 1024 from its top surface 1023. As such, the usable space on the top surface 1023 is maximized.

FIG. 18 depicts a portion of a shelf assembly 1020 including a pair of support brackets 600, only one of which is shown, constructed in accordance with a sixth embodiment the present disclosure. Similar to the embodiments described above, the shelf assembly 1020 includes a flat shelf panel

32

17                                                                                    18

1024 with a hydrophobic surface (not shown) arranged and configured in a spill containment pattern (not shown) on its top surface 1023. The spill containment pattern can resemble any of the patterns described above with respect to FIGS. 3-6, or otherwise.

As shown, the support brackets 600 are adapted to support opposing side perimeter portions 12 of a flat shelf panel 1024 in a manner generally the same as those described above. Each bracket 600 includes a vertical plate portion 602 and a horizontal plate portion 604, thereby having a generally upside-down L-shaped cross-section. The vertical and horizontal plate portions 602, 604 are disposed at an angle of approximately 90° relative to each other. Additionally, however, the horizontal plate portion 604 includes a curved concave profile defining an elongated channel 608 in its topside and extending along the length thereof. Finally, a layer of an adhesive material (not shown) is disposed in the channel 608 between the bracket 600 and a bottom surface 12a of the side perimeter portions 12 of the shelf panel 1024. While the channel 608 of the embodiment depicted above is formed by the horizontal plate portion 604 being curved, the channel 608 could alternatively be formed simply by having a recess in the top surface of the horizontal plate portion 604. So configured, the bottom surface of the horizontal plate portion 604 does not necessarily have to be curved, as illustrated.

This channel concept for receiving adhesive could be applied to any of the support brackets described above with reference to FIGS. 7-17. For example, the horizontal legs 104, 204, 404 of the brackets 100, 200, 400 depicted in FIGS. 7 and 8, FIGS. 9 and 10, and FIGS. 13 and 14, respectively, could include channels disposed in the top surfaces 104a, 204a, 304a thereof for receiving adhesive. Similarly, the top members 302 of the brackets 300 depicted in FIGS. 11 and 12 could include channels disposed in top surfaces thereof for receiving adhesive. In the embodiment depicted in FIGS. 11 and 12, the channels could be formed directly into the horizontal supporting surfaces 304 of the top members 302 of the brackets 300. Finally, in the embodiment depicted in FIGS. 15-17 channels for receiving adhesive could be formed in the horizontal top surfaces 504b of the supporting rails 504 of the brackets 500. Therefore, it should be appreciated that the concept of providing channels in the top surfaces of the support brackets for receiving adhesive is not limited to the embodiment depicted in FIG. 18, but rather, can be applied to any of the embodiments expressly described herein, as well as any embodiment covered by the scope of the attached claims.

As mentioned above, any of the foregoing shelf brackets 100-600 can be constructed of any one or more of a variety of materials such as metal, plastic, etc. and they may be attached to the shelf panel 1024 using any one or more of a variety of different adhesives, or other attachment means. The process and/or method for assembling these components can also include a variety of variations.

For example, in one embodiment the brackets described with reference to FIGS. 7 and 8, for example, could be constructed of a sheet metal with an epoxy polyester hybrid powder disposed on them. The brackets are placed into a fixture and the adhesive, which can include Loctite 3494 acrylic UV/Visible light-cured adhesive, is applied to the top surface of the brackets automatically. The glass shelf panel is then placed into the fixture on top of the adhesive and a clamping pressure is applied to the top of the glass shelf panel. The adhesive "wets out," i.e., the adhesive spreads out to a thickness of about 0.006" to about 0.010" thick. The parts are then passed under a mercury UV lamp (wavelength of about 365 nm, at about 200-400 watts per inch) for about 12-18 seconds, with the adhesive being disposed about 5.5" to

about 6" away from the lamp. Once the adhesive is cured, the clamping pressure is removed and the assembly can be removed from the fixture.

In an alternative to this method, a hot-melt polyurethane adhesive can be used to secure the shelf panel to the brackets. First, the brackets are placed into a fixture, and a melted polyurethane adhesive is applied instead of the UV cured adhesive described above. The part is again clamped as the adhesive quick-sets. No lights are needed. The assembly can then be removed from the fixture.

In yet another alternative method, an adhesive tape, such as 3M VHB tape, can be used instead of a liquid adhesive. This tape would be placed onto either the underside of the glass shelf panel or on the top surface of the support brackets. Protective paper would then be removed from the tape, and the glass shelf panel and the support brackets can be joined together in a fixture, similar to that described above. A small amount of pressure is applied to the glass shelf panel to set the tape, and then the assembly can be removed from the fixture.

While the foregoing embodiments of the shelf assembly 1020 have been described as including shelf panels 1024 with top surfaces 1023 that are completely free from intrusion or other obstruction, thereby maximizing the available shelf space, alternative embodiments of the shelf assembly 1020 can include rear and/or front trim components. Such rear and/or front trim components are minimally invasive, but can perform functions that may be desirable in certain applications.

For example, as mentioned above, the shelf assemblies 1020 described with reference to FIGS. 7 and 8, and FIGS. 9 and 10, include support brackets 100, 200, respectively, that are adapted to be slidably supported on ribs formed in the side panels of an appliance such as a refrigerator. Such slidable shelf assemblies 1020 can benefit from the incorporation of rear and front trim components.

For example, FIGS. 19-22 illustrate one embodiment of such a slidable shelf assembly 1020 including, for the sake of illustration only, the support brackets 100 described above with reference to FIGS. 7 and 8. The shelf assembly 1020 of FIGS. 19-22 could equally include the support brackets 200 described with reference to FIGS. 9 and 10. The shelf assembly 1020 includes a completely flat glass shelf panel 1024, a pair of opposing support brackets 100, a front trim component 14, and a rear trim component 16. The support brackets 100 are adhered to the bottom of the side edges of the shelf panel 1024 for slidably supporting the shelf panel 1024 within a refrigerator in a manner identical to that described with reference to FIGS. 7 and 8.

The front trim component 14 includes an elongated plastic member with a length substantially identical to the width of the shelf panel 1024. As shown in more detail in FIG. 21 the front trim component 14 includes a generally U-shaped attachment portion 18 and a lip portion 20 extending outward from the attachment portion 18. The attachment portion 18 defines an elongated channel 22 with a plurality of barbed ribs 24 formed on both the upper and lower legs 18a, 18b of the attachment portion 18 and extending into the channel 22. The channel 22 receives the front edge of the shelf panel 1024 such that the barbed ribs 24 frictionally engage the panel 1024 and fix the front trim component 14 thereto. So configured, the front trim component 14 and, more particularly, the lip portion 20 of the front trim component 18 serves as a "bumper," for example, to prevent bottles or other glass objects that are being loaded into the refrigerator from impacting the bare glass edge of the shelf panel 1024 and breaking the same.

33

US 8,286,561 B2

| 19 | 20 |

Referring now to FIG. **22**, the rear trim component **16** of the shelf assembly **1020** is illustrated as being substantially identical to the front trim component **14**, but without the lip portion extending outward. Instead, the rear trim component **16** merely includes a generally U-shaped attachment portion **26** having upper and lower legs **26a**, **26b**. The attachment portion **26** defines an elongated channel **28** with a plurality of barbed ribs **30** formed only on the upper leg **26a** of the attachment portion **26**. The channel **28** receives the rear edge of the shelf panel **1024** such that the barbed ribs **30** frictionally engage the shelf panel **1024** and fix the rear trim component **16** thereto. So configured, the rear trim component **16** serves as a "stopper" to prevent items stored on the back portion of the shelf panel **1024** from sliding off of the shelf panel **1024** in the event that a user abruptly slides the shelf assembly **1020** out of the refrigerator.

While FIG. **21** depicts a front trim component **14** that is U-shaped and receives the front edge of the shelf panel **1024**, other configurations are intended to be within the scope of the present disclosure. For example, FIG. **23** illustrates an alternative front trim component **32**. The trim component **32** extends generally the length of and is fixed to the front edge of the shelf panel **1024** with a layer of adhesive **34**. The front trim component **32** includes a generally L-shaped cross-section and includes a horizontal leg **36** and a vertical leg **38** disposed at an angle of approximately 90° relative to the horizontal leg **36**. The front trim component **32** is preferably constructed of a plastic material such that the vertical leg **38** thereof can absorb the impact of glass bottles being loaded into the refrigerator, for example, and prevent breakage. While the trim component **32** in FIG. **23** is described as being constructed of plastic, other materials are intended to be within the scope of the present disclosure. One advantage of the trim component **32** depicted in FIG. **23** is that it does not interfere with, encroach upon, or otherwise obstruct the top surface **1023** of the shelf panel **1024**. As such, the available space on the top surface **1023** is maximized while also providing the "bumper" function.

EXAMPLES

Examples 1-29

Water Retention Testing

The shelves having a hydrophobic spill containment pattern of various embodiments of the present disclosure were tested to determine that amount of water that could be retained on the shelf without failure (i.e. leakage). To accommodate for variations in the area of the shelves, which would affect the volume of liquid retained, the amount of retained water was measured as the height of the water retained in the non-hydrophobic region. Testing was completed by first leveling the shelf using a leveling apparatus. The shelf can be placed over a tray to catch any leakage from the shelf. The test water had a temperature in a range of 32° F. to 50° F. Water was poured slowly so as not to cause "waves" or splashes" onto the geometric center of the non-hydrophobic region. For example, water can be poured onto the shelf using a small funnel. A screw can be inserted into the funnel to baffle the flow, if needed. Water can be introduced into the funnel in about 5 mm or about 10 mm increments. Water volume was measured prior to pouring onto the shelf, using, for example, graduated cylinders. Water was poured onto the shelf at a distance of about 1 mm to about 2 mm above the shelf. The shelf was continually filled with water until overflow just began to occur. The height of the water retained on the shelf was then determined by dividing the volume of water poured onto the shelf just prior to overflow by the area of the non-hydrophobic region.

Shelves having a hydrophobic spill containment pattern formed using the Ferro frit, and a 1% solution of tridecafluoro-1,1,2,2-tetrahydrooctyl trichlorosilane in hexane applied to the frit, were tested in accordance with the above described method. The silane was cured on the frit at a temperature of about 200° F. for about 15 minutes. The spill containment pattern was formed as a border around the perimeter of the glass shelf, at or near the edge of the shelf. The shelves were tested at varying temperatures and humidity conditions. The average water height retention was about 4.43 mm.

| Examples No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Ambient Temperature (° F.) | 78 | 78 | 78 | 78 | 79 | 79 | 79 | 79 |
| Ambient Humidity (%) | 55 | 55 | 55 | 55 | 56 | 56 | 56 | 56 |
| Area of the Nonhydrophobic Region (cm²) | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 |
| Height of Retained Water (mm) | 4.57 | 4.45 | 4.27 | 4.45 | 4.39 | 4.39 | 4.33 | 4.33 |

| Examples No. | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|
| Ambient Temperature (° F.) | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 |
| Ambient Humidity (%) | 55 | 55 | 55 | 55 | 56 | 56 | 56 | 56 |
| Area of the Nonhydrophobic Region (cm²) | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 | 1639.6 |
| Height of Retained Water (mm) | 4.39 | 4.51 | 4.39 | 4.57 | 4.45 | 4.51 | 4.51 | 4.39 |

The following examples are merely intended to illustrate the shelf assemblies of the present disclosure, and are not meant to limit the scope thereof in any way.

Shelves prepared with a hydrophobic spill containment pattern using an acid etch surface treatment and tridecafluoro-1,1,2,2-tetrahydrooctyl trichlorosilane as the hydro-

**34**

US 8,286,561 B2

21

phobic solution were also tested for water height retention. Acid etching was performed using Armour Etch® Glass Etching Cream. Shelves were prepared by etching for about 3 minutes to about 6 minutes. Example 25 was etched twice using an etching time of from 3 to 6 minutes for each etching process. Specifically, a first etching procedure was performed by applying the etching solution to the substrate, allowing it to remain on the substrate for about 3 minutes to about 6 minutes, and washing the etching solution from the surface of the substrate. A second etching procedure was then performed by again applying the etching solution, allowing it to remain on the substrate for about 3 minutes to about 6 minutes, and washing the etching solution from the surface. The fluorosilane was applied and the shelf was baked for about 20 minutes at 200° F.

The shelves were first tested for water height retention shortly after having the hydrophobic spill containment pattern was formed and cooled. The shelves were then retested sometime after the first test. As shown in the data below, in general, the water height retention properties of the shelves improved after the first testing. Without intending to be bound by theory, it is believed that when the spill containment pattern is first contact with water after formation, additionally silicon oxide groups remaining on the surface of silane and/or the surface-modified substrate by hydrolyzed by the water, thereby creating additional bonding sites between the silane and the surface-modified substrate and improving the hydrophobic nature of the spill containment pattern. The average water height of the acid etch samples was about 5.18 mm. The average water height of the acid etched shelves, which were etched for about 3 minutes was about 5.18 mm. The average water height of the acid etched shelves, which were etched for about 4 minutes was about 5.19 mm. The average water height of the acid etched shelves, which were etched for about 5 minutes was about 5.18 mm. The average water height of the acid etched shelves, which were etched for about 6 minutes was about 5.19 mm.

22

Example 30

Abrasion Resistance

The shelves having a hydrophobic spill containment pattern of various embodiments of the present disclosure were tested to determine the ability of the shelf to retain a spill (simulated by water) following repeated abrasion of the hydrophobic treatment. The amount of water retained by the shelf before failure was measured before any abrasions were applied using the method described above and the height of the retained water was calculated. Next, a one quart glass jar was used to make abrasions by placing it on the hydrophobic region and sliding the jar horizontally along the surface of the shelf until the jar has passed over the entire hydrophobic region. The jar was then slide back to its original position, passing over the hydrophobic surface once more. The forward and backward motion of the jar is defined as one jar abrasion cycle. About fifty jar abrasion cycles were performed. The water height retention test was repeated after each fifty abrasion cycles. As shown in FIG. **24**, a shelf having a hydrophobic spill containment pattern formed from a ceramic frit and a hydrophobic compound did not lose effectiveness for retaining water in the non-hydrophobic region of the shelf after 300 abrasion cycles. Shelves having a hydrophobic spill containment pattern formed by acid etching the substrate and applying the hydrophobic compound to the acid etched region showed some loss of effectiveness after 300 abrasion cycles.

Example 31

Resistance to Cleaning

The shelves having a hydrophobic spill containment pattern of various embodiments of the present disclosure were tested to determine the ability of the shelf to retain a spill

| Examples No. | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|
| Etch time (min) | 3 | 3 | 4 | 6 | 3 | 5 | 3 | 4 |
| Area of the Nonhydrophobic Region (cm²) | 982.6 | 982.6 | 982.6 | 982.6 | 982.6 | 982.6 | 982.6 | 982.6 |
| Height of Retained Water (mm) | 5.14 | 5.09 | 4.99 | 5.09 | 4.86 | 5.09 | 5.09 | 5.09 |
| Retested height of retained water (mm) | 5.60 | 5.04 | 5.34 | 5.39 | 5.29 | 5.39 | 5.34 | 5.34 |
| Average | 5.37 | 5.06 | 5.17 | 5.24 | 5.08 | 5.24 | 5.22 | 5.22 |

| Examples No. | 25 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|---|
| Etch time | 2 etching procedures performed | 6 | 5 | 6 | 5 |
| Area of the Nonhydrophobic Region (cm²) | 982.6 | 982.6 | 982.6 | 982.6 | 982.6 |
| Height of Retained Water (mm) | 5.09 | 5.09 | 5.09 | 5.09 | 5.14 |
| Retested height of retained water (mm) | — | 5.14 | 5.09 | 5.34 | 5.29 |
| Average | — | 5.11 | 5.09 | 5.22 | 5.22 |

(water) following repeated cleaning cycles. First the shelves were tested prior to any cleaning treatment to determine a baseline water retention level. Water retention height was tested in accordance with the method described above. Next, five cleaning cycles for each of four cleaning methods were

US 8,286,561 B2

23                                                          24

performed on the glass shelf. A cleaning cycle is defined as five forward and backward motions of the cleaning product/applicator perpendicular to the hydrophobic treatment with a consistent 2 kg load. Four different cleaning methods were performed along portions of the hydrophobic spill containment pattern, including, Windex wiped with a paper towel, Dawn dish soap wiped with a cotton dish cloth, Formula 409 cleaner wiped with a sponge, and Clorox wipes. Each cleaning method was performed on a separate portion of the spill containment pattern. The water height retention test was repeated after each five cleaning cycles.

The Windex/paper towel cleaning method was prepared by saturating a 5 inch square of paper towel with Windex Original formula so that the paper towel was completely wet, but not dripping. The Dawn dish soap/cotton dish cloth method was performed using a solution containing 2 ml of Dawn dish soap in one liter of room temperature water. The cotton dish cloth was then dipped in the solution and applied to the shelf. The Formula 409/sponge method was performed by cutting a sponge into an approximately 1 inch by 1 inch square and saturating the sponge with Formula 409 All Purpose Cleaner. The Clorox wipe method was performed using a Clorox Wipe folded into a 1 inch by 1 inch square. All methods were performed using a 2 kg mass applied to the applicator.

As shown in FIG. 25, a shelf having a hydrophobic pattern formed from a ceramic frit and a hydrophobic compound did not lose effectiveness after 30 cleaning cycles. Shelves having a hydrophobic spill containment pattern formed by acid etching the glass substrate and applying a hydrophobic compound to the etched portion minimally lost effectiveness after 30 cleaning cycles.

Example 32

Stain Resistance

Stain resistance of a shelf having a hydrophobic spill containment pattern in accordance with an embodiment of the present disclosure was tested against a variety of staining agents, including, spaghetti sauce, canned beets, grape juice, yellow mustard, butter, Italian dressing, cherry Kool-Aid, and Soy sauce. Each staining agent was applied to approximately one inch areas of the shelf, including a portion of the hydrophobic spill containment pattern and the non-hydrophobic region, and then allowed to stand for approximately 72 hours. The majority of the dried material was then wiped from the shelf with a paper towel and clean wash cloth containing a mixture of water and Dawn dish soap was used to remove any remnants of the material. As shown in FIGS. 26A and 26B, a shelf having a hydrophobic still containment pattern formed from a ceramic frit and a hydrophobic compound in accordance with an embodiment of the present disclosure was stain resistant to all staining agents.

As earlier described, the hydrophobic surface arranged in a spill containment pattern in accordance with the preferred embodiments provides a spill containment feature which prevents spilled liquids from leaking off of the top surface of the shelf, and shelves in accordance with the preferred embodiments can be used in various applications, such as refrigerator shelves.

It will be apparent to those skilled in the pertinent arts that other embodiments of shelving members in accordance with the invention may be designed. That is, the principles of shelving members in accordance with the disclosure are not limited to the specific embodiments described herein. For example, shelf members or other support surfaces having a hydrophobic spill containment surfaces could be used in various settings, such as shelving in other settings, tables, countertops or the like, and are not limited to use as refrigerator shelves.

Further, it will be apparent to those skilled in the pertinent art that any method which may be used for creating a hydrophobic surface arranged in a spill containment pattern in substantially the same plane as the top surface of the shelf member is within the scope of the disclosure described herein, even if such method requires the use of multiple pieces to manufacture the shelf member. For example, a frame of hydrophobic material may be bonded to the shelf member such that it forms a continuous border which is generally in the same plane as the top surface of the shelf. Accordingly, it will be apparent to those skilled in the art that modifications and other variations of the above-described illustrative embodiments of the disclosure may be effected without departing from the spirit and scope of the novel concepts of the invention.

What is claimed:

**1**. A shelf assembly comprising:
a shelf panel having a generally flat top surface which is capable of supporting articles which may be placed on said shelf panel;
a hydrophobic surface applied in a spill containment pattern on the said top surface;
wherein the majority of the surface area of said top surface of the shelf panel is not hydrophobic, thereby providing one or more non-hydrophobic central portions bounded by said spill containment pattern of said hydrophobic surface.

**2**. The shelf assembly of claim **1**, wherein said spill containment pattern is a continuous border which defines a single non-hydrophobic central portion within said border.

**3**. The shelf assembly of claim **1**, wherein said spill containment pattern is a continuous border located near the perimeter of the top surface of the shelf panel.

**4**. The shelf assembly of claim **1**, wherein said spill containment pattern is located along the perimeter of the top surface of the shelf panel.

**5**. The shelf assembly of claim **1**, wherein said spill containment pattern comprises a first continuous border and a second continuous border spaced from said first continuous border, the first continuous border located along the perimeter of the top surface of the shelf panel, and the second continuous border spaced inwardly from said first continuous border such that the second continuous border completely bounds a non-hydrophobic central portion of the top surface of the shelf panel, and the first and second continuous borders together define between them area a non-hydrophobic ring portion for containing overflow from said non-hydrophobic central portion.

**6**. The shelf assembly of claim **1**, wherein said spill containment pattern is in the form of a grid pattern on the top surface of the shelf panel and wherein said grid pattern defines a plurality of non-hydrophobic central portions on the top surface of the shelf panel, each of the plurality of non-hydrophobic central portions completely bounded by a portion of the grid pattern.

**7**. The shelf assembly of claim **1**, wherein said shelf panel is comprised of a material chosen from the group consisting of glass, plastic, metal and combinations thereof.

**8**. The shelf assembly of claim **1**, wherein the shelf panel is transparent.

**9**. The shelf assembly of claim **8**, wherein the shelf panel is glass.

**10**. The shelf assembly of claim **7**, wherein the hydrophobic surface is transparent.

**36**

US 8,286,561 B2

25

**11.** The shelf assembly of claim **1**, wherein at least some portion of the hydrophobic surface is colored.

**12.** The shelf assembly of claim **11**, wherein the hydrophobic surface contains a colored portion in a form chosen from the group consisting of a pattern, a company name, a company logo and combinations thereof.

**13.** The shelf assembly of claim **1**, wherein the hydrophobic surface comprises:

a ceramic frit layer adjacent to and bonded to the top surface of said shelf panel; and

a hydrophobic compound coated over the ceramic frit layer.

**14.** The shelf assembly of claim **13**, wherein said ceramic frit layer contains additive particles that create roughness in a top surface of the ceramic frit layer.

**15.** The shelf assembly of claim **13**, wherein at least a portion of said ceramic frit layer is colored.

**16.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a hydrophobic coating over a roughened area in the surface of said shelf panel.

**17.** The shelf assembly of claim **16**, wherein said roughened area is made by binding comprises a plurality of particles bound to the surface of the shelf panel.

**18.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a coating of hydrophobic particles on the surface of said shelf panel.

**19.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a hydrophobic compound applied over or within the matrix of a cured sol gel composition.

**20.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a metal oxide primer with an integrated hydrophobic compound.

**21.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a hydrophobic coating applied over a metal oxide primer.

**22.** The shelf assembly of claim **1**, wherein said hydrophobic surface comprises a hydrophobic compound comprising a variety of molecular chain lengths to create a coating with surface irregularities.

**23.** The shelf assembly of claim **1**, wherein the hydrophobic surface arranged in the spill containment pattern has a thickness in the range of approximately—0.001 microns to approximately 250 microns.

**24.** The shelf assembly of claim **1**, wherein the hydrophobic surface comprises a hydrophobic compound selected from the group consisting of fluorocarbons, fluoroalkyl silanes, fluoroalkoxy silanes, fluoroalkyl alkyl silanes, and combinations thereof.

**25.** A method of manufacturing a shelf capable of containing liquid spills thereon comprising:

providing a panel having a generally flat top surface which is capable of supporting articles which may be placed on said panel;

applying a hydrophobic surface arranged in a spill containment pattern generally in the plane of said top surface;

leaving the majority of the surface area of said top surface of the panel non-hydrophobic, thereby providing one or more non-hydrophobic central portions bounded by the spill containment pattern of the hydrophobic surface.

**26.** The method of claim **25**, wherein applying a hydrophobic surface comprises:

applying a ceramic frit to the top surface of the panel in a spill containment pattern;

curing the ceramic frit to couple the ceramic frit to the top surface of the panel;

applying a hydrophobic compound to the cured ceramic frit; and

26

curing the hydrophobic compound.

**27.** The method of claim **26**, wherein curing the ceramic frit comprises heating the ceramic frit to a temperature in a range of about 1000° F. to about 1400° F.

**28.** The method of claim **26**, wherein curing the hydrophobic compound comprises heating the hydrophobic compound to a temperature in a range of about 100° F. to about 600° F.

**29.** The method of claim **26**, wherein curing the hydrophobic compound comprises exposing the hydrophobic compound to ambient temperature.

**30.** The method of claim **26**, wherein applying the hydrophobic compound comprises applying a hydrophobic solution comprising the hydrophobic compound dispersed or dissolved in a solvent to the cured ceramic frit.

**31.** The method of claim **26**, further comprising etching the cured ceramic frit with an etching solution prior to applying the hydrophobic compound to the cured ceramic frit.

**32.** The method of claim **26**, further comprising etching the entire panel including the cured ceramic frit prior to applying the hydrophobic compound to the cured ceramic frit.

**33.** A shelf assembly, comprising:

a generally flat shelf panel having a top surface and a bottom surface, the top surface capable of supporting articles;

a hydrophobic surface applied in a spill containment pattern generally in the plane of said top surface;

at least one non-hydrophobic central portion completed completely bounded by the spill containment pattern for containing liquids on the top surface of the shelf panel; and

at least one support bracket attached to the bottom surface of the shelf panel such that the top surface of the shelf panel is completely free from intrusion or other obstruction, thereby maximizing the available shelf space on the top surface of the shelf panel.

**34.** A shelf assembly, comprising:

a generally flat shelf panel having a top surface and a bottom surface, the top surface capable of supporting articles;

a hydrophobic surface applied in a spill containment pattern generally in the plane of said top surface;

at least one non-hydrophobic central portion completed completely bounded by the spill containment pattern for containing liquids on the top surface of the shelf panel; and

at least one support bracket attached only to the bottom surface of the shelf panel such that the top surface of the shelf panel is completely free from intrusion or other obstruction, thereby maximizing the available shelf space on the top surface of the shelf panel.

**35.** The shelf assembly of claim **33**, further comprising an adhesive material disposed between the support bracket and bottom surface of the shelf panel thereby attaching the support bracket to the shelf panel.

**36.** The shelf assembly of claim **35**, wherein the adhesive material comprises a clear adhesive material.

**37.** The shelf assembly of claim **33**, wherein the at least one support bracket includes a pair of support brackets, each of which is adhered to the bottom surface of the shelf panel.

**38.** The shelf assembly of claim **33**, wherein the at least one support bracket is disposed entirely below the top surface of the shelf panel.

**39.** The shelf assembly of claim **33**, wherein the at least one support bracket is disposed entirely opposite the shelf panel from the top surface of the shelf panel.

**40.** The shelf assembly claim **33**, wherein the at least one support bracket includes a top surface and the adhesive mate-

**37**

US 8,286,561 B2

27

28

rial is disposed between the top surface of the support bracket and the bottom surface of the shelf panel.

**41**. The shelf assembly of claim **40**, wherein the top surface of the support bracket defines a channel receiving the adhesive material.

**42**. The shelf assembly of claim **33**, wherein the at least one support bracket includes a generally L-shaped cross-section.

**43**. The shelf assembly of claim **33**, wherein said spill containment pattern is a continuous border which defines a single non-hydrophobic central portion within said border.

**44**. The shelf assembly of claim **33**, wherein said spill containment pattern is a continuous border located near the perimeter of the top surface of the shelf panel.

**45**. The shelf assembly of claim **33**, wherein said spill containment pattern is located along the perimeter of the top surface of the shelf panel.

**46**. The shelf assembly of claim **33**, wherein said spill containment pattern comprises a first continuous border and a second continuous border spaced from said first continuous border, the first continuous border located along the perimeter of the top surface of the shelf panel, and the second continuous border spaced inwardly from said first continuous border such that the second continuous border completely bounds a non-hydrophobic central portion of the top surface of the shelf panel, and the first and second continuous borders together define between them area non-hydrophobic ring portion for containing overflow from said non-hydrophobic central portion.

**47**. The shelf assembly of claim **33**, wherein said spill containment pattern is in the form of a grid pattern on the top surface of the shelf panel and wherein said grid pattern defines a plurality of non-hydrophobic central portion on the top surface of the shelf panel, each of the plurality of non-hydrophobic central portions completely bounded by a portion of the grid pattern.

**48**. The shelf assembly of claim **33**, wherein said shelf panel is comprised of a material chosen from the group consisting of glass, plastic, metal and combinations thereof.

**49**. The shelf assembly of claim **33**, wherein the shelf panel is transparent.

**50**. The shelf assembly of claim **33**, wherein the shelf panel is glass.

**51**. The shelf assembly of claim **33**, wherein the hydrophobic surface is transparent.

**52**. The shelf assembly of claim **33**, wherein at least some portion of the hydrophobic surface is colored.

**53**. The shelf assembly of claim **33**, wherein the hydrophobic surface contains a colored portion in a form chosen from the group consisting of a pattern, a company name, a company logo and combinations thereof.

**54**. The shelf assembly of claim **33**, wherein the hydrophobic surface comprises:

a ceramic frit layer adjacent to the top surface of said shelf panel; and

a hydrophobic compound coated over the ceramic frit layer.

**55**. The shelf assembly of claim **54**, wherein said ceramic frit layer contains additive particles that create roughness in a top surface of the ceramic frit layer.

**56**. The shelf assembly of claim **54**, wherein at least a portion of said ceramic frit layer is colored.

**57**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a hydrophobic coating over a roughened area in the surface of said shelf panel.

**58**. The shelf assembly of claim **57**, wherein said roughened area is made by binding comprises as plurality of particles bound to surface of the shelf panel.

**59**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a coating of hydrophobic particles on the surface of said shelf panel.

**60**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a hydrophobic compound applied over or within the matrix of a cured sol gel composition.

**61**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a metal oxide primer with an integrated hydrophobic compound.

**62**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a hydrophobic coating applied over a metal oxide primer.

**63**. The shelf assembly of claim **33**, wherein said hydrophobic surface comprises a hydrophobic compound comprising a variety of molecular chain lengths to create a coating with surface irregularities.

**64**. The shelf assembly of claim **33**, wherein the hydrophobic surface arranged in the spill containment pattern has a thickness in the range of approximately 0.001 microns to approximately 250 microns.

\*    \*    \*    \*    \*

**38**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,286,561 B2                                          Page 1 of 1
APPLICATION NO.  : 12/562920
DATED                   : October 16, 2012
INVENTOR(S)        : John P. Driver et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, at column 24, line 25, "on the said top surface" should be -- on said top surface --.

In claim 5, at column 24, line 49, "between them area a non-hydrophobic ring" should be -- between them a non-hydrophobic ring --.

In claim 17, at column 25, line 22, "area is made by binding comprises" should be -- area comprises --.

In claim 33, at column 26, lines 27-28, "central portion completed completely bounded" should be -- central portion completely bounded --.

In claim 34, at column 26, lines 42-43, "central portion completed completely bounded" should be -- central portion completely bounded --.

In claim 40, at column 26, line 66, "The self assembly claim 33" should be -- The shelf assembly of claim 33 --.

In claim 46, at column 27, line 26, "between them area non-hydrophobic ring" should be -- between them a non-hydrophobic ring --.

In claim 47, at column 27, line 32, "a plurality of non-hydrophobic central portion" should be -- a plurality of non-hydrophobic central portions --.

In claim 58, at column 28, lines 21-23, "roughened area is made by binding comprises as plurality of particles bound to surface" should be -- roughened area comprises a plurality of particles bound to the surface --.

Signed and Sealed this
Thirteenth Day of November, 2012

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

# CERTIFICATE OF SERVICE

I hereby certify that, on this the 21st day of January 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all counsel of record.

I further certify that pursuant to Fed. R. App. P. 25(a)(2)(D) and 25(c), Federal Circuit Rule 25(a), and ECF-10(B) of the Court's Administrative Order Regarding Electronic Case Filing, dated May 17, 2012, I shall cause six paper copies of the foregoing brief to be filed at the address provided below within five days of the Court's acceptance of the foregoing brief in the CM/ECF System:

> Office of the Clerk
> United States Court of Appeals for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

> /s/ Marshall J. Schmitt
> Marshall J. Schmitt
> Attorney for Appellant
> SCHOTT Gemtron Corporation

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

Pursuant to Federal Rule of Appellate Procedure 32, I certify that

the attached APPELLANT'S OPENING BRIEF uses a proportionally

spaced 14-point typeface in compliance with Fed. R. App. P. 32(a)(5),

and contains no more than 13,900 words, in compliance with Fed. R.

App. P. 32(a)(7)(B)(i) and Federal Circuit Rule 32(b).


/s/ Marshall J. Schmitt
Marshall J. Schmitt
Attorney for Appellant
SCHOTT Gemtron Corporation